**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| SIERRA CLUB, VOTE SOLAR, 350 COLORADO, and ENVIRONMENTAL DEFENSE FUND,<br><br>Petitioners<br><br>v.<br><br>U.S. DEPARTMENT OF ENERGY, and CHRIS WRIGHT, in his official capacity as Secretary of Energy,<br><br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 26-1273 |

**PETITION FOR REVIEW**

Sierra Club, Vote Solar, 350 Colorado, and Environmental Defense Fund (collectively, "Public Interest Organizations") petition the Court for review of the Department of Energy's and Secretary of Energy Christopher Wright's (collectively, "DOE") Order No. 202-26-31 dated June 26, 2026 (the "Order") (Exhibit A), DOE's denial by inaction of Public Interest Organizations' request for rehearing of the Order, and any amendment, modification, or renewal of that Order. Public Interest Organizations petition under section 313 of the Federal Power Act, 16 U.S.C. § 825*l*(b), and section 502 of the DOE Organization Act of 1977, 42 U.S.C. § 7192(a), along with Federal Rule of Appellate Procedure 15(a) and D.C. Circuit Rule 15(a). On July 24, 2026, Public Interest Organizations timely moved to intervene and sought rehearing of the Order (Exhibit B).

The prerequisites for judicial review of this petition have been met. On August 24, 2026, DOE issued a Notice of Denial of Rehearing by Operation of Law. *See* DOE, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration (Exhibit C); *see also* 16 U.S.C. § 825*l*(a)–(b). Public Interest Organizations' petition is filed within sixty days after the denial of rehearing. *Id.* § 825*l*(b). This Court has subject matter jurisdiction, Public Interest Organizations are parties aggrieved by the Order, and venue is proper. *Id.* § 825*l*(a)–(b).

Dated October 2, 2026

Respectfully Submitted,

*/s/ Jennifer Yun*
Jennifer Yun (DC Cir. 66550)
Michael Lenoff (DC Cir. 66374)
1250 I St. NW, Fourth Floor
Washington, DC 20005
(202) 667-4500
jyun@earthjustice.org
mlenoff@earthjustice.org

*Counsel for Vote Solar and 350 Colorado*

*/s/ Gregory E. Wannier*
Gregory E. Wannier (DC Cir. 55920)
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org

*Counsel for Sierra Club*

*/s/ Tomás Carbonell*
Tomás Carbonell (DC Cir. 54320)
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(202) 387-3500
tcarbonell@edf.org

*Counsel for Environmental Defense Fund*

## RULE 26.1 DISCLOSURE STATEMENTS

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

Vote Solar states that it is a non-profit environmental organization. Petitioner Vote Solar does not have any parent corporation, and no publicly held corporation owns 10% or more of its stock.

350 Colorado states that it is a non-profit environmental organization. Petitioner 350 Colorado does not have any parent corporation, and no publicly held corporation owns 10% or more of its stock.

Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment. Sierra Club has no parent companies, and no publicly held company has a 10% or greater ownership interest in Sierra Club.

Environmental Defense Fund states that it is a 501(c)(3) non-profit environmental organization dedicated to finding practical solutions to critical environmental problems through the use of law, policy, science, and economics. Environmental Defense Fund has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

[continued for signatures]

Respectfully Submitted,


*/s/ Jennifer Yun*
Jennifer Yun (DC Cir. 66550)
Michael Lenoff (DC Cir. 66374)
1250 I St. NW, Fourth Floor
Washington, DC 20005
(202) 667-4500
jyun@earthjustice.org
mlenoff@earthjustice.org

*Counsel for Vote Solar and 350 Colorado*

*/s/ Gregory E. Wannier*
Gregory E. Wannier (DC Cir. 55920)
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org

*Counsel for Sierra Club*

*/s/ Tomás Carbonell*
Tomás Carbonell (DC Cir. 54320)
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(202) 387-3500
tcarbonell@edf.org

*Counsel for Environmental Defense Fund*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing **Petition for Review** and **Rule 26.1 Disclosure Statements** and all attachments with the Clerk of the Court using the Court's CM/ECF system.

I further certify that I have on this 2nd day of October, 2026, caused copies of the foregoing to be served via certified priority mail, return receipt requested, on:

Chris Wright
Secretary, U.S. Department of Energy
1000 Independence Ave., SW
Washington, DC 20585

Todd Blanche
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Jonathan Brightbill
General Counsel
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., SW
Washington, D.C. 20585

I also caused copies to be sent via electronic mail to AskCR@hq.doe.gov and The.Secretary@hq.doe.gov.

I have also served a copy of the foregoing on all parties to the proceeding before the DOE via electronic mail:

Carrie Noteboom
Assistant Deputy Attorney General
Gabrielle Falcon
Assistant Attorney General
Wendy Rosati
Assistant Attorney General
Robyn L. Wille
First Assistant Attorney General
Jessica L. Lowrey
First Assistant Attorney General
Sarah F. Quigley
Assistant Attorney General
Phalen Kohlruss-Reuman
Assistant Attorney General
Patrick Witterschein
Assistant Attorney General

1300 Broadway, 10th Floor
Denver, CO 80203
carrie.noteboom@coag.gov
gabby.falcon@coag.gov
robyn.wille@coag.gov
jessica.lowrey@coag.gov
sarah.quigley@coag.gov
Phalen.Kohlruss@coag.gov
Patrick.Witterschein@coag.gov

*Counsel for State of Colorado*

Jennifer Quinn-Barabanov
Michelle S. Kallen
David Marcou
Alexander Langer
Micaela Hyams
Steptoe LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
jquinnba@steptoe.com
mkallen@steptoe.com
dmarcou@steptoe.com
alanger@steptoe.com
mhyams@steptoe.com

*Attorneys for Tri-State Generation and Transmission Association, Inc.*

Jennifer Hammitt,
Director of Legal Affairs
Sarah Leonard,
General Counsel

2000 E. Horsetooth Road
Fort Collins, CO 80526
hammittj@prpa.org
leonards@prpa.org

*Attorneys for Platte River Power Authority*

Dated: October 2, 2026

Respectfully submitted,

*/s/ Jennifer Yun*
Jennifer Yun

# Exhibit A

**Department of Energy**
Washington, DC 20585

Tri-State Generation and Transmission Association, Platte River Power Authority, Salt River Project, PacifiCorp, and Public Service Company of Colorado, and Southwest Power Pool
Regarding Craig Station

Order No. 202-26-31

Pursuant to the authority vested in the Secretary of Energy by section 202(c) of the Federal Power Act (FPA),[1] and section 301(b) of the Department of Energy (DOE or the Department) Organization Act,[2] and for the reasons set forth below, I hereby determine that an emergency exists within the Western Electricity Coordinating Council (WECC)–Rocky Mountain[3] assessment area due to a shortage of electric energy, a shortage of facilities for the generation of electricity, and other causes. Issuance of this Order will meet the emergency and serve the public interest.

## *BACKGROUND*

Craig Station (Craig) is an electric generating facility in Craig, Colorado. Craig is operated by the Tri-State Generation and Transmission Association (Tri-State). Craig consists of three coal-fired generation units, Unit 1 (446.4 MW), Unit 2 (446.4 MW), and Unit 3 (534.8 MW), with a combined name plate capacity of 1427.6 MW.[4] Unit 1 and Unit 2 are co-owned by Tri-State, Platte River Power Authority, Salt River Project, PacifiCorp, and Public Service Company of Colorado (a subsidiary of Xcel Energy), hereinafter collectively referred to as the co-owners.[5] Unit 3 is wholly owned by Tri-State. Unit 1 and Unit 2 began operations in 1980 and 1979, respectively. Unit 3 began operations in 1984. Unit 1 was slated to cease operations in December 2025. Unit 2 and Unit 3 are slated to retire in 2028.[6]

---

[1] 16 U.S.C. § 824a(c).

[2] 42 U.S.C. § 7151(b).

[3] The 2024 Long-Term Reliability Assessment (LTRA) from the North American Electric Reliability Corporation (NERC) included Colorado in the WECC–Northwest assessment area. The 2025 LTRA provides new assessment area boundaries for WECC to provide more geographic detail of reliability risk information and to, "reflect a more accurate alignment with operational and planning realities, as well as the footprints of various entities." In the 2025 LTRA, Colorado is included in the WECC–Rocky Mountain assessment region.

[4] U.S. Energy Info. Admin., *Form EIA-860, Schedule 3: Generator Data* (2024), https://www.eia.gov/electricity/data/eia860/.

[5] Platte River Power Authority, Craig Units 1 & 2 (Yampa Project), https://prpa.org/generation/yampa-project/.

[6] It likely would be difficult for the coal-fired unit to resume operations once retired. Specifically, practical issues, such as acquiring employment, contracts, and

Order Nos. 202-25-14 and 202-26-21, issued pursuant to FPA section 202(c) on December 30, 2025, and March 30, 2026, respectively, each required that Craig Unit 1 continue to be available to operate for 90 days, until March 30, 2026, and June 28, 2026, respectively. Those orders were based on my determination that emergency conditions existed within the WECC–Northwest and WECC–Rocky Mountain assessment areas.

Specifically, I determined that the WECC–Northwest and, later, WECC–Rocky Mountain, assessment areas faced significant amount of retiring baseload generation resources and concerns meeting demand during shoulder periods.[7] I determined that the continued operation of Craig Unit 1 would provide additional generation capacity, which would help prevent the loss of power to homes and businesses that would otherwise pose a risk to public health and safety.[8] I determined that the continued operation of Craig Unit 1 was necessary to alleviate immediate and anticipated threats to reliability.[9]

My determination was based on several facts. First, in its 2024 Long-Term Reliability Assessment (LTRA), the North American Electric Reliability Corporation (NERC) notes that in the WECC–Northwest assessment area, which included Colorado, Idaho, Montana, Oregon, Utah, Washington, and Wyoming, "[e]nergy variability is greater in the Northwest than other WECC regions due to the large share of wind and hydro in the portfolio." The 2024 LTRA notes that:

> Five [gigawatts (GW)] of baseload resource retirements are anticipated between 2024 and 2028. The energy needs are to be replaced by solar, wind, and [battery energy storage systems], further increasing variability in the portfolio. Given the retiring of baseload resources, supply chain issues preventing the construction of [battery energy storage systems]

---

permits, may greatly increase the timeline for resumption of operations, such that the facility may not be available in the period needed. Moreover, if the co-owners were to begin disassembling the unit or other related facilities, the associated challenges would be greatly exacerbated. The costs and time of decommissioning a coal plant are extensive, and restarting such decommissioned plants would presumably cost the same as decommissioning in dollars and time, if not more. Thus, continuous operation is required in such cases so long as the Secretary determines a shortage exists and is likely to persist. *See* Jennifer Lessick et al., *Bus. Models for Coal Plant Decommissioning*, at 9–12 (Aug. 2021), https://www.pnnl.gov/main/publications/external/technical_reports/PNNL-31348.pdf.

[7] *See*, *e.g.*, *Tri-State Generation & Transmission Ass'n*, DOE Order No. 202-25-14, at 1–2 (Dec. 30, 2025) (*Tri-State*).

[8] *See id.* at 1–3.

[9] *See id.* at 3.

> resources are a concern as they assist in meeting demand during shoulder periods where solar availability is dropping but loads remain high.[10]

Second, the 2024 WECC Western Assessment of Resource Adequacy notes that peak demand in WECC's Northwest-Central subregion, which included Colorado at the time, is "forecast to grow by 8.5% over the next decade, from 33 GW in 2025 to 36 GW in 2034."[11] Meanwhile, WECC notes that most planned retirements are "baseload generation, such as coal, natural gas, and nuclear."[12]

Further, in January 2026, NERC released its 2025 Long-Term Reliability Assessment.[13] While NERC assessed that the WECC–Rocky Mountain region, which includes Colorado, is at normal risk of energy shortfalls over the next five years,[14] the area has an "[anticipated reserve margin] that falls below the [Reference Margin Level] in Summer 2034 and 2035, and Winter 2034–35."[15] The LTRA also notes that the WECC–Rocky Mountain assessment area faces challenges from an aging thermal resource fleet, which can lead to unplanned outages, exacerbated by supply chain issues, and vendor availability.[16] Additionally, both solar and wind variability are year-round concerns, and while the region is pursuing advancement into Regional Transmission Organizations (RTO) to leverage a wider footprint, smaller entities currently have limited geographic diversity to counteract these generation constraints.[17]

## *CONTINUING EMERGENCY CONDITIONS*

The emergency conditions that necessitated the issuance of Order Nos. 202-25-14 and 202-26-21 continue, both in the near and long term.[18] The production of electricity from Craig Unit 1 continues to be critical to maintain reliability in the WECC–Rocky Mountain assessment area.

The 2025 WECC Western Assessment of Resource Adequacy notes that "the West's planned resource buildout will not keep up with anticipated load growth over the

---

[10] N. Am. Elec. Reliability Corp., *2024 Long-Term Reliability Assessment*, at 13 (Dec. 2024, corrected July 11, 2025), https://www.nerc.com/globalassets/our-work/assessments/nerc_ltra_2025.pdf.

[11] WECC, *W. Assessment of Res. Adequacy 2024: Peak Demand by Subregion*, at 2, https://www.wecc.org/wecc-document/17066.

[12] WECC, *W. Assessment of Res. Adequacy 2024* , https://feature.wecc.org/wara/.

[13] NERC, *2025 Long-Term Reliability Assessment* (Jan. 2026), https://www.nerc.com/globalassets/our-work/assessments/nerc_ltra_2025.pdf.

[14] *See id.* at 7.

[15] *Id.* at 160–61.

[16] *See id.* at 161.

[17] *Id.*

[18] Further, as noted in *Tri-State*, as a coal-fired facility, it would be difficult for Craig Unit 1 to resume operations once it has been retired. *See Tri-State*, DOE Order No. 202-25-14 at 1.

next decade, particularly in the Basin and Northwest subregions. The West could see energy shortfalls as early as 2028."[19] The assessment goes on to say that "[i]f resources are added as planned, loss of load may be limited to the Basin and Northwest subregions. However, if planned resource additions are delayed or cancelled, other subregions could also be at risk."[20] Further, the assessment highlights that 90% of planned resources over the next decade are inverter-based resources, which "continue the rapid evolution of the resource mix away from traditional dispatchable resources to more weather-dependent resources."[21] The assessment notes that "entities plan to retire 22 GW of generation over the next 10 years. The vast majority is baseload generation such as coal (7 GW), natural gas (8 GW), and nuclear (2.3 GW, Diablo Canyon's two units, in 2029 and 2030)."[22]

Between 2019 and 2024, the retirement of coal-fired generating capacity in Colorado has led to a decline in the share of coal-generated electricity from 45% to 25%.[23] Looking forward, by 2029, about 3,700 megawatts (MW) of coal-fired generating capacity in Colorado is scheduled to retire according to the Energy Information Administration,[24] accounting for all but one coal-fired power plant in Colorado. In that same time frame, 620 MW of natural gas-fired generating capacity in Colorado will retire as well.[25] In 2025, intermittent wind accounted for over 5,300 MW of Colorado's electricity generating capacity.[26] Additionally, Colorado Public Utilities Commissioners have expressed concerns about the ability of certain utilities to meet projected summer 2026 loads.[27]

Finally, in May 2026, NERC released its 2026 Summer Reliability Assessment. According to NERC, Anticipated Reserve Margins will remain above the Reference Margin Level, they note that "wildfires in the region, along with extreme heat conditions

---

[19] WECC, *W. Assessment of Res. Adequacy* (2025), https://feature.wecc.org/2025wara/index.html.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] U.S. Energy Info. Admin. (EIA), *Elec. Data Browser, Net Generation for All Sectors Annually from 2019-2025, State: Colorado*, https://www.eia.gov/electricity/data/browser/#/topic/0?agg=2,0,1&fuel=vtvp&geo=0000000000g&sec=g&freq=A&start=2019&end=2024&ctype=linechart&ltype=pin&rtype=s&pin=&rse=0&maptype=0.

[24] EIA, *Preliminary Monthly Elec. Generator Inventory (based on Form EIA-860M as a supplement to Form EIA-860)* (Jan. 2026), https://www.eia.gov/electricity/data/eia860m/ (choose "January 2026" XLS document under "2026" column, titled "Inventory of Operating Generators as of Jan. 2026").

[25] *Id.*

[26] *Id.*

[27] *Comanche 3 Repair Delay Raises RA Concerns in Colo.*, RTO INSIDER (Mar. 26, 2026), https://www.rtoinsider.com/129021-comanche-3-repair-delay-raises-ra-concerns-in-colorado/.

for the summer, pose the greatest reliability risk scenario for the Rocky Mountains . . . [which] can impact rural communities disproportionately."[28]

Order Nos. 202-25-14 and 202-26-21 were preceded by executive orders on January 20, 2025, and April 8, 2025, in which President Donald J. Trump underscored the dire energy challenges facing the Nation due to growing resource adequacy concerns. President Trump declared a national energy emergency in Executive Order No. 14156, "Declaring a National Energy Emergency," in which he determined that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[29] The Executive Order adds, "hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets."[30] In the subsequent Executive Order No. 14262, "Strengthening the Reliability and Security of the United States Electric Grid," President Trump emphasized that "the United States is experiencing an unprecedented surge in electricity demand driven by rapid technological advancements, including the expansion of artificial intelligence data centers and increase in domestic manufacturing."[31]

In addition, President Trump issued a White House Memo for the Secretary of Energy that emphasized the findings of Executive Order No. 14156, stating that "ensuring reliable coal supply chains and baseload power generation capacity is essential to the United States national defense… Without sufficient coal-fired baseload power, the United States will lack the stable electricity required to support defense installations, industrial expansion, and the high-energy demands of emerging technologies, such as artificial intelligence."[32] The President "further determine[d] that action to expand coal supply chain capacity and baseload generation availability is necessary to avert an

---

[28] NERC, *2026 Summer Reliability Assessment*, at 37, https://www.nerc.com/globalassets/our-work/assessments/nerc_sra_2026.pdf.

[29] Exec. Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/declaring-a-national-energy-emergency/ (*Declaring a National Energy Emergency*).

[30] *Id*.

[31] Exec. Order No. 14262, 90 Fed. Reg. 15521 (Apr. 8, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/strengthening-the-reliability-and-security-of-the-united-states-electric-grid/ (*Strengthening the Reliability and Security of the United States Electric Grid*).

[32] Memorandum from President Donald J. Trump to the Secretary of Energy (Apr. 20, 2026) ("Presidential Determination Pursuant to Section 303 of the Defense Production Act of 1950, as Amended, on Coal Supply Chains and Baseload Power Generation Capacity"), https://www.whitehouse.gov/presidential-actions/2026/04/presidential-determination-pursuant-to-section-303-of-the-defense-production-act-of-1950-as-amended-on-coal-supply-chains-and-baseload-power-generation-capacity/.

industrial resource or critical technology item shortfall that would severely impair national defense capability."[33]

Further, the Department of Energy detailed the myriad challenges affecting the Nation's energy systems in its July 2025 "Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid," issued pursuant to the President's directive in Executive Order No. 14262. The Department concluded that "[a]bsent decisive intervention, the Nation's power grid will be unable to meet projected demand for manufacturing, re-industrialization, and data centers driving artificial intelligence (AI) innovation."[34]

## *ORDER*

FPA section 202(c)(1) provides that whenever the Secretary of Energy determines "that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy," the Secretary has the authority "to require by order . . . such generation, delivery, interchange, or transmission of electric energy as in [his] judgment will best meet the emergency and serve the public interest."[35] This statutory language constitutes a specific grant of authority to the Secretary to require the operation of Craig Unit 1 when the Secretary has determined that such operation will best meet an emergency caused by a sudden increase in the demand for electric energy or a shortage of generation capacity, or a shortage of electric energy or facilities for generation or transmission of electric energy.

As described above, the emergency conditions resulting from increasing demand and shortage from premature retirement of the generation facility will continue in the near term and are also likely to continue in subsequent years. This could lead to the loss of power to homes and businesses in the areas that may be affected by curtailments or power outages, presenting a risk to public health and safety.

I have determined that, to best meet the emergency arising from increased demand, determined shortage, and other causes, and serve the public interest under FPA section 202(c), Craig Unit 1 shall be made available for operation through September 26, 2026.

---

[33] *Id.*

[34] DOE, *Res. Adequacy Rep.: Evaluating the Reliability & Sec. of the U. S. Elec. Grid*, at 1 (July 2025), https://www.energy.gov/sites/default/files/2025-11/DOE%20Final%20EO%20Report%20%28REVISED%20OCT%2027%29.pdf.

[35] Although the text of FPA section 202(c) grants this authority to "the Commission," section 301(b) of the Department of Energy Organization Act transferred this authority to the Secretary of the Department of Energy. *See* 42 U.S.C. § 7151(b).

Based on my determination of an emergency set forth above, I hereby order:

A. From June 29, 2026, at the direction of the Southwest Power Pool (SPP) in its role as Balancing Authority and Reliability Coordinator, Tri-State and the co-owners shall take all measures necessary to ensure that Craig Unit 1 is available to operate. For the duration of this Order, SPP is directed to take every step to employ economic dispatch of Craig Unit 1 to minimize costs to ratepayers. Following the conclusion of this Order, sufficient time for orderly ramp down is permitted, consistent with industry practices. Tri-State and the co-owners are directed to comply with all orders from SPP related to the availability and dispatch of Craig Unit 1.

B. To minimize adverse environmental impacts, this Order limits operation of Craig Unit 1 to the times and within the parameters established in paragraph A. Tri-State shall provide a daily notification to the Department (via AskCR@hq.doe.gov) reporting whether Craig Unit 1 has operated in compliance with this Order.

C. All operations of Craig Unit 1 must comply with applicable environmental requirements, including but not limited to monitoring, reporting, and recordkeeping requirements, to the maximum extent feasible while operating consistent with the emergency conditions. This Order does not provide relief from any obligation to pay fees, or purchase offsets or allowances for emissions that occur during the emergency conditions, or to use other geographic or temporal flexibilities available to generators.

D. By July 14, 2026, Tri-State, in coordination with the co-owners, are directed to provide the Department of Energy (via AskCR@hq.doe.gov) with information concerning the measures it has taken and is planning to take to ensure the operational availability of Craig Unit 1 consistent with this Order. SPP, Tri-State and the co-owners shall also provide such additional information regarding the environmental and operational impacts of this Order and its compliance with the conditions of this Order, as requested by the Department of Energy from time to time.

E. Tri-State and the co-owners are directed to file with the Federal Energy Regulatory Commission any tariff revisions or waivers to effectuate this Order, as needed. Rate recovery is available pursuant to 16 U.S.C. § 824a(c).

F. This Order shall not preclude the need for Craig Unit 1 to comply with applicable state, local, or Federal law or regulations following the expiration of this Order.

G. Because this Order is predicated on the shortage of facilities for generation of electric energy and other causes, Craig Unit 1 shall not be considered a capacity resource.

H. This Order shall be effective from June 29, 2026, through September 26, 2026, with the exception of applicable compliance obligations in paragraph D.

Issued in Washington, D.C. on this 26th day of June 2026.

Chris Wright
Secretary of Energy

cc: **FERC Commissioners**
Chairman Laura V. Swett
Commissioner David Rosner
Commissioner Lindsay S. See
Commissioner Judy W. Chang
Commissioner David A. LaCerte

**Colorado Public Utilities Commission**
Chairman Eric Blank
Commissioner Megan Gilman
Commissioner Tom Plant

# Exhibit B

BEFORE THE UNITED STATES DEPARTMENT OF ENERGY

| | |
|---|---|
| Federal Power Act Section 202(c) Emergency Order: Tri-State Generation and Transmission Association, Platte River Power Authority, Salt River Project, PacifiCorp, and Xcel Energy | Order No. 202-26-31 |

Motion to Intervene and Request for Rehearing and Stay of
Sierra Club, Vote Solar, 350 Colorado, Public Citizen, and Environmental Defense Fund (collectively, "Public Interest Organizations")


**I. INTRODUCTION ........................................ 3**

**II. STATEMENT OF ISSUES AND SPECIFICATION OF ERROR ........ 5**

**III. INTERVENORS' INTERESTS ........................... 7**

**IV. BACKGROUND ........................................ 10**

*A. The Primary Actors in the Electric Industry Already Protect Resource Adequacy Without Intrusion from the Department. ........ 10*

1. The Federal Energy Regulatory Commission Regulates Wholesale Electricity Markets and Mechanisms to Acquire Adequate Resources. .... 10
2. NERC Protects Reliability via Standards and Regular Assessments. ...... 13
3. The Utilities that Own and Operate Craig Protect Reliability and Resource Adequacy in Their Service Territories. ........ 14
4. State and Regional Regulatory Bodies Protect Resource Adequacy Through Integrated Resource Planning and Annual Capacity Demonstration Requirements. ........ 18

*B. Craig's Retirement Was Planned for a Decade by Utilities and State Regulators. ........ 22*

1. Craig Is a Power Plant in Colorado Originally Built in 1980. ........ 22
2. Tri-State Operates and Partially Owns Craig. ........ 24
3. Craig Is Old, Unreliable, Inflexible, Dirty, and Expensive. ........ 24

**V. REQUEST FOR REHEARING ........................ 28**

*A. The Order Addresses Circumstances Beyond the Lawful Scope of an Emergency Under Section 202(c) and Fails to Provide Evidence or Reasoned Decision-Making Substantiating the Existence of an Emergency under Section 202(c). ........ 31*

1. Legal Framework: Section 202(c) Empowers the Department to Respond Only to Imminent Concerns. ........ 32

2. The Order Primarily Focuses on Long-Term Bulk-System Reliability and Coal Plant Retirements, Neither of Which Is an Emergency Under Section 202(c), and Separately the Claimed "Long-Term" Emergency Is Unreasoned and Not Based on Substantial Evidence............................... 39
3. The Described Concerns Are Insufficiently Specific and Certain to Meet the Statutory Definition of an Emergency................................................ 56
4. The Sources Cited in the Order Do Not Support the Existence of a Near-Term Emergency......................................................................... 57
5. Many Sources Not Cited in the Order Undercut the Claimed Near-Term and Long-Term Emergency.................................................................... 62

*B. The Order Fails to Best Meet the Claimed Emergency and Serve the Public Interest.* ........................................................................................... *69*

1. Legal Framework: Section 202(c)(1) Authorizes the Department to Require Only Generation that Best Meets the Emergency and Serves the Public Interest. ........................................................................ 70
2. The Order Fails to Provide a Reasoned Basis for Requiring Economic Dispatch to Meet the Emergency. ............................................................ 71
3. The Order Fails to Address Craig's Shortcomings. ................................... 73
4. The Order Fails to Address or Reflect Consideration of Alternatives....... 77

*C. The Order Exceeds Other Limits on the Department's Authority.* .................. *79*

1. The Department Lacks Jurisdiction to Impose the Availability Requirements. ........................................................................................ 79
2. The Department Lacks Jurisdiction to Disallow Treatment of Craig as a Capacity Resource. ................................................................................ 81

*D. The Order Fails to Provide the Conditions Required Under Section 202(c) to Lessen Conflicts with Environmental Standards and Minimize Environmental Harm.* ........................................................................... *84*

1. Legal Framework: Section 202(c) Further Limits the Department's Authority and Mandates Affirmative Steps to Maximize Environmental Compliance and Minimize Environmental Harm Where the Order "May Result in a Conflict" with a Federal, State, or Local Environmental Law or Regulation. ....................................................................................... 84
2. The Order May Result in a Conflict with a Federal, State, or Local Environmental Law or Regulation. .......................................................... 85
3. The Order Lacks the Conditions Required by Section 202(c). .................. 87

**VI. REQUEST FOR STAY** .......... **91**
**VII. CONCLUSION** .......... **94**
**GLOSSARY OF TERMS** .......... **96**
**INDEX OF EXHIBITS** .......... **97**

## I. Introduction

For the third time, the Department of Energy ("Department") is unlawfully using Section 202(c) of the Federal Power Act to prevent the retirement of Craig Unit 1 ("Craig"). Craig generates power by burning coal, and the Department is acting pursuant to an unprecedented policy to exceed its carefully constrained emergency authority under Section 202(c) in order to prevent coal plant retirements. The policy is unlawful because Section 202(c) applies only to imminent, unexpected shortfalls, not to the Department's preference for specific types of energy generation.

Order No. 202-26-31 ("Order") renews the Department's Order No. 202-25-14 ("December Order") and No. 202-26-21 ("March Order"). Public Interest Organizations previously requested rehearing of both orders and, after the Department failed to act on that request, have petitioned the United States Court of Appeals for the District of Columbia Circuit for review of those orders. *Sierra Club et al. v. Dep't of Energy et al.*, No. 26-1060; Ex. 2-186 at *passim* (Public Interest Organizations' January 2026 Rehearing Request); *Sierra Club et al. v. Dep't of Energy et al.*, No. 26-1172, Ex. 3-05 at *passim* (Public Interest Organizations' April 2026 Rehearing Request).

The Order offers no lawful basis, rational reasoning, or evidentiary support for an emergency justifying the invocation of Section 202(c). In purporting to find an emergency in Colorado and portions of Wyoming, Nebraska, and South Dakota, the Department focuses on changes to the mix of generators. Generators burning coal and other fossil fuels are retiring, but are being replaced by new resources, including solar, wind, battery resources, and new thermal resources. Replacing dirty, expensive, and unreliable coal plants like Craig with modern technology is not an emergency. It is, instead, a result of market forces and prudent planning.

None of the sources the Department cites in the Order, collectively or separately, support the claimed near-term or "long-term" emergency. The Department looks for support from reliability reports published by the North American Electric Reliability Corporation ("NERC"), but these documents portray the region as having "normal risk." The same goes for the reports on which the Department relies from the Western Electricity Coordinating Council. The Department also cites a couple of executive orders and a presidential memorandum containing no relevant facts, as well as its own error-riddled and widely panned study that attempts to evaluate resource adequacy in 2030. Further, in reaching for data about the mix of generators in a single

state (Colorado) to support its purported multi-state emergency, the Department looks only at one side of the coin, focusing on planned retirements with no attention paid to planned additions. In fact, Colorado has added, and plans to add, more generating capacity than has been and will be retired, resulting in a significant net increase in generating resources. And just as in the December Order and the March Order, the Department commits an even more basic error; in pulling data from its own Energy Information Administration, the Department overstates what that data says about the amount of planned coal retirements by more than 900 MW.

Meanwhile, the Department fails to consider a multitude of evidence of which the Department is or should be aware. This list begins with the careful and detailed resource planning undertaken by all five of Craig's co-owners, including Tri-State Generation and Transmission Association ("Tri-State"), Platte River Power Authority ("Platte River"), PacifiCorp, and Xcel Energy (also known as Public Service Company of Colorado) ("Xcel") (collectively and together with Salt River Project, the "Craig Co-Owners"). For nearly a decade, the Craig Co-Owners have been planning to retire Craig on December 31, 2025, and otherwise ensure resource adequacy.

More broadly, the Department fails to address a host of studies and monitoring from state regulators, regional entities, and private utilities. These efforts undercut the Department's claimed emergency. The evidence shows that the established planning and monitoring efforts are resulting in sufficient supplies of electricity now and will continue to provide for resource adequacy and reliability through the end of the decade and beyond, particularly as planned resources enter service. The Department's failure to engage with these studies and efforts while reaching sweeping, unsupported conclusions is not reasoned decision-making. Moreover, the Department lacks authority to override the states' and utilities' decisions to retire the plant and bring on cleaner and cheaper resources.

Whatever needs our modern energy system has, Craig is not the answer. The plant is an old, dirty, expensive generator that is required to retire under Colorado law. Running Craig after December 31, 2025, violates state law and plagues the region with excessive amounts of harmful air pollution that clouds Colorado's treasured federal public lands in haze, including Rocky Mountain National Park, Flat Tops Wilderness Area, Eagles Nest Wilderness Area, Mount Zirkel Wilderness Area, and Rawah Wilderness Area. Pollution from Craig also causes premature deaths and tens of millions of dollars in health harms. Ex. 2-123 at PDF 5 (EPA COBRA Health Effects Estimate).

"All costs" incurred by the Craig Co-Owners to comply with the Order "end up on ratepayers." *See* Laura Sanicola, Barrons, *Who's Paying to Keep Coal Plant Alive? All Electricity Customers, Trump Advisor Says* (Jan. 14, 2026), https://www.msn.com/en-us/money/markets/who-s-paying-to-keep-coal-plant-alive-all-electricity-customers-trump-advisor-says/ar-AA1UdRHI. Tri-State avers that the Order is likely to require additional expenditures "in operations, repairs, maintenance and, potentially, fuel

supply, all factors increasing costs," and that the utility "is working to prepare filings in support of cost recovery." *Tri-State Makes Craig Generating Station Unit 1 Available to Operate in Compliance with DOE Emergency Order* (Jan. 23, 2026), https://tristate.coop/tri-state-makes-craig-generating-station-unit-1-available-operate-compliance-doe-emergency-order.

Craig's inability to operate reliably and economically is plainly apparent but not addressed in the Order. Craig's operator and co-owners have substantially reduced capital and major maintenance expenditures over the past few years in anticipation of retirement. In fact, Craig was broken when the Department issued the December Order, having suffered a mechanical failure that halted electricity generation. Tri-State, *U.S. DOE Orders Tri-State to Keep Craig Generating Station Unit Operating for Next 90 Days* (Dec. 31, 2025), https://tristate.coop/us-doe-orders-tri-state-keep-craig-generating-station-unit-operating-next-90-days. Restoring the plant to operable condition took more than four weeks, and the plant will require tremendous maintenance and other investments to function consistently. *See* Tri-State, *Tri-State Makes Craig Generating Station Unit 1 Available to Operate in Compliance with DOE Emergency Order* (Jan. 23, 2026), https://tristate.coop/tri-state-makes-craig-generating-station-unit-1-available-operate-compliance-doe-emergency-order.

The Order is costly, harmful, unnecessary, unwanted, and unlawful. Public Interest Organizations respectfully request that the Department grant intervention in the proceedings over the Order; stay the Order; grant rehearing of the Order; rescind the Order (and any renewals of the Order); and allow Craig to retire.

## II. Statement of Issues and Specification of Error

The undersigned Public Interest Organizations move to intervene and request rehearing and a stay pursuant to Section 313(a) of the Federal Power Act, 16 U.S.C. § 825*l*(a), and the applicable rules of practice and procedure, 18 C.F.R. §§ 385.203, .212, .214, .713; *see* Ex. 2-10 at PDF 2 (Cooke Email to Alle-Murphy) (recommending that "a party seeking rehearing can look for procedural guidance to [Federal Energy Regulatory Commission's ("FERC")] Rules of Practice and Procedure, 18 CFR Part 385.").[1] Public Interest Organizations' motion and requests are based upon the following errors and issues:

---

[1] Until sometime after June 18, 2025, the Department maintained a webpage with procedures for intervention and rehearing requests. U.S. Dep't of Energy, *DOE 202(c) Order Rehearing Procedures* (visited June 18, 2025), https://www.energy.gov/ceser/doe-202c-order-rehearing-procedures (attached as Ex. 2-11) [hereinafter "DOE Rehearing Procedures"]. The Department maintains another website that currently states, "All public comments and requests related to

A. The Department has not demonstrated that an emergency exists in any portion of the Western Electricity Coordinating Council Rocky Mountain assessment area as defined in the Order, or in any other area, as required by Section 202(c) of the Federal Power Act; nor has the Department demonstrated that an emergency exists as defined in the implementing regulations for Section 202(c). *See, e.g.*, 16 U.S.C §§ 824(a)–(b), 824a(a)–(c); 10 C.F.R. §§ 205.371–.375; *Emergency Interconnection of Elec. Facilities and the Transfer of Elec. to Alleviate an Emergency Shortage of Elec. Power,* 46 Fed. Reg. 39984 (Aug. 6, 1981); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000); *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303 (1961); *Citizens Action Coal. v. FERC*, 125 F.4th 229 (D.C. Cir. 2025); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009); *Alcoa Inc. v. FERC*, 564 F.3d 1342 (D.C. Cir. 2009); *Cal. Indep. Sys. Op. Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004); *Otter Tail Power Co. v. Federal Power Commission*, 429 F.2d 232 (8th Cir. 1970); *Richmond Power & Light v. FERC*, 574 F.2d 610, 615 (D.C. Cir. 1978); *Duke Power Co. v. Fed. Power Com.,* 401 F.2d 930, 938 (D.C. Cir. 1968).

B. Even if the emergency described by the Order did exist—it does not—the Department has not demonstrated a reasoned basis for its determination that requiring the Southwest Power Pool ("SPP") and the Craig Co-Owners to ensure Craig is available to operate and requiring SPP to "take every step to employ economic dispatch of [Craig]" will "best meet the emergency and serve the public interest." *See, e.g.*, 16 U.S.C. § 824a(c); 10 C.F.R. §§ 205.373; 205.375; *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020); *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009); *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359 (1998); *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); *NAACP v. Fed. Power Comm'n*, 425 U.S. 662 (1976); *Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747 (1973); *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973); *California v. Fed. Power Comm'n*, 369 U.S. 482 (1962); *Pa. Water*

---

FPA section 202(c) should be sent via email to AskCR@hq.doe.gov. . . . Additional information about 202(c) procedures, if necessary, will be announced on this page. The provision of this process for submission of correspondence or comments on any pending application is for purposes of ensuring the receipt by the appropriate office and personnel within the Department. Establishment of this email address does not establish a 'docket,' and those submitting correspondence do not constitute parties or intervenors to any proceeding." U.S. Dep't of Energy, *DOE's Use of Federal Power Act Emergency Authority* (last visited Apr. 27, 2026), https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority (attached as Ex. 2-12) [hereinafter "DOE 202(c) Webpage"]. Public Interest Organizations' instant motion and requests are also pursuant to the DOE 202(c) Webpage and the DOE Rehearing Procedures.

*& Power Co. v. Fed. Power Comm'n*, 343 U.S. 414 (1952); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200 (D.C. Cir. 2013); *Chamber of Com. of the U.S. v. Secs. & Exch. Comm'n*, 412 F.3d 133 (D.C. Cir. 2005); *Sierra Club v. Env't. Prot. Agency*, 353 F.3d 976, 980 (D.C. Cir. 2004); *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105 (D.C. Cir. 2001).

C. The Order exceeds the Department's authority in its availability requirement and its decree concerning whether Craig shall be considered a capacity resource. *See, e.g.*, 16 U.S.C. §§ 824(a)–(b), 824a(b)–(c); *Gallardo v. Marstiller*, 596 U.S. 420 (2022); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260 (2016); *Gomez-Perez v. Potter*, 553 U.S. 474 (2008); *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359 (1998); *Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453 (1972); *Conn. Light & Power v. Fed. Power Comm'n*, 324 U.S. 515 (1945); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009).

D. The Department has unlawfully failed to ensure that the Order requires generation of electric energy only during hours necessary to meet the emergency and serve the public interest, that operations are consistent with any applicable environmental laws and regulations to the maximum extent practicable, and that any adverse environmental impacts are minimized; there is no indication that the Department consulted with the primary Federal agency with expertise in the environmental interests protected by the laws and/or regulations with which the operations required by the Order may conflict; the Department has not included in the Order or made public any conditions that may have been submitted by that Federal agency; and the Department has not included in the Order or made public any explanation of why such conditions would prevent the order from adequately addressing the emergency. *See, e.g.*, 16 U.S.C. § 824a(c)(2); *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162 (2016); Ex. 2-13 (DOE Order No. 202-22-4); Ex. 2-14 (Department Order No. 202-17-4 Summary of Findings); Ex. 2-21 (Department Order No. 202-26-01); Ex. 2-22 (Department Order No. 202-26-01A); Ex. 2-24 (Department Order No. 202-24-1).

## III. Intervenors' Interests

As further discussed below, each of the Public Interest Organizations has interests that may be directly and substantially affected by the outcome of this proceeding. Each party may therefore intervene in this proceeding. 18 C.F.R. § 385.214; *see* Ex. 2-11 (DOE Rehearing Procedures); Ex. 2-12 (DOE 202(c) Webpage); Ex. 2-10 (Cooke Email to Alle-Murphy).

Each of the Public Interest Organizations also demonstrates a concrete injury arising from the Order that is redressable by a favorable outcome. Each organization is therefore aggrieved by the Department's Order and may properly apply for

rehearing. *See* 16 U.S.C. § 825*l*(a); *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105, 1112 (D.C. Cir. 2001); 18 C.F.R. §§ 385.203, 385.713; Ex. 2-11 (DOE Rehearing Procedures); Ex. 2-12 (DOE 202(c) Webpage); Ex. 2-10 (Cooke Email to Alle-Murphy).

*A. Sierra Club*

Sierra Club has a demonstrated organizational commitment to reducing pollution and harm from coal-fired power plants, including Craig. Sierra Club's Beyond Coal Campaign seeks to reduce the pollution currently being produced by coal-fired power plants such as Craig, and to reduce energy bills by ensuring that ratepayers do not fund the cost of continuing to operate uneconomic coal plants like Craig. To those ends, Sierra Club has long engaged in advocacy relating to Craig Station. Sierra Club has intervened in Tri-State's electric resource plans before the Colorado Public Utilities Commission (the "Colorado Commission") in order to ensure that the retirement of Craig remained on track and was part of Tri-State's approved resource plan. Craig's retirement has been a premise of much of Sierra Club's work in Colorado.

Craig is owned by five utilities that serve electric customers in several states, including Arizona, Colorado, New Mexico, Utah, and Wyoming. In each of these states, Sierra Club has members who receive electricity service from a utility that owns Craig. For example, Sierra Club has over 15,000 members in Colorado, including members who receive electricity from Xcel, Tri-State, or Platte River. The Order harms Sierra Club's members' financial interests, because they will likely have to pay their share of the costs to comply with the Order.

In addition, Sierra Club has members who live, work, and/or recreate in areas of Colorado that are affected by air pollution from Craig. The Order will harm Sierra Club's members' aesthetic, health, and environmental interests by leading to increased air emissions that will pollute scenic areas, harm human health, and impair air quality.

*B. Vote Solar*

Vote Solar is an independent nonprofit organization working to repower the United States with clean energy by making solar power more accessible and affordable through effective policy advocacy. Vote Solar seeks to promote the development of solar at every scale, from distributed rooftop solar to large utility-scale solar facilities, and to encourage common-sense electrification of the economy, all as part of the transition away from fossil fuel-powered energy consumption. Vote Solar has over 92,000 members nationally and nearly 3,000 members in Colorado, including members who are customers of the utilities that purchase electricity from Tri-State Generation and Transmission Association and customers of Craig's other co-owners. Vote Solar is not a trade group, and it does not have corporate members.

Pollution emitted by Craig harms Vote Solar's members, and the Order will harm these members by preventing the coal unit from retiring as planned and thus prolonging the time period it can emit pollution into nearby communities. In addition, Vote Solar's members will likely be harmed by the Order because Tri-State and the other Craig co-owners will incur increased costs to keep Craig online after its retirement deadline. The customers of the utilities that purchase electricity from Tri-State and customers of the other co-owners, including Vote Solar's members, will likely be responsible for paying these costs and will pay higher utility bills because of the Order. Vote Solar and its members have an interest in ensuring that Tri-State retires Craig as planned, and the Order extending the lives of these coal units harms Vote Solar's and its members' interests.

*C. 350 Colorado*

350 Colorado is a grassroots movement and organization working to build a fossil-free future powered by 100% renewable energy. 350 Colorado empowers communities to come together to dismantle oppressive systems that enable poverty, racism, and inequality. 350 Colorado engages at the local and state level to ensure that Colorado has a clear and immediate pathway to reduce emissions and secure 100% clean, renewable energy for all. 350 Colorado strives to protect vulnerable communities because all Coloradans deserve a safe and livable environment. 350 Colorado has around 20,000 members working toward a fossil-free future, including members who are customers of the utilities that purchase electricity from Tri-State Generation and Transmission Association and customers of Craig's other co-owners. Because the Order requires Craig Unit 1 to stay online past its retirement deadline, the Order harms 350 Colorado and its members by prolonging the time period that Craig can emit pollution. The Order will also harm 350 Colorado and its members by increasing their energy costs as Tri-State and the other Craig co-owners pass along the costs they have incurred to comply with the Order to their customers.

*D. Public Citizen*

Established in 1971, Public Citizen is a national research and advocacy organization representing the interests of household consumers. Public Citizen has members and supporters in every state, including those who pay electric utility bills in Colorado and the Western United States. Public Citizen is active before the Federal Energy Regulatory Commission promoting just and reasonable rates, and in supporting efforts for utilities to be accountable to the public. Financial details about the organization are on its website. Public Citizen, Annual Reports, www.citizen.org/about/annualreport/.

*F. Environmental Defense Fund*

The Environmental Defense Fund ("EDF") is a nonprofit membership organization with hundreds of thousands of members nationwide, including

approximately 10,000 members who live in Colorado and pay for and consume electricity in the state, and who are harmed by pollution from Craig's coal-burning operations. EDF's mission is to build a vital Earth for everyone by preserving the natural systems on which all life depends. Guided by expertise in science, economics, law, and business partnerships, EDF seeks practical and lasting solutions to address environmental problems and protect human health, including in particular by addressing pollution from the power sector. On behalf of its members, EDF works with partners across the private and public sectors to engage in utility regulatory forums at the federal level and throughout the United States to advocate for policies that will create an affordable, reliable, and low pollution energy system. Craig's retirement would help create an affordable, reliable, and low pollution energy system. Because the Order denies these and other benefits of the plant's retirement, the Order harms EDF members.

## IV. BACKGROUND

### *A. The Primary Actors in the Electric Industry Already Protect Resource Adequacy Without Intrusion from the Department.*

Multiple entities in Colorado and the Western Electricity Coordinating Council ("WECC") Rocky Mountain assessment area have consistently maintained resource adequacy in the region through a combination of resource adequacy assessments and long-term planning. Resource adequacy is "the situation where an electric system has enough capacity available to meet customer demand, plus a reserve margin on top, in most hours under most conditions based on a chosen standard." Ex. 2-01 at 2–6 (Current Energy Group January Report) (defining resource adequacy and including perspective from National Laboratory of the Rockies). The electric industry uses a variety of metrics to assess resource adequacy, though each metric gets to the same concept: whether there are sufficient resources available to both meet forecasted demand and provide an additional buffer. *See id.* However defined or measured, the entities and processes discussed below have for decades maintained an interconnected planning web that has sustained, and continues to sustain, resource adequacy across the region. That includes, of course, accounting for declared retirements, including Craig's long-planned retirement.

#### *1. The Federal Energy Regulatory Commission Regulates Wholesale Electricity Markets and Mechanisms to Acquire Adequate Resources.*

FERC regulates wholesale sales and transmissions of electric energy in interstate commerce. 16 U.S.C. § 824(b)(1). Federal authority over the electric grid dates back at least to 1935, when the Federal Power Act became law and the Federal Power Commission administered the Act.

The Federal Power Act did not give the federal agency plenary authority over the electric grid. Instead, Congress provided that federal regulation shall "extend only to

those matters which are not subject to regulation by the States" and provided that "[t]he Commission" does not have jurisdiction, "except as specifically provided in [the Federal Power Act], over facilities used for the generation of electric energy." *Id.* at § 824(a)–(b)(1). As such, authority over generation facilities belongs to the states. *See id.*

In 1977, through the Department of Energy Organization Act, Congress reorganized the agencies that administer the Federal Power Act. Congress created the Department of Energy and FERC. 42 U.S.C. §§ 7131, 7171(a). Congress also transferred certain functions of "the Commission" in the Federal Power Act to the Department and other functions to FERC, thereby abolishing the Federal Power Commission. *See id.* §§ 7151(b), 7172(a)(1). FERC retained authority over rates and charges for the transmission or sale of electric energy, and the non-emergency interconnection of facilities for the generation, transmission, and sale of electric energy. *Id.* § 7172(a)(1)(B). The Department's authority over functions of "the Commission" in the Federal Power Act include functions under some subsections of Section 202 of the Act. *See id.* § 7151(b). The 1977 reorganization did not expand the role of the "the Commission" at the expense of state authority or shrink states' authority over generation facilities. *See, e.g.*, *id.* § 7113 ("Nothing in this chapter shall affect the authority of any State over matters exclusively within its jurisdiction.").

As part of its regulatory oversight, FERC has promoted the role of nonprofit entities, known as Independent System Operators or Regional Transmission Organizations. *See Fed. Energy Regul. Comm'n v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016); *Regional Transm. Orgs.*, Order No. 2000, 65 Fed. Reg. 810, 811 (Jan. 6, 2000); *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transm. Servs. by Pub. Utils. and Recovery of Stranded Costs by Pub. Utils. and Transm. Utils.*, Order No. 888, 61 Fed. Reg. 21540, 21542 (May 10, 1996). FERC generally regulates these entities pursuant to its authority over rates and charges for wholesale sales and transmissions of electric energy. *See, e.g.*, Order No. 2000, 65 Fed. Reg. at 811. These entities, referred to here as Independent System Operators or RTOs, perform a variety of functions, including:

- Ensuring the electric grid operates reliably in a defined geographic footprint;
- Balancing supply and demand instantaneously and maintaining sufficient operating reserves;
- Dispatching system resources as economically as possible;
- Coordinating system dispatch with neighboring balancing authority areas;
- Planning for transmission in its footprint;
- Coordinating system development with neighboring systems and participating in regional planning efforts; and
- Providing non-discriminatory transmission access.

Ex. 2-19 at 53 (FERC Energy Primer). Some Independent System Operators "also operate capacity markets, which, along with underlying resource adequacy rules, ensure sufficient capacity is available." *Id.* at 68.

The Independent System Operators now span much of the country, excluding portions of the Southeast, Southwest, and Northwest regions of the country. *See id.* at 37. The map in Figure 1 below depicts the geographic footprint of the various Independent System Operators before April 1, 2026.

*Figure 1: Boundary Areas of RTOs and ISOs*




Source: Ex. 2-19 at 67 (FERC Energy Primer).

Beginning on April 1, 2026, the SPP RTO footprint expanded, as shown in Figure 2 below.

*Figure 2: SPP Expanded Footprint*




Source: Ex. 2-180 at PDF 1 (SPP RTO Expansion).

2. *NERC Protects Reliability via Standards and Regular Assessments.*

NERC is the "Electric Reliability Organization" under section 215 of the Federal Power Act. *N. Am. Elec. Reliab. Corp.*, 116 FERC ¶ 61,062, at P 3, *order on reh'g & compliance*, 117 FERC ¶ 61,126 (2006); *see* 16 U.S.C. § 824o(a)(2). This role dates back to 2005, after Congress added Section 215 to the Act and FERC certified NERC as the Electric Reliability Organization. Energy Policy Act of 2005, Pub. L. No 109-58, Title XII, Subtitle A, section 1211(a), 119 Stat. 594, 941 (2005), 16 U.S.C. 824o (2000 & Supp. V 2005); 116 FERC ¶ 61,062, at P 3.

As the Electric Reliability Organization, NERC is responsible for establishing and enforcing reliability standards for the bulk power system. 16 U.S.C. § 824o(a)(2); 18 C.F.R. § 39.1. NERC's reliability standards are subject to FERC's review and approval. 16 U.S.C. § 824o(d).

The NERC-developed and FERC-approved reliability standards apply to all users, owners, and operators of the bulk power system within the continental United States. *Id.* § 824o(b)(1); 18 C.F.R. §§ 39.2, 40.1(a), 40.2(a); *see id.* § 39.1 (defining "Bulk–Power System"). Each reliability standard identifies the types of entities that must comply with the standard, like generator owners, transmission owners, or transmission operators. *Reliability Standard Compliance and Enforcement in Regions with Regional Transm. Orgs. or Indep. Sys. Ops.*, 122 FERC ¶ 61,247, at P 4 (2008); *e.g.*, Ex. 2-117 at EOP-011-4 (NERC Emergency Operations) (stating requirements applicable to, *inter alia*, balancing authorities, reliability coordinators, and transmission operators for the purpose of "address[ing] the effects of operating Emergencies by ensuring each Transmission Operator and Balancing Authority has developed plan(s) to mitigate operating Emergencies and that those plans are

implemented and coordinated within the Reliability Coordinator Area as specified within the requirements”).

NERC performs other functions in addition to development and enforcement of reliability standards. For instance, NERC annually assesses seasonal and long-term reliability of the bulk power system and monitors system performance. *See* 18 C.F.R. § 39.11. Since it began providing standardized “risk” assessments by region in the summer of 2021, NERC has adhered to a three-tiered assessment of risk: areas facing the least risk are “low” or “normal” risk regions, areas facing the most risk are “high” risk regions, and areas in between are “elevated” risk regions. *See* Ex. 2-28 at PDF 75, 124, 170, 218 (2019–24 NERC Summer Reliability Assessments). NERC’s determination of “elevated” risk generally indicates that there is a “[p]otential for insufficient operating reserves in above-normal conditions.” Ex. 2-27 at 6 (NERC 2025 Summer Reliability Assessment). NERC typically provides specific context and details associated with its determination. *See id.* at 17–39.

NERC also delegates certain authorities to six Regional Entities that make up the Electric Reliability Organization Enterprise. Ex. 2-149 at 1 (“About WECC” Webpage). The largest of these, the WECC, is one of the key regional actors described below working to ensure that the power grid remains reliable. *Id.* at 1–2.

3. *The Utilities that Own and Operate Craig Protect Reliability and Resource Adequacy in Their Service Territories.*

The five utilities that own and operate Craig have service territories spanning a significant portion of the Western United States, including the Rocky Mountain assessment area. Tri-State is a wholesale electric cooperative that provides electricity to retail cooperatives in Colorado, New Mexico, Wyoming, and Nebraska. The geographic footprint of the Tri-State members is shown in Figure 3.

*Figure 3: Tri-State Members*



Source: Ex. 2-114 at 2 (Tri-State Members).

PacifiCorp serves customers in Washington, Oregon, California, Idaho, Utah, and Wyoming. Ex. 2-124 at 1 (2025 PacifiCorp_FactSheet). Salt River Project serves customers in Arizona. Ex. 2-125 at 1 (Service Area and Territory (Electric Power and Water) SRP). Platte River and Xcel serve customers in Colorado. Ex. 2-126 (Xcel, List of Towns Receiving Electric Service in Colorado); Ex. 2-127 (Who we serve - Platte River Power Authority).

The resource adequacy responsibility of the Craig Co-Owners can be broken down into two separate categories: responsibilities of the utilities that serve as balancing authorities; and their responsibilities as load-serving entities, i.e., entities that provide electricity directly to retail customers, and/or their responsibilities as wholesale providers that generate and transmit electricity to other retail utilities.

Currently, two of the Craig Co-Owners (Tri-State and Platte River) are members of an RTO (SPP West). In addition, balancing authorities perform many of the functions that RTOs perform, including balancing supply with demand and dispatching generation. *See* Ex. 2-115 (Department Explainer on Balancing Authorities) at *passim*; Ex. 2-116 at 1 (EIA Explainer on Balancing Authorities).

Four of the five Craig Co-Owners are load-serving entities that provide electricity directly to retail customers. The fifth, Tri-State, is a wholesale provider with obligations to meet the demand of its member cooperatives.

The utilities meet their reliability requirements through a variety of overlapping processes. At one end of the spectrum is long-term resource planning, which each utility conducts through resource planning. Platte River prepares and adopts an Integrated Resource Plan ("IRP") every four years. Tri-State and Xcel submit Electric Resource Plans ("ERPs") at least every four years for the Colorado Commission to approve. PacifiCorp prepares an IRP every two years, which it submits to state commissions in its service territory. Salt River Project updates its IRP every five years. While the cadence varies, each resource plan is, at its core, an exercise in forecasting electricity demand on a long-term basis and then adopting a plan to acquire the quantity of generating, storage, and demand-response resources needed to reliably serve forecasted demand.

Each utility also has various processes for acquiring resources on a shorter-term basis than is possible through an IRP. These processes include short-term purchases made on a seasonal basis; day-ahead purchases; and, at the shortest extreme, purchases made on an intra-hour basis through energy imbalance markets. For example, in its December 2025 Near Term Procurement Report, Xcel indicated it had made seasonal purchases of capacity for the winter and summer seasons in 2026. Ex. 2-93 at 29 (Table 8) (Xcel 2025 Near Term Procurement Report).

The utilities also participate in reserve-sharing agreements that allow them to call upon resources to deal with very short-term resource needs. For example, Salt

River Project and Xcel participate in the Northwest Power Pool Reserve Sharing Group:

> Along with participating in the [Western Area Power Administration] Balancing Authority, [Xcel] entered the [Northwest Power Pool] Reserve Sharing Program in September 2019. The [Northwest Power Pool] Reserve Sharing Program Agreement provides for sharing of contingency operating reserves among interconnected electric utilities operating in the Western Interconnection. There are presently 22 participating Balancing Authorities in the [Northwest Power Pool] Reserve Sharing Program. By pooling their contingency reserves, these utilities are able to carry less contingency reserve capacity than if they operated independently. Under the [Northwest Power Pool] Reserve Sharing Program Agreement, [Xcel] can call on and purchase contingency reserves (spinning and non-spinning), and the energy associated with such reserves, when they are activated in response to a sudden system disturbance. [Xcel] can also purchase emergency assistance under the [Northwest Power Pool] Reserve Sharing Program Agreement.

Ex. 2-94 at 118 (Xcel 2024 JTS, Volume 2 Technical Appendix).

In addition, each of the Craig Co-Owners either participates to varying degrees or has plans to participate in organized wholesale markets. As of April 2026, Tri-State and Platte River participate in a regional market operated by SPP, whereas PacifiCorp participates in the Western Energy Imbalance Market operated by the California Independent System Operator. Ex. 2-111 at 2 (Western Energy Imbalance Market Webpage). The footprint of the Western Energy Imbalance Market and its planned expansion is shown in Figure 4 below.

*Figure 4: Western Energy Imbalance Market Footprint and Planned Expansion*




Source: Ex. 2-111 at 2 (Western Energy Imbalance Market Webpage).

Meanwhile, Xcel intends to join SPP's day-ahead and real time energy market offerings outside of the SPP's main footprint, called "Markets Plus" or "Markets+," in 2027. Ex. 2-167 at PDF 3 (SPP Markets+ Website). Under Markets+, SPP will perform centralized commitment and dispatch on a day-ahead and real-time basis for participating utilities. *Id.*

Effective April 1, 2026, Tri-State and Platte River are now members of the western expansion of the SPP RTO, called SPP West. Ex. 2-161 at 1 (SPP West Press Release). Under SPP West, SPP not only performs similar centralized dispatch and unit commitment functions that it will perform in Markets Plus, but also performs other reliability services for Tri-State, Platte River, and other Western utilities, such as transmission planning and assuming the role of balancing authority and reliability coordinator. As shown in the figure below, SPP West covers a portion of WECC's Rocky Mountain assessment area. The scope of SPP's expansion is shown in Figure 5 below.

*Figure 5: SPP Markets+, SPP West, and WRAP Footprints*




Source: Ex. 2-167 at PDF 2 (SPP Markets+ Website).

4. *State and Regional Regulatory Bodies Protect Resource Adequacy Through Integrated Resource Planning and Annual Capacity Demonstration Requirements.*

As noted above, state public utility commissions in the following states regulate at least one of the Craig Co-Owners: California, Colorado, Idaho, Oregon, Utah, Washington, and Wyoming. All seven of these state commissions have reviewed resource plans stating that Craig would retire by December 31, 2025. *See infra* secs. V.A.2, V.A.5. None of these seven state commissions has expressed any concern regarding retiring Craig by December 31, 2025. No state commission has directed any of the Craig owners to operate Craig past 2025. The attached report from Telos Energy describes the role of the Colorado Commission in ensuring resource adequacy and reliability for two of the Craig Co-Owners, Xcel and Tri-State. Ex. 2-5 at 7–9 (Telos Energy Report).

*i. The Western Power Pool Is Implementing a Western Resource Adequacy Program and Forecasts Regional Resource Adequacy on an Annual Basis.*

The Western Power Pool is a grouping of utilities and partners that coordinate and share resources in the Western Interconnection. Ex. 2-131 at 10 (FERC Western Energy Markets Explainer). The Western Power Pool's territory stretches from British Columbia and Alberta through all or parts of multiple states, *id.* at 9–10, as shown in Figure 6 below.

*Figure 6: Boundary Area of Western Power Pool*




Source: Ex. 2-131 at 9 (FERC Western Energy Markets Explainer).

The Western Power Pool organizes multiple programs to ensure that participants are protected against emergency events that would otherwise disrupt service or lead to blackouts. For instance, it operates a reserve sharing program, in which participating Balancing Authorities share contingency reserves to ensure that participants have access to sufficient power during emergencies. *See* Ex. 2-145 (Western Pool Reserve Sharing Program). The Western Power Pool also organizes more rapid-response grid stability coordination, including a frequency response sharing group in which participating entities work together to secure adequate ancillary services to maintain minute-to-minute grid stability. Ex. 2-146 (Western Frequency Response Sharing Group).

Of particular note to the question of resource adequacy oversight, in February 2023 the Western Power Pool secured approval from FERC to create a more comprehensive resource adequacy coordination regime, the Western Resource Adequacy Program. *Northwest Power Pool*, 182 FERC ¶ 61063 (2023). The Western Resource Adequacy Program was designed initially as a voluntary resource adequacy planning and compliance program for utilities in the West and is intended to supplement the resource planning and projections undertaken by utilities, states, and provinces. *Id.* at ¶ 5. As FERC identified in its order approving the Western Resource Adequacy Program, the operational program serves as "a resource of last resort—not a resource of first resort"—and participants are maintaining their own processes to plan ahead and ensure their own resource adequacy. *Id.* at ¶ 98. This makes the coordination offered by the Western Resource Adequacy Program entirely additional and complementary to the other planning processes discussed in this section. *Id.* at ¶ 5.

The Western Resource Adequacy Program has two distinct operational components: a forward-showing process and operational follow-through. Under the forward-showing component, participants in the program demonstrate seven months in advance of each summer season and each winter season that they have secured their proportional share of regional capacity, which includes a required planning reserve margin that is designed to meet a loss-of-load expectation ("LOLE") standard of 1-event-in-10-years. *Id.* at ¶¶ 6, 53. To avoid a charge, participants must also show that they have reserved at least 75% of the transmission necessary to deliver energy at the time of their forward-showing filings, and all of the necessary transmission during the activation period of the operating program. Ex. 2-147 at § 13.2 (WRAP Tariff). This transmission reservation must be at the highest level of reliability (NERC Priority 6 or Priority 7 firm point-to-point or network integration transmission service). *Northwest Power Pool*, 182 FERC ¶ 61063, at ¶¶ 54, 78.

Each participant's forward projection is then tested against a nearer-term forecast (week ahead or day ahead) in the operational phase of the Western Resource Adequacy Program process. Based on the results of the comparison, participants with surpluses may be required to hold back capacity for the benefit of other participants with a deficit, with fines levied for nonperformance of this obligation to hold back. *Id.* at ¶¶ 7, 94–95. In this way, the Western Resource Adequacy Program ensures that each balancing authority in the region is able to rely on imports from neighbors, thereby approximating one of the key benefits load-serving entities gain via participation in RTOs in other parts of the country. *See generally* 89 FERC ¶ 61,285.

As of October 31, 2025, 16 utilities committed to the Program's initial binding operational season, in Winter 2027/28. Ex. 2-148 (WRAP Notice). Even in its voluntary form, the Western Resource Adequacy Program has added to the tapestry of regional cooperation that has helped ensure the West continues to receive power reliably.

*ii. WECC Assesses Resource Adequacy in the Region on an Annual Basis and Enforces Federal Standards.*

WECC is the largest of the six Regional Entities that make up NERC's Electric Reliability Organization Enterprise. Ex. 2-149 at 1–2 ("About WECC" Webpage). Its service territory encompasses two Canadian provinces (Alberta and British Columbia), the northern portion of Baja California, Mexico, and all or parts of many Western states, *id.*, as shown below in Figure 7.

*Figure 7: Boundary Areas of WECC Subregions*




Source: Ex. 2-01 at app'x A at 1 (Current Energy Group January Report).

Under its NERC-delegated authority, WECC is responsible for setting regional reliability standards, monitoring compliance with those standards, enforcing standards, and overseeing reliability assessment and performance analysis within WECC's footprint. *Id.*; Ex. 2-150 at § 401 (NERC Rules of Procedure); *see N. Am. Elec. Reliab. Corp.*, 153 FERC ¶ 61,134, at PP 55–56 (2015). This work includes ensuring that regional contingency reserve standards are aligned with national standards and performing risk assessments of bulk power system users, owners, and operators on the reliability of the Western Interconnection. Ex. 2-151 at 13–14 (WECC Contingency Reserve Whitepaper) (finding that by reducing minimum contingency

reserve amounts, prior sequestered resources will be made available to match the less predictable response of variable generation resources and more development of variable generation sources may be encouraged); Ex. 2-152 (WECC Risk Factor Criteria).

WECC also performs a yearly assessment of resource adequacy in its footprint, which is a useful resource for system planners. *E.g.*, WECC, *Western Assessment of Resource Adequacy: 2024* (last visited April 21, 2026), https://feature.wecc.org/wara/; Ex. 2-09 (2024 Western Assessment of Resource Adequacy). The yearly resource adequacy assessment performed by WECC is "an energy-based probabilistic" assessment, which evaluates resource adequacy under a variety of conditions. *Id.* It divides WECC's larger footprint into smaller subregions and provides detailed analysis of regional demand forecasts and planned resource additions for the next 10 years. *Id.* The scenarios modeled in the assessment include increased demand and slower buildout of generating resources. *Id*. These analyses provide information that helps inform NERC's reliability assessments of the entire country's energy system. Ex. 2-153 at 1 (WECC Reliability Assessment Webpage). Additionally, WECC contributes to NERC's assessments. *See* Ex. 3-07 at 14 (NERC 2026 Summer Reliability Assessment).

### *B. Craig's Retirement Was Planned for a Decade by Utilities and State Regulators.*

#### *1. Craig Is a Power Plant in Colorado Originally Built in 1980.*

Craig began operations in 1980. The generator is located in Craig, Colorado, approximately 200 miles northwest of Denver and 45 miles west of Steamboat Springs. Craig's location is shown in Figure 8 below.

*Figure 8: Craig Plant Map*




Source: Google Earth.

Craig Unit 1 is part of a three-unit coal-fired generating facility (collectively, and with associated facilities, the "Craig Plant"). The Craig Plant's three units all rely on burning coal to generate electricity. Tri-State has committed to retiring Craig Unit 2 by September 30, 2028, and Craig Unit 3 by January 1, 2028. Ex. 2-89 at 5 (Tri-State 2025 ERP Annual Progress Report).

*Figure 9: Craig Plant Photograph*



Source: Ex. 2-53 (Colorado Sun Article).

*2. Tri-State Operates and Partially Owns Craig.*

Tri-State serves as the operator of Craig. As the operating agent, Tri-State is responsible for the daily management, administration, and maintenance of the facility. Ex. 2-49 at 6 (Tri-State Revised ERP Assessment of Existing Resources).

Tri-State is also a partial owner of Craig, holding a 24% interest. Ex. 2-03 at 3 (Powers Decl.). The other Craig Co-Owners, along with their respective shares, are as follows: PacifiCorp owns 19.28%; Platte River owns 18%; Xcel owns 9.72%; and Salt River Project owns 29%. *Id.* at 3–4 (citing utility filings).

*3. Craig Is Old, Unreliable, Inflexible, Dirty, and Expensive.*

*i. Craig Is Old and Unreliable.*

Craig is *past* the typical operational life of coal units. Ex. 2-03 at 5 (Powers Decl.) (citing Ex. 2-48 at 18 (IEA Report); Ex. 2-47 at 127 (Palgrave Handbook)). Its production and reliability have declined with age.

Data from the U.S. Environmental Protection Agency's ("EPA") Air Markets database indicates that Craig's gross output declined by 38% from 2022 through 2025, the most recent year for which annual data is available. The values are shown in Figure 10 below.

*Figure 10: Craig Output from 2022 through 2025*

| Year | Production (MWh) |
|---|---|
| 2022 | 2,797,335 |
| 2023 | 2,015,029 |
| 2024 | 1,824,100 |
| 2025 | 1,724,208 |

Source: Ex. 2-113 (Craig Station, AMD data 2020 through 2025) (EPA Air Markets Database). MWh values rounded to nearest integer.

In recent years, Craig has experienced a sharp increase in outages, which reflect aged, worn components that are expensive and may be difficult to repair or replace. Ex. 2-03 at 5, 7–8, 14–15 (Powers Decl.). The outages at Craig demonstrate an increasing inability to perform consistently, even under normal conditions. Tri-State and Platte River have explained that "as Craig Unit 1's operations are further extended past its intended lifespan, it is likely to experience more and longer periods of outage." Ex. 3-06 at 32 (Tri-State and Platte River April Rehearing Request). In fact, when the Department issued the December Order, Craig had a forced outage that began on December 19, 2025 due to a valve failure. Ex. 2-06 (Tri-State December 2025 Press Release). The December 2025 forced outage is characteristic of an old plant that is prone to mechanical failures. Ex. 2-03 at 7 (Powers Decl.); *see also* Ex.

3-06 at 41, 32 n.33 (Tri-State and Platte River April Rehearing Request) (describing Craig Unit 1 as an "aging coal plant" and that explaining that "forcing Craig Unit 1 to continue operating to address projected shortfalls in 2034, when it would be 54 years old, only exacerbates concerns about reliance on aging resources").

Craig's December 2025 forced outage is consistent with recent trends. Outside of scheduled maintenance periods, Craig has been unable to produce power during significant portions of recent years (known as the unit's "forced outage rate"). Ex. 2-03 at 7–8 (Powers Decl.) (citing Tri-State's filings with the Colorado Commission). For example, Craig experienced a sharp year-over-year forced outage rate increase between 2022 and 2023, increasing from 1.75 percent to 9.53 percent. *Id.* Craig's 9.53 percent forced outage rate translates into 835 hours that Craig could not operate in 2023, or approximately five weeks of forced unavailability. *Id.* Because of Craig's inconsistent and sharply increasing forced outage rate, it cannot meet the demands of an emergency. *See* Ex. 2-175 at 9 (Tri-State and Platte River January Rehearing Request) (stating that "Craig Unit 1 has had multiple breakdowns and required significant repairs to continue operating into 2025").

Craig's recent forced outages are a direct result of significantly decreased capital expenditures and maintenance at Craig. Ex. 2-03 at 6–7 (Powers Decl.). This is unsurprising, as the Craig Co-Owners announced the plant's retirement date in 2016. Because the co-owners anticipated that the plant would retire at the end of 2025, they did not undertake maintenance projects that they would have undertaken had they been expecting to operate the unit past 2025. *Id.* at 7; Ex. 2-175 at 9 (Tri-State and Platte River January Rehearing Request) (stating that the co-owners have deferred optional maintenance since 2019). In fact, in response to the December Order, Tri-State conceded that the "retirement decision has informed operational and maintenance decisions." Ex. 2-06 (Tri-State December 2025 Press Release). As evidenced by Craig's December 2025 outage, the plant requires additional investments in operations and maintenance because the Craig Co-Owners have been foregoing maintenance in recent years. *Id.*; Ex. 2-03 at 7 (Powers Decl.). In fact, in response to the December Order, the Co-Owners had to repair out-of-service equipment such as filter pumps, ash blowers, and feedwater heater tubes. Ex. 3-06 at 14 (Tri-State and Platte River April Rehearing Request). Foregone maintenance makes Craig more prone to failure and more likely to need to go on outage to fix broken parts or maintain the unit. Ex. 2-04 at 4 (Grid Strategies Cost Report); *see also* Ex. 2-06 (Tri-State December 2025 Press Release).

Tri-State transitioned from a preventative approach to a "fix it if it breaks" approach at Craig. Ex. 2-03 at 6–7 (Powers Decl.). As Tri-State and Platte River have explained, "Craig Unit 1's planned closure was announced a decade ago, and numerous steps, such as deferring maintenance, reducing staffing, and redirecting capital expenditures, have been undertaken since." Ex. 3-06 at 22 (Tri-State and Platte River April Rehearing Request). This approach is consistent with Tri-State's investment strategy for early retirement of coal units. Tri-State stated that it

"proactively works to reduce and eliminate capital expenses related to early retirement of resources as can be seen by the historical capital expense." Ex. 2-51 at 187 (Tri-State 2020 ERP). Tri-State's filings with the Colorado Commission further memorialize this "fix it if it breaks" approach for Craig. Tri-State represented that its "investments in [the Craig Plant] are being appropriately limited to only actions necessary for ensuring safe operations and regulatory compliance, given the impending retirement of these units." Ex. 2-50 at 10 (Insgold 2023 ERP Direct Testimony). As a result, "it is unlikely that Craig 1 can be depended upon to operate reliably." Ex. 2-03 at 5 (Powers Decl.).

*ii. Craig Is Inflexible.*

On top of Craig's reliability problems, the plant cannot respond on short notice. Ex. 2-03 at 8–9 (Powers Decl.). Coal units—including Craig—take a minimum of 12 hours to reach full load operation from a cold start. *Id.*; *see* Ex. 2-44 at PDF 3 (RMI Analysis of Coal Plants' Threats to Reliability); Ex. 2-33 at PDF 3 (IEA Flexibility Report).

*iii. Craig Is Dirty and Environmentally Harmful.*

Additionally, Craig is a significant source of pollution. Based on its 2025 activity, Craig can be expected to emit every three months over one billion pounds of carbon dioxide ("$CO_2$"), over one million pounds of nitrogen oxides ("$NO_x$"), and hundreds of thousands of pounds of sulfur dioxide ("$SO_2$"). *See* Ex. 2-03 at 12 (Powers Decl.).

Craig's air pollution results in several harms. $NO_x$ and $SO_2$ both cause health concerns, including respiratory problems. *Id.* at 10. And $CO_2$ is the primary cause of global warming. *Id.* at 11. Pollution from coal generation can have drastic and deadly health effects. *See, e.g.*, Ex. 2-121 at 2 (Mercury Mortality Risks of Coal); Ex. 2-123 at PDF 4–5 (EPA COBRA Health Effects Estimate). On an annual basis, air pollution from Craig causes an estimated 4 premature deaths, and this pollution increases the likelihood of emergency room visits, heart attacks, and asthma attacks. *Id.*; Ex. 2-160 at PDF 2–3 (Clean Air Task Force Toll from Coal). In total, the health harms from Craig's air pollution result in over $56 million in estimated costs each year. Ex. 2-123 at PDF 5 (EPA COBRA Health Effects Estimate).

Air pollution from the plant also clouds Colorado's treasured federal public lands in haze. Craig's operation impairs visibility in several national parks and wilderness areas in Colorado, including (among others) Rocky Mountain National Park, Flat Tops Wilderness Area, Eagles Nest Wilderness Area, Mount Zirkel Wilderness Area, and Rawah Wilderness Area. Ex. 2-03 at 11 (Powers Decl.) (citing Ex. 2-71 at 47–48 (BART CALPUFF)). Therefore, alongside the health burdens of the pollution, the continued operation of Craig will harm the people who visit and recreate at these iconic landscapes.

In addition to air pollution, continued operation of Craig will worsen water scarcity in the state and the region. Craig uses approximately 250,000 gallons of water per hour of operation at its net capacity of 427 MW. *Id.* at 16 (citing Ex. 2-88 at 19 (Tri-State 2023 ERP Modeling Assumptions)). All the while, Colorado, the river basin that shares its name, and the surrounding states are in a water crisis. *See* Ex. 2-52 at 3 (Colorado 2023 Water Plan). Water conservation remains a key priority for Colorado, especially as the region experiences population growth, long-term warming trends, major wildfires, aridification, and multi-year drought. *Id.* (Colorado 2023 Water Plan). The energy sector drives water overuse in the state, and coal-fired power plants are water consumptive compared to renewable sources of energy. *Id.* at 21.

Retiring Craig would eliminate the plant's environmental harms. Meanwhile, the ongoing operation of Craig will guarantee that the plant's harmful air pollution and wasteful water practices persist.

*iv. Craig Is Expensive.*

Craig is also an expensive plant to run. In 2024, Craig cost over $80 million to operate. Ex. 2-04 at 3 (Grid Strategies Cost Report). Over the period 2022 to 2024, operating Craig cost nearly $85 million per year. *Id.* Operating Craig at its average output from 2022 through 2024 will cost more than $20 million for each 90-day period. Tri-State and Platte River have noted that if they "must continue to dispatch Craig Unit 1, as the unit has in the past, for the entire emergency period until 2034, costs could exceed millions in operating and maintenance costs, exclusive of fuel costs." Ex. 3-06 at 26 (Tri-State and Platte River Request for Rehearing).Craig is an uneconomic source of electricity. As Tri-State and Platte River have emphasized, there is "no economic benefit available from retaining the to-be-retired facility because it is *uneconomic to operate*." Ex. 2-175 at 20 (Tri-State and Platte River January Rehearing Request) (emphasis added); *see also* Ex. 3-06 at 40 (Tri-State and Platte River April Rehearing Request) (stressing that "Craig Unit 1 is an older, uneconomic unit"). The available data demonstrates that Craig's "cost of producing electricity is almost always higher than the value of that electricity." Ex. 2-04 at 6 (Grid Strategies Cost Report). Craig's fuel costs exceed the average market price, and considering variable costs makes Craig even more uneconomic. *Id.* at 3–4. All told, market prices do not cover Craig's variable costs in over ninety percent of hours. *Id.* at 6. In other words, the cost of producing electricity at Craig is overwhelmingly higher than the value of that electricity.

Further, Craig's foregone maintenance exacerbates the plant's already high operating costs. As coal plants age, they require sustaining capital expenditures and increasing O&M costs over time. When coal plants reach an age of 40–50 years, they require a significant increase in capital expenditure. *Id.* at 4 (citing Ex. 2-162 at 29, 62 (EIA Generating Unit Annual Capital and Life Extension Costs Analysis). Recent forced shutdowns—including the shutdown that began in December 2025—demonstrate the need for maintenance expenditures at Craig. Ex. 2-06 (Tri-State

December 2025 Press Release). Tri-State and Platte River stated that due to Craig's age and the extent of deferred maintenance, keeping the plant operable involves "particularly high costs . . . compared to possible alternatives." Ex. 3-06 at 40 (Tri-State and Platte River April Rehearing Request); *see also id.* at 19 ("Ongoing operations at Craig Unit 1 will require continual maintenance and staffing readiness, with further equipment failures requiring repair and staffing (including overtime).").

"All costs" incurred by the Craig Co-Owners to comply with the Order "end up on ratepayers." Ex. 2-163 at 1–2 (Trump Advisor Says Electricity Customers Pay for 202(c) Orders). Tri-State and Platte River have highlighted the unfairness of the "costs of compliance fall[ing] directly on their members and customers." Ex. 2-175 at 1, 4-5 (Tri-State and Platte River January Rehearing Request). Tri-State and Platte River have explained that DOE's 202(c) orders impose "a heavy economic burden" by requiring them to "incur various operations and maintenance costs to ensure Craig Unit 1 is ready and able to operate at SPP's direction." Ex. 3-06 at 20 (Tri-State and Platte River April Rehearing Request)." These costs include "additional investments in operations, repairs, maintenance and, potentially, fuel supply, all factors increasing costs," and Tri-State "is working to prepare filings in support of cost recovery." Ex. 2-166 at 1 (Tri-State January 2026 Press Release); *see also* Ex. 2-175 at 15, 17, 20 (Tri-State and Platte River January Rehearing Request) (describing operational, maintenance, and staffing costs); Ex. 3-06 at 18-20, 26 (Tri-State and Platte River April Rehearing Request) (describing operational and maintenance expenses and replacement fuel costs); Ex. 2-176 at 4-5 (Xcel Motion to Intervene in Petition for Rehearing) (stating that the co-owners have incurred "substantial additional operations, maintenance, and fuel costs," that Xcel's share of those costs was approximately $100,000 as of April 2026, and that Xcel intends to seek cost recovery).

***

These harms can be avoided by retiring Craig. As further discussed below, the Craig Co-Owners—Tri-State, the Salt River Project, Platte River, PacifiCorp, and Xcel—wanted to retire the plant on December 31, 2025. Further, the state and federal regulators—including the Colorado Commission, the Colorado Department of Public Health and Environment, and the U.S. EPA—each approved the retirement. *See, e.g.,* Ex. 2-85 (Colorado Commission Decision in 20A-0528E) (approving resource plan where Craig ceases to generate electricity after 2025); Ex. 2-90 at 40 (Colorado Commission Decision No. C25-0612) (same); Ex. 2-65 (CDPHE Regulation No. 3); 83 Fed. Reg. 31332.

## V. Request for Rehearing

The Order is a manifestation of the Department's overarching policy to systematically misapply Section 202(c) of the Federal Power Act to preserve fossil-fueled power plants, including coal-fired plants, that otherwise would be retired. That

policy aims to bolster the fossil energy industry, irrespective of need, expense, and harm. In its zeal to implement its policy through issuance of the Order, (1) the Department has exceeded the authority Congress gave it, using its "emergency" powers in the absence of any imminent shortfall to impose federal control over basic generation and supply decisions; and (2) the Department has done so without reasoned decision-making and on the basis of purported "facts" that are not supported by credible evidence. *See Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (explaining that, absent statutory authorization, an agency's action is contrary to law); *Allentown Mack Sales & Serv., Inc. v. Nat'l Labor Rel. Bd.*, 522 U.S. 359, 374 (1998) (explaining agency obligation to undertake reasoned decision-making); *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (same); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("The agency must make findings that support its decision, and those findings must be supported by substantial evidence."); *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency cannot ignore evidence contradicting its position."). Numerous examples of the Department's unreasoned and unlawful decision-making are described throughout this section V. The only plausible explanation for these repeated legal errors is that the Department has prioritized implementing its policy over compliance with the law.

Congress never conferred on the Department the broad authority over the country's mix of power generation resources that the Department seeks to wield under the pretense of responding to claimed "emergencies." To the contrary, Congress explicitly reserved authority over resource adequacy and grid reliability to the states, to FERC, and to NERC. *See, e.g.*, 16 U.S.C. §§ 824(a)–(b), 824o; *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U. S. 190, 205 (1983). Both the agency's new policy and the Order exceed the Department's authority and are therefore contrary to law.

Before tackling the Order's legal faults and issues*, see infra* secs. V.A through V.D, it is useful to understand the broader context of the Department's policy. The Department acknowledges that its Order is based on a government-wide policy—dictated by Executive Order—of promoting fossil-based energy through the use of any emergency powers executive departments and agencies could try to invoke. Order at 4–5. The Order relies upon the Energy Emergency Executive Order, 90 Fed. Reg. 8433, which directs the heads of all executive departments and agencies to use "emergency authorities" and "other lawful authorities" to facilitate the production, extraction, creation, and generation of coal and other fossil fuels. Order at 5 (relying on Ex. 2-36 (Energy Emergency EO)).

The Order also relies on another executive order, the Grid EO. *Id.* (relying on Ex. 2-37 (Grid EO)). The Grid EO was issued at the same time as three other executive actions aimed at giving a lifeline to the coal industry, and was announced at a White House political event focused on promoting coal. Ex. 2-38 (NY Times Coal Article). In essence, the Grid EO calls on the Department to assume the authority for resource

adequacy and grid reliability decision-making that the Federal Power Act reserves to others, and to "systemize" the issuance of Section 202(c) orders for that improper purpose. *See* Ex. 2-37, 90 Fed. Reg. at 15521–22 (Grid EO) (directing the Department to "streamline, systemize and expedite" the issuance of Section 202(c) orders; to develop a "uniform methodology" for assessing reserve margins and a protocol to retain generators the Secretary deems critical to system reliability; and to prevent certain generators from leaving the bulk power system or converting to a different fuel source).

The Department's words and actions following issuance of the Grid EO reveal its efforts to unlawfully arrogate to itself others' authority through systematic misapplication of Section 202(c) to prop up coal-burning power plants. The Department's initial steps included issuing a Section 202(c) order to prevent the well-planned retirement of the J.H. Campbell coal plant. *See* Order No. 202-25-3 at *passim*. The Department's order was clear on one point—Campbell cannot be allowed to retire—but left vague and unclear almost everything else. *See, e.g.*, *Consumers Energy Co. v. Midcontinent Indep. Sys. Op., Inc.*, 192 FERC ¶ 61,158, at PP 39–40 (2025) (recognizing the variety of interpretations of the Campbell order and settling on "the most reasonable reading of the DOE Order's intended scope"). The Campbell order failed to make clear even where the grid supposedly needed energy from Campbell, selectively quoted sources without examining their context and core findings, and flouted Congress' explicit limitations on the Department's Section 202(c) powers. *See* Motion to Intervene and Request for Rehearing and Stay of Sierra Club et al. at *passim* (June 18, 2025), https://www.energy.gov/sites/default/files/2025-07/PIO%20Request%20for%20Rehearing%20of%20Order%20No.%20202-25-3.pdf.

After preventing Campbell's retirement, the Department continued to implement its policy. In addition to the Craig orders, the Department has issued Section 202(c) orders to prevent fossil-burning plant retirements in Michigan, Order Nos. 202-25-3, 202-25-7, 202-25-9, 202-26-16, and 202-26-22; Indiana, Order Nos. 202-25-12, 202-25-13, 202-26-19, 202-26-20, 202-26-29, and 202-26-30; Washington, Order No. 202-25-11, 202-26-18, and 202-26-28; in Pennsylvania, Order Nos. 202-25-4, 202-25-8, 202-25-10, 202-26-17, and 202-26-24; and in Florida, Order No. 202-26-26.

Additionally, on July 7, 2025, the Department published the "methodology" required by the Grid EO, which the Department explained will "guide reliability interventions," including the use of Section 202(c) orders. Ex. 2-35 at vi (July Resource Adequacy Report); *see also* Ex. 2-39 at 3–4 (DOE July 7 Press Release) ("The methodology also informs the potential use of DOE's emergency authority under Section 202(c) of the Federal Power Act."). The report identifies no present or imminent emergency; at most, using deeply flawed methodology, it identifies a theoretical shortfall of generation in 2030.

Taken together, the Energy Emergency EO, Grid EO, July Resource Adequacy Report, and the Department's Section 202(c) orders reflect a policy to promote the long-term preservation of fossil-fueled electric generation, including coal-fired generation, by using the Department's emergency authority under Section 202(c). To the extent these actions left any room for doubt that the Department has such a policy, Energy Secretary Wright's own words have removed it. In his statement to the press when the Centralia Order issued, Secretary Wright emphasized, "The Trump administration will continue taking action to keep America's coal plants running." Ex. 2-181 (Department Press Release on March Centralia Order); *see also* Ex. 2-118 (Department Press Release on Centralia Order) (stating same); *see also* Ex. 2-34 (Secretary Wright's West Virginia Remarks) (reporting Secretary Wright's stated intention to stop the closure of coal plants and claimed authority to do so).

The Department has further reinforced this policy by renewing its application to Craig.

*A. The Order Addresses Circumstances Beyond the Lawful Scope of an Emergency Under Section 202(c) and Fails to Provide Evidence or Reasoned Decision-Making Substantiating the Existence of an Emergency under Section 202(c).*

The Order claims an emergency exists within the WECC Rocky Mountain assessment area. Order at 1. According to the Order, "the emergency conditions . . . will continue in the near term and are also likely to continue in subsequent years." *Id.* at 6. The Order then identifies the supposed emergency: "the loss of power to homes and businesses in the areas that may be affected by curtailments or power outages." *Id.*

As discussed below, the Order's determination of an emergency in the WECC Rocky Mountain assessment area exceeds statutory authority and is both unreasoned and without substantial evidence.[2]

---

[2] To the extent the Department claims an emergency in some region distinct from the WECC Rocky Mountain assessment area defined in the Order and by WECC, the Department's emergency declaration still exceeds statutory authority and is both unreasoned and without substantial evidence, including (but not limited to) because the Order does not claim an emergency exists in any such region, presents no reasoning associated with any such region, offers no credible evidence demonstrating an emergency in such region, and fails to examine the evidence detracting from an emergency determination in such region. Moreover, the Order is unreasoned and not based on substantial evidence in imposing requirements to best meet such an emergency and serve the public interest. Public Interest Organizations addressed in January 2026 the Department's prior claim, in the December Order, of an emergency

1. *Legal Framework: Section 202(c) Empowers the Department to Respond Only to Imminent Concerns.*

The Order invokes Section 202(c) of the Federal Power Act, which provides:

> During the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation of transmission of electric energy . . . the Commission shall have authority . . . with or without notice, hearing, or report, to require by order such temporary connections of facilities and such generation, deliver, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest.

16 U.S.C. § 824a(c)(1). That authority was transferred to the Department by the Department of Energy Organization Act. *See* 42 U.S.C. § 7151(b).

Section 202(c)'s text and context establish that an "emergency" enabling the Department to override state and private decision-making must be an imminent circumstance. 16 U.S.C. § 824a(c). As such, the Department may act only where there exists a pressing necessity or exigency that calls for immediate action or remedy from the Department. The constrained scope of Section 202(c)'s emergency authority is confirmed by the broader statutory context—in particular, the separate regime delineating federal authority over bulk-system reliability in Section 215 of the Federal Power Act, *id.* § 824o—as well the Department's regulations, caselaw applying Section 202(c), and the Department's consistent past practice.

i. *The Text and Context of Section 202(c) Confine an Emergency to Imminent Circumstances.*

Section 202(c)'s text empowers the Department to require generation only in an "emergency." *Id.* § 824a(c). Both the ordinary meaning of the term (which the statute does not expressly define) and statutory context limit the Department's emergency authority to circumstances of pressing necessity or exigency that call for immediate action or remedy from the Department. At the time Congress enacted Section 202(c), Webster's New International Dictionary of the English Language (1930) defined "emergency" as, with emphasis added here, a "*sudden* or *unexpected* appearance or occurrence… An *unforeseen* occurrence or combination of circumstances which calls for *immediate* action or remedy; *pressing* necessity; exigency." Contemporary dictionaries similarly define "emergency" as demanding imminence: an emergency is

---

in "WECC Northwest." See Ex. 2-186 at sec. V.A (Public Interest Organizations' January 2026 Rehearing Request).

"an *unforeseen* combination of circumstances or the resulting state that calls for *immediate* action." Merriam Webster's Dictionary 407 (11th ed. 2009) (emphasis added); *see* 3 Oxford English Dictionary 119 (1st ed. 1913) (defining emergency similarly as "a state of things *unexpectedly* arising, and urgently demanding *immediate* action" (emphasis added)); *see also* Benjamin Rolsma, *The New Reliability Override*, 57 Conn. L. Rev. 789, 812 n.147 (2025) (noting that dictionaries have given the term "emergency" the "same meaning for many years").

The remainder of Section 202(c) underscores the exigency inherent in the governing term "emergency." The authority granted by Section 202(c) is, in the first instance, a war-time power. 16 U.S.C. § 824a(c) (beginning with "[d]uring the continuance of any war in which the United States is engaged"); *see Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) (noting that statutory terms should be interpreted in the context of nearby parallel terms "in order to avoid the giving of unintended breadth to the Acts of Congress"). An "emergency" under the statute is limited to circumstances of similar urgency: "a *sudden* increase in the demand for electric energy," for example. 16 U.S.C. § 824a(c) (emphasis added); *see Richmond Power & Light v. FERC*, 574 F.2d 610, 615 (D.C. Cir. 1978) (holding that Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances"); S. Rep. No. 74-621, at 49 (1935) (explaining that Section 202(c) provides "temporary power designed to avoid a repetition of the conditions during the last war, when a serious power shortage arose").

The text's use of the present tense accentuates its focus on imminent and certain concerns: It empowers the Department to act only where "an emergency *exists*." 16 U.S.C. § 824a(c) (emphasis added). The Section's title and text both emphasize that it provides a "temporary" authority, further emphasizing that its emphasis on immediate—not distant—needs. *Id.* § 824a(c), (c)(1); *see Dubin v. United States*, 599 U.S. 110, 120–21 (2023) (cleaned up) ("The title of a statute and the heading of a section are tools available" to resolve "the meaning of a statute," and "a title is especially valuable where it reinforces what the text's nouns and verbs independently suggest."). That near-term focus precludes use of Section 202(c) to pursue broader or long-term energy-policy goals, such as a "fear of overdependence" on foreign oil supplies, *Richmond Power & Light*, 574 F.2d at 617, or "energy independence," Ex. 2-35 at 1 (July Resource Adequacy Report); *see also Richmond Power & Light*, 574 F.2d at 614 (Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances, and is aimed at situations in which demand for electricity exceeds supply and not those in which supply is adequate but a means of fueling its production is in disfavor.").

Section 202's overall structure further highlights Section 202(c)'s emphasis on imminent, near-term concerns. The preceding subsections (202(a) and (b)) together define and limit the tools by which the federal government may pursue "abundant" energy supplies in the normal course. 16 U.S.C. § 824a(a) (seeking "abundant supply of electric energy" by directing the federal government to "divide the country into

regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy"); *id.* § 824a(b) (allowing federal government to order "physical connection . . . to sell energy to or exchange energy" upon application, and after an opportunity for hearing). The resulting statutory "machinery for the promotion of the coordination of electric facilities" comprises the following: in subsection (a), an instruction to establish a general framework meant to facilitate "coordination by voluntary action"; in subsection (b), "limited authority to compel interstate utilities to connect their lines and sell or exchange energy," subject to defined procedural and substantive requirements, when "interconnection cannot be secured by voluntary action"; and in subsection (c), "much broader" but "temporary" authority "to compel the connection of facilities and the generation, delivery, or interchange of energy during times of war or other emergency." S. Rep. No. 74-651 at 49 (1935).

That tiered structure—placing primary emphasis on voluntary resource adequacy planning, 16 U.S.C. § 824a(a), specifying limited authority where that voluntary system fails, *id.* § 824a(b), and allowing for "temporary" central command-and-control only in case of an "emergency," *id.* § 824a(c)—requires that Section 202(c) remain narrowly confined to instances of an immediate and unavoidable "break-down in electric supply," S. Rep. No. 74-651 at 49 (1935), rather than a mere desire for more abundant supply in the future, *cf.* Order at 6 (emphasis added) (pointing to conditions that "will continue in the near term and are also *likely* to continue in *subsequent years*" that "*could* lead to the loss of power . . . in the areas that *may* be affected by curtailments or power outages, presenting a *risk* to public health and safety"). The tiered structure authorizes increasingly intrusive federal intervention, but under increasingly narrow circumstances. Interpreting Section 202(c)'s "emergency" powers to permit the Department to compel generation based on nothing more than the generalized challenges of operating a reliable bulk electric system in a transforming energy landscape, or concerns over longer-term resource adequacy, *see* Order at 1–5, would unwind the careful balance of voluntary, market-driven action and federal power set out in Sections 202(a) and 202(b). Such an interpretation cannot be squared with the statutory text and structure. *See Otter Tail Power Co. v. Fed. Power Comm'n*, 429 F.2d 232, 233–34 (8th Cir. 1970) (holding that Section 202(c) "enables the Commission to react to a war or national disaster," while Section 202(b) "applies to a crisis which is likely to develop in the foreseeable future").

*ii. Congress' Enactment of a Specific, Cabined Scheme to Address Reliability Concerns Confirms That Generalized or Long-Term Bulk Power System Reliability Concerns Are Not an "Emergency" Under Section 202(c).*

That the Department's Section 202(c) emergency powers do not extend to general supervision of bulk power-system reliability is confirmed by Section 215 of the Federal Power Act—which specifically and directly delineates the scope of federal authority to enforce mandatory reliability requirements for the bulk power system. 16 U.S.C. § 824o. Congress added Section 215 to the Federal Power Act in 2005

precisely because the Act as it then existed—including Section 202—did not give the federal government the power to enforce measures designed to ensure bulk-system reliability. *See Rules Concerning Certification of the Elec. Reliab. Org.; and Procedures for the Establishment, Approval, and Enforcement of Elec. Reliab. Standards*, 70 Fed. Reg. 53117, 53118 (Sept. 7, 2005) ("In 2001, President Bush proposed making electric Reliability Standards mandatory and enforceable," leading to enactment of Section 215 in 2005); Ex. 2-119 at page 7-6 (2001 National Energy Policy) (noting that "[r]egional shortages of generating capacity and transmission constraints combine to reduce the overall reliability of electric supply in the country" and that "one factor limiting reliability is the lack of enforceable reliability standards" because "the reliability of the U.S. transmission grid has depended entirely on *voluntary* compliance," and then recommending "legislation providing for enforcement" of reliability standards (emphasis added)); S. Rep. No. 109-78 at 48 (2005) (stating that Section 215 "changes our current voluntary rules system" for bulk-system reliability "to a mandatory rules system"); *see also Alcoa, Inc. v. FERC*, 564 F.3d 1342, 1344 (D.C. Cir. 2009) (noting that prior to the Energy Policy Act of 2005, "the reliability of the nation's bulk-power system depended on participants' voluntary compliance with industry standards").

By enacting Section 215, Congress provided a comprehensive and carefully circumscribed scheme to empower the federal government to enforce bulk-system reliability requirements. That statutory scheme strikes a careful balance between state and federal authority, and between private, market-driven decisions and top-down control. Reliability standards are devised by NERC independent "of the users and owners and operators of the bulk-power system" but with "fair stakeholder representation." 16 U.S.C. § 824o(c)–(d); *see also id.* § 824o(a)(3) (defining reliability standards as "a requirement . . . to provide for reliable operation of the bulk-power system"). FERC may approve or remand those standards (but not replace them with its own) and is required to "give due weight" to NERC's "technical expertise" while independently assessing effects on "competition." *Id.* § 824o(d)(2)–(4). Section 215 provides specified enforcement mechanisms and procedures for reliability standards—which mechanisms conspicuously exclude the power to command specific generation resources to remain operational. *Id.* § 824o(e). And Section 215 carefully preserves state authority over "the construction of additional generation" and in-state resource adequacy, establishing regional advisory boards to ensure appropriate state input on the administration of reliability standards. *Id.* § 824o(i)–(j).

Interpreting Section 202(c) to permit the Department to mandate generation based on its own unfettered assessment of bulk-system reliability needs would effectively allow the Department to bypass Section 215's procedural safeguards, constraints on federal authority, and protection of state power. Such a bypass would impermissibly "contradict Congress' clear intent as expressed in its more recent," reliability-specific legislation, enacted "with the clear understanding" that the Department had "no authority" to address long-term reliability through Section 202(c). *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 142 &

149 (2000); s*ee also Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 401–02 (D.C. Cir. 2004) ("Congress's specific and limited enumeration of [agency] power" over a particular matter in one Section of the Federal Power Act "is strong evidence that [a separate Section] confers no such authority on [agency]."). Congress has, in Section 215, directly established the mechanisms (and limitations) by which the federal government may compel action to ensure the reliability of bulk power electric system. In so doing, it has confirmed that the Department may not, through Section 202(c) "emergency" orders, use those reliability concerns to mandate the generation it views as required to address broad resource adequacy problems; the Department's emergency authority is confined to shortfalls requiring immediate response.

*iii. The Department's Regulations Similarly Establish that Section 202(c) Emergency Authority Can Only Be Invoked to Address Imminent, Certain Supply Shortfalls Requiring Immediate Response.*

The Department's regulations demonstrate its own long-standing understanding that Section 202(c)'s emergency authority is confined to imminent, certain, and otherwise unavoidable resource shortages, and does not provide a mechanism to address broad, long-term concerns as to the reliability of the bulk power system. The regulations recognize that an emergency under Section 202(c) requires, first, "a *specific* inadequate power supply situation." 10 C.F.R. § 205.371 (emphasis added). The Department's non-specific dissatisfaction with regional power planning does not, consequently, empower the Department to override that planning by emergency order. The need for both specificity and certainty is repeated in the Department's regulations defining an inadequate energy supply: "A system may be considered to have" inadequate supply when "the projected energy deficiency . . . *will* cause the applicant [for a 202(c) Order] to be unable to meet its normal peak load requirements based upon use of all of its otherwise available resources so that it *is* unable to supply adequate electric service to its customers." *Id.* § 205.375 (emphasis added). The same provision suggests that an emergency will generally exist only when "the projected energy deficiency . . . without emergency action by the [Department], will equal or exceed 10 percent of the applicant's then normal daily net energy for load." *Id.*

The regulations further recognize that Section 202(c) does not provide a means of planning against months-off expectations or risks. They define an emergency as "an unexpected inadequate supply of electric energy which may result from the unexpected outage or breakdown" of generating, transmission, or distribution facilities—not a tool to ensure future energy abundance, or override state and private planning that the Department deems inadequate. 10 C.F.R. § 205.371. Under the regulations, emergencies are characterized by shortages produced by "weather conditions, acts of God, or unforeseen occurrences not reasonably within the power of the affected 'entity' to prevent." *Id.* Where the culprit is increased demand, it must be "a *sudden* increase in customer demand," *id.* (emphasis added), rather than demand projections producing non-immediate reliability concerns.

And while the regulations suggest that "inadequate planning or the failure to construct necessary facilities *can* result in an emergency," they recognize that the Department may not utilize a "continuing emergency order" to mandate long-term system planning. *Id.* (emphasis added). The regulations also recognize that "where a shortage of electricity is projected due solely to the failure of parties to agree to terms, conditions, or other economic factors" there is no emergency "unless the inability to supply electric service is *imminent*." *Id.* (emphasis added). An emergency may exist where past planning failures produce an immediate, present-tense shortfall (that is where, a shortfall *results* from insufficient planning); the Department has no authority to commandeer bulk-system reliability planning merely because it deems current plans inadequate. *See* 10 C.F.R. § 205.375 (requiring present inability to meet demand to demonstrate inadequate energy supply). As the Department stated when it promulgated those regulations, the statute allows the Department to provide "assistance [to a utility] during a period of unexpected inadequate supply of electricity," but does not empower it to "solve long-term problems." *Emergency Interconnection of Elec. Facilities and the Transfer of Elec. to Alleviate an Emergency Shortage of Elec. Power,* 46 Fed. Reg. 39984, 39985–86 (Aug. 6, 1981).

*iv. Courts Have Uniformly Held that Section 202(c) Can Be Invoked Only in Immediate Crises.*

Caselaw applying Section 202(c) further supports the narrow circumstances under which it permits the Department to seize command of the power system. *Richmond Power and Light* arose out of the 1973 oil embargo. The Federal Power Commission responded to the embargo by calling for voluntary transfer of electricity from non-oil power plants to areas of the country that relied heavily on oil, such as New England. 574 F.2d at 613. The New England Power Pool was not convinced that the voluntary program would work and petitioned the Commission for a 202(c) order. *Id.* Rather than issue such an order, the Commission facilitated an agreement between state commissions and supplying utilities, which satisfied the New England Power Pool, leading it to withdraw its petition. *Id.* A dissatisfied utility sought judicial review of the Commission's decision to allow the withdrawal of the Section 202(c) petition. *Id.* at 614.

The court easily upheld the Commission's decision not to invoke Section 202(c). *Id.* Though the oil embargo had ended, the utility argued that the "high cost and uncertain supply of imported oil" justified an emergency order. *Id.* The Commission countered that the voluntary program had worked, the New England Power Pool never interrupted service, and there was no need for a Section 202(c) order. *Id.* at 615. The D.C. Circuit agreed. *Id.* The utility alternatively argued that "dependence on imported oil leaves this country with a *continuing* emergency." *Id.* (emphasis added). The court observed that Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances." *Id.* Interpreting this statutory language, the court upheld the Commission's view that Section 202(c) cannot be used when "supply is adequate but a means of fueling its production is in disfavor." *Id. Richmond Power*

*and Light* thus teaches that Section 202(c) is not an appropriate means to implement long-term national policy to switch fuels.

The Eighth Circuit has similarly held that Section 202(c) can only be used to respond to immediate crises. In *Otter Tail Power*, a utility insisted that the only way for the Federal Power Commission to properly order the utility to connect to a municipal power provider was to issue a Section 202(c) order. 429 F.2d at 234. Demand for electricity in the city had increased, and the peak load of the municipal power provider was getting to be so high that both of its two generators would likely need to be used simultaneously in the near future, "causing a possible loss of service should one malfunction during a peak period." *Id.* at 233–34. To avoid this possible loss of service, the Federal Power Commission issued a Section 202(b) order, requiring the utility to connect to the municipal power provider. *Id.* The utility argued that the Federal Power Commission used the wrong provision and should have used Section 202(c) instead. *See id.*

The court explained that Section 202(c) "enables the Commission to react to a war or national disaster" by ordering "immediate" interconnection during an "emergency." *Id.* at 234. For non-emergency situations, "[o]n the other hand, Section 202(b) applies," including when there is a "crisis which is likely to develop in the foreseeable future but which does not necessitate immediate action on the part of the Commission." *Id.* The court upheld the Commission's use of Section 202(b) instead of Section 202(c) because there was no immediate emergency. *See id.* The case law thus uniformly supports that Section 202(c) can only be used in short-term, urgent emergencies.

*v. The Department's Prior Orders Recognize that Section 202(c) Does Not Confer Plenary Authority Over Bulk-System Resource Adequacy.*

The Department's consistent application of Section 202(c) prior to 2025 further corroborates the urgency of the emergency conditions that are the necessary predicate for any Department intervention under that Section 202(c). *See Fed. Trade Comm'n v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941) ("[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it is equally significant in determining whether such power was actually conferred."). Since obtaining authority under Section 202(c) in the 1970s and prior to 2025, the Department has consistently used Section 202(c) to address specific, imminent, and unexpected shortages—not to address longer-term reliability concerns or demand forecasts. *See, e.g.*, Ex. 2-13 at 1 (DOE Order No. 202-22-4) (responding to ongoing severe winter storm producing immediate and "unusually high peak load" between Christmas Eve and Boxing Day); Ex. 2-16 at 1–2 (DOE Order No. 202-20-2) (responding to shortages produced by ongoing extreme heat and wildfires); Ex. 2-20 at 1 (DOE Order No. 202-08-1) (ordering temporary connection of facilities in response to "massive devastation caused by Hurricane Ike," leaving "large portions"

of Texas "without electricity"); *see also* Rolsma, 57 Conn. L. Rev. at 803–04 (describing "sparing[]" use of Section 202(c) outside of war-time shortages during the twentieth century).[3] Public Interest Organizations are not aware of any instance in which, before 2025, the Department utilized Section 202(c) in response to generalized regional risks related to long-term resource adequacy without any immediate need for the Department to address a particular, defined generation shortfall, and for good reason: Any such use would exceed the Department's statutory authority.

2. *The Order Primarily Focuses on Long-Term Bulk-System Reliability and Coal Plant Retirements, Neither of Which Is an Emergency Under Section 202(c), and Separately the Claimed "Long-Term" Emergency Is Unreasoned and Not Based on Substantial Evidence.*

The Department's determination that an emergency exists rests on its assertion that "increasing demand and shortage from accelerated retirement of generation facilities . . . could lead to the loss of power to homes and businesses." Order at 6. This determination focuses on long-term concerns, noting that such conditions are "likely to continue in subsequent years" in concluding that an emergency designation is appropriate. *Id.* Those concerns—even if fully substantiated—would not be a basis to mandate Craig's continued operation. And they are not substantiated. Utilities and regulators have taken and are continuing to take steps to address longer-term adequacy to ensure no resource shortfall arises.

i. *Even Assuming Arguendo Evidentiary Support, the Department's Long-Term Concerns, as Well as Its Concerns About Coal Plant Retirements, Are Not an "Emergency" Within the Meaning of 202(c).*

As an initial matter, even if the Order's claimed emergency conditions were established (they are not), reliability concerns arising beyond "the near term . . . in subsequent years," Order at 6, do not qualify as an emergency under Section 202(c). Such concerns are neither imminent nor unexpected. The Department's stated concerns cannot plausibly be characterized as a "*sudden* increase in the demand for

---

[3] The Department has also narrowly tailored the remedies in Section 202(c) orders before 2025 to ensure that the orders only address the stated emergency, to limit the order to the minimum period necessary, and to mitigate violations of environmental requirements and impacts to the environment. *See, e.g.*, Ex. 2-13 at 4–7 (DOE Order No. 202-22-4) (limiting order to the 3 days of peak load, directing PJM to exhaust all available resources beforehand, requiring detailed environmental reporting, notice to affected communities, and calculation of net revenue associated with actions violating environmental laws); Ex. 2-16 at 3–4 (DOE Order No. 202-20-2) (limiting order to the 7 days of peak load, directing CAISO to exhaust all available resources beforehand, requiring detailed environmental reporting).

electric energy" or a "shortage" in electric energy, generation, or transmission constituting an emergency. 16 U.S.C. § 824a(c)(1) (emphasis added).

At most, the Order describes long-term trends that may affect the reliability of the bulk power system in the future if left unaddressed. The Order's longer-term concerns are based on projections of demand increases, changes in the mix of power supply resources, challenges in resource development, and the Administration's view of foreign actors. *See* Order at 1–6.

While many of the Order's stated concerns are the province of state, regional, and private entities, Congress has provided certain mechanisms for the federal government to address the reliability concerns raised in the Order. The emergency provision in Section 202(c), along with the Department's claimed power to seize command-and-control authority over generating resources like Craig, are not among those mechanisms.

The congressionally provided mechanisms to the federal government include Section 202(a), which allows the federal government to pursue "an abundant supply of electric energy" but only by facilitating "*voluntary* interconnection and coordination of facilities for the generation, transmission, and sale of electric energy" 16 U.S.C. § 824a(a) (emphasis added). Additionally, under certain circumstances, Section 202(b) allows the federal government to require utilities to sell or exchange energy with other facilities, but only upon application and with "no authority to compel the enlargement of generating facilities for such purposes." *Id.* § 824a(b).

Another mechanism, Section 215, provides for mandatory, nationwide reliability standards developed and enforced by a federally certified but independent entity. 16 U.S.C. § 824o(d)–(e). "These standards," the Department explains, "ensure that all owners, operators, and users of the bulk-power system have an obligation to maintain system security and reliability." Ex. 2-120 at 7 (Department Export Authorization EA-365-C (Oct. 21, 2025)). The standards cannot be enforced by ordering generation facilities to operate, and Section 215 specifically disallows requiring the "construction of additional generation" or "enforc[ing] compliance" with "adequacy" standards. 16 U.S.C. § 824o(e), (i)(2).

The Order purports to mandate generation based upon the Department's assessment of the bulk power system's long-term reliability needs, a power Congress chose not to provide *any* federal agency. *See* 16 U.S.C. § 824o(e) (specifying enforcement mechanisms for federal reliability standards). And what authority Congress has authorized to implement mandatory reliability standards it provided to FERC—not the Department. *Alcoa,* 564 F.3d at 1344. Reliability concerns in future years simply do not constitute an emergency within the meaning of Section 202(c).

An emergency under Section 202(c) must be imminent. Section 202(c) provides an explicitly "temporary" authority, 16 U.S.C. § 824a(c), preventing any interpretation

of its terms that might encompass a potential resource adequacy emergency in "subsequent years." Order at 6. The expansive interpretation of Section 202(c) implicit in the Order, stretching the meaning of "emergency" to cover resource planning concerns over "years" subsequent to the near term, is further precluded by the Federal Power Act's express background principles of permitting "Federal regulation" only of "matters which are not subject to regulation by the States," and disavowing "jurisdiction, except as specifically provided" over "facilities used for the generation of electric energy." 16 U.S.C. § 824(a), (b)(1); *see Duke Power Co. v. Fed. Power Comm'n,* 401 F.2d 930, 938 & 938 n.51 (D.C. Cir. 1968) (explaining that the Federal Power Act's policy declarations are "relevant and entitled to respect as a guide in resolving any ambiguity or indefiniteness in the specific provisions which purport to carry out its intent"). The Department knows that "resource adequacy planning and capacity requirements . . . have traditionally been the domain of state regulatory commissions, NERC-certified Regional Entities, and RTOs/ISOs," *i.e.*, not the Department. Ex. 2-120 at 5 n.4 (Department Export Authorization EA-365-C (Oct. 21, 2025)).

Through the Order, the Department expressly seeks to override the decisions of utilities and their regulators pursuant to the procedures established by Congress to ensure abundant electricity supplies and the reliability of the bulk-electric system. In using an emergency declaration to engage in long-term resource planning, the Department is usurping the role of states and others charged with resource adequacy planning. Section 202(c) does not permit that effort to transform the statutory scheme from one driven primarily by market- and state-based decision-making to one consolidating centralized command-and-control in the Department. And it especially does not permit that transformation in service of the Department's desire to dictate "how much coal-based generation there should be over the coming decades"—a power that the Supreme Court has found Congress "highly unlikely" to have left to agency discretion. *West Virginia v. EPA*, 597 U.S. 697, 729 (2022). The retirements of generators burning coal and other fossil fuels to which the Order devotes significant attention do not constitute an emergency under Section 202(c). *See, e.g.*, *Richmond Power & Light*, 574 F.2d at 614 (Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances, and is aimed at situations in which demand for electricity exceeds supply and not those in which supply is adequate but a means of fueling its production is in disfavor.").[4]

[4] For the same reasons, the logistical and financial challenges of bringing back a decommissioned coal plant—i.e., the fact that keeping the Department's favored generation resource functional is costly—cannot constitute an emergency under Section 202(c). *Contra* Order at 1-2, n.6.

*ii. The Order's Cited Evidence Does Not Demonstrate Any Long-Term Resource Adequacy Concerns.*

In addition to being an invalid basis for Department action under Section 202(c), the Order's discussion of long-term concerns is unreasoned and without substantial evidence, including because the Order both overestimates the potential of a shortfall and underestimates the ability of existing processes to address any projected shortfall. The Order discusses six sources touching on long-term issues, some of which simply regurgitate the two previous orders' findings: (1) NERC's 2025 Long-Term Reliability Assessment; (2) the 2025 Western Assessment of Resource Adequacy; (3) the 2024 Western Assessment of Resource Adequacy; (4) data from the Energy Information Administration concerning generating capacity in Colorado; (5) executive orders and a presidential memorandum; and (6) DOE's July Resource Adequacy Report. Order at 1-6. None of these sources presents evidence of circumstances anywhere near an emergency in the Rocky Mountain region. And many other sources the Department knows or should know, yet fails to consider, further undermine the Department's claim.

*NERC's 2025 Long-Term Reliability Assessment*

In the "Background" section, the Order quotes and cites to the 2025 Long-Term Reliability Assessment. Order at 3. The Order recites the following factors listed in the Assessment: the WECC Rocky Mountain Region has an "[anticipated reserve margin] that falls below the [Reference Margin Level] in Summer 2034 and 2035, and Winter 2034-35"; the area "faces challenges from an aging thermal resource fleet"; and "solar and wind variability are year-round concerns." Order at 3.

The Order's reliance on the 2025 Long-Term Reliability Assessment is unreasoned. The Order cites statements that do state or even support the existence of an emergency under Section 202(c) while ignoring the remainder of the document, which undercuts the Department's claimed emergency. The 2025 Long-Term Reliability Assessment finds that the WECC Rocky Mountain assessment area has normal risk. Ex. 2-178 at 7, 159–62 (NERC 2025 Long-Term Reliability Assessment). In detailing its findings for 2027 and 2029, the assessment reports 0 MWh of expected unserved energy, 0 ppm of normalized unserved energy, and 0 hours of lost load risk. See Figure 11 below.

*Figure 11: NERC Assessment Results*

| Base-Case Summary of Results | | | |
|---|---|---|---|
| | 2026* | 2027 | 2029 |
| EUE (MWh) | N/A | 0 | 0 |
| NEUE (ppm) | N/A | 0.00 | 0.00 |
| LOLH (hours per Year) | N/A | 0.00 | 0.00 |
| *No prior results as the assessment area is new for the 2025 LTRA. | | | |

Source: Ex. 2-178 at 161 (NERC 2025 Long-Term Reliability Assessment).

Moreover, the Department's own data reveals that actual conditions in distant years are more protective than depicted in the NERC data. The NERC assessment of lost load hours for the WECC Rocky Mountain assessment area is tied to "Tier 1" resources, *see id.* at 159–62, 168, but Department data reveals the area has a greater number of Tier 1 resources than included in the NERC assessment, Ex. 2-182 at 10 (Grid Strategies Analysis of NERC LTRA). Department data further reveals that there is a significant amount of Tier 2 resources planned for the WECC Rocky Mountain assessment area, even after accounting for likely resource cancellations. *Id.* at 11–12. NERC's assessment excludes Tier 2 supply-side resources, yet projects heightened demand through inclusion of data center demand akin to Tier 2 additions. *See* Ex. 2-178 at 9 (NERC 2025 Long-Term Reliability Assessment) ("To be counted in load forecasting, data center projects have advanced from speculative and exploratory stages into development commitments necessary to drive grid planning studies."); Ex. 2-182 at 19 (Grid Strategies Analysis of NERC LTRA) ("The LTRA includes all loads with 'development commitments necessary to drive grid planning studies.' In contrast, the LTRA only counts generators that have completed all planning studies and signed an interconnection agreement."). In sum, the supply-side picture in the NERC assessment underestimates likely-to-connect power resources, while there is good reason to believe the demand-side picture overestimates future data center needs, resulting in an analysis that is "too pessimistic." Ex. 2-182 at 4–5 (Grid Strategies Analysis of NERC LTRA).

In addition, projections about reserve margin levels in 2034–2035 cannot establish that an emergency exists, because utilities and grid operators have ample time to address any potential needs for incremental resources in 2034–2035. "The fact that a study such as the 2025 [Long-Term Reliability Assessment] might show a potential shortfall in 2034 and beyond if no further action is taken does not mean that shortfall will, or is likely to, actually occur in 2034. That is because each utility in the Rocky Mountain assessment area regularly forecasts whether it will need additional resources and then procures the resources needed to meet future customer demand." Ex. 2-185 at 9 (Current Energy Group April Report).

The 2024 Long-Term Reliability Assessment does not support the claimed emergency, either. The 2024 assessment finds that the WECC-NW region (which at that time encompassed the current WECC Rocky Mountain assessment area) has

normal risk. Ex. 2-07 at 6 (NERC 2024 Long-Term Reliability Assessment). And when Tier 2 resources are included, the 2024 Long-Term Reliability Assessment finds that the reserve margin in the WECC-NW region remains above reference levels through 2034. *See* Ex. 2-01 at 14–15 (Current Energy Group January Report); *see also* Ex. 2-02 at 7–8 (Grid Strategies Resource Adequacy Report). The 2024 Long-Term Reliability Assessment reaches this finding even while projecting demand growth of 18.7% in the WECC-NW region, more than double the 8.5% demand growth referenced in the December Order. *See* Ex. 2-01 at 15 (Current Energy Group January Report); Order at 3. Thus, even with the planned retirements of multiple coal and natural gas units in the region and the potential for increased demand, the WECC Northwest assessment area is within a region that the 2024 Long-Term Reliability Assessment assesses as "begin[ning] from a position of strong resource adequacy" and "finds no evidence of medium-term resource adequacy crisis." Ex. 2-01 at 15 (Current Energy Group January Report).

*WECC's 2025 Western Assessment of Resource Adequacy*

The Order references isolated statements from WECC's 2025 Western Assessment of Resource Adequacy, including that the "West could see energy shortfalls as early as 2028" and that "90% of planned resources over the next decade are inverter-based resources." Order at 3–4.

WECC's 2025 assessment contradicts the Department's determination that an emergency exists in the Rocky Mountain region. WECC's 2025 assessment finds that the Rocky Mountain region is at "normal"—not elevated—risk. Ex. 2-183 (2025 Western Assessment of Resource Adequacy); *see* Ex. 2-185 at 1 (Current Energy Group April Report). See Figure 12 below, which appears in WECC's 2025 assessment.

Figure 12: WECC's 2025 Subregional Risk Assessment




Source: Ex. 2-183 at PDF 3 (2025 Western Assessment of Resource Adequacy).

WECC's 2025 assessment shows little-to-no loss of load events and hours unless only two-thirds of planned additions are added, and even then the risk is years away. See Ex. 2-183 at PDF 8–11 (2025 Western Assessment of Resource Adequacy); Ex. 2-184 at PDF 38–42 (2025 WARA Supplemental Information); Ex. 2-185 at 6–8 (Current Energy Group April Report). WECC found that the Rocky Mountain region would experience zero loss of load hours over the next ten years if planned additions are completed on time, even in the high load scenario. Ex. 2-185 at 6–8 (Current Energy Group April Report).

The Order does not provide any evidence that planned resource additions have in fact been delayed or cancelled in the Rocky Mountain region. To the contrary, as explained below, the largest electric utilities in the Rocky Mountain region, such as Xcel and Tri-State, continue to bring new resources online and to procure additional resources. The Order also offers no reason or evidence that conditions beyond the Rocky Mountain region support the claimed emergency in the Rocky Mountain region.

The Order also quotes and cites to WECC's statement that 90% of planned resource additions "are inverter-based resources," while "the vast majority" of retiring generation is coal, natural gas, and nuclear. Order at 4. This is not evidence of a long-term shortfall in electricity or generating supplies. The Order does not even attempt to explain how the planned addition of generating capacity—even if from "inverter-

based resources"—and the resulting shift in resource mix can possibly qualify as evidence of, or contribute to, a shortfall in electricity or generating supplies. To the contrary, several reports from within the Department indicate that integrating much higher levels of wind, solar, and battery storage is compatible with meeting electricity demand and maintaining reliability. For example, the National Laboratory of the Rockies, which is housed within the Department, has conducted retrospective studies documenting that utilities have integrated large amounts of "inverter-based resources" while meeting electricity demand and satisfying reliability standards. Ex. 2-173 at 16-18 (2024 NREL Lessons from Renewable Integration Studies) ("Over the past two decades, dozens of studies have been conducted to evaluate questions associated with maintaining reliability in power systems with an increased deployment of variable renewable energy (wind and solar). . . . These lessons can support current utility plans to develop large amounts of economic renewable energy deployments while maintaining state and federal reliability standards."). Similarly, the National Laboratory of the Rockies has conducted prospective studies demonstrating that it is possible to integrate much higher levels of "inverter-based resources," particularly wind, solar, and battery storage, while meeting electricity demand and reliability standards. Ex. 2-174 at 39-43 (2021 NREL North American Renewable Integration Study).

Moreover, the Department's stated concern about a shifting resource mix in Colorado ignores the comprehensive processes regional planners undergo to ensure ongoing resource adequacy in their service territories. As those processes demonstrate, there is nothing sacred about electrons generated by coal plants that make them more suited than any other resource to maintain grid stability, and thus there is no cause for alarm at the prospect of coal dropping from 45% to 25% of Colorado's electric output. *See* Order at 4.

Resource adequacy planning, in which grid operators utilize a Loss of Load Model to compare the suite of available resources with projected peak loads and ensure that the region meets a certain grid reliability standard, "is a well-established practice across the country." Ex. 2-01 at 4 (Current Energy Group January Report). One key output of this process is a "Planning Reserve Margin," which describes the percentage of excess supply-side resources (i.e., beyond what are needed to serve projected peak load periods) that are or should be on the system to meet the standard.

Crucially, a well-run resource adequacy process will typically include an assessment of individual resources' ability to help alleviate potential shortfalls, i.e. during major storms and heat waves. This assessment is used to derate individual resources based on how likely they are to show up when supply is tight and/or demand is high; the process is often called "capacity accreditation." *Id.* at 5. The methodology for accrediting the capacity from generating resources naturally takes into account different sources of uncertainty for different resources—for instance, wind and solar units are limited mostly by the likelihood of different weather conditions, whereas

thermal units will be limited by both extreme weather events and periodic equipment failures—but the accredited capacity value that results is universal. This reflects the ultimate goal of the capacity accreditation process, which is to create apples-to-apples comparisons of the value different resource types provide: while resource accreditation values may change over time, one MW of accredited capacity from a wind farm is equivalent to that from a coal plant.

The Order also quotes and cites to WECC's statement concerning the amount of generation expected to retire "over the next 10 years," i.e., by the end of 2035. Order at 4. As a threshold matter, planned generator retirements do not, by themselves, support the Order's claim that there exists "a shortage of electric energy" or "a shortage of facilities for the generation of electricity." *Id.* at 1. While the Order cites WECC's estimate that 22 GW of generation may retire through 2035, *id.* at 4, the Order neglects to mention that WECC estimates that approximately 177 GW of new capacity additions are planned through 2035, Ex. 2-183 at 3, 15–16. It is fundamentally unreasoned, and arbitrary and capricious, for the Department to support its claim that a shortage of energy or facilities exists by focusing solely on generator retirements rather than considering both subtractions and additions to generating capacity. When WECC considered both sides of the equation (i.e., both retirements and planned additions), WECC found that the Rocky Mountain region would have zero loss of load hours through 2035 in the "All Additions" and "95%" scenarios. *Id.* at 8.

Moreover, the Department has claimed, while denying the Public Interest Organizations' rehearing request of the December Order, that it takes much less time than 10 years to bring new generating resources online. For example, the Department has asserted that "[i]t can take months, if not years" to bring new resources online, and claimed that the "typical" project took 55 months to bring online "from interconnection request to the beginning of commercial operations." Ex. 3-01 at 7 (December Rehearing Order, Order No. 202-25-14B). We do not concede that the Department's assertions about the length of time needed to bring new resources online are supported by substantial evidence and accurately reflect timelines in the Rocky Mountain Assessment Area. However, the Department's statements that new resources can be brought online in "months," and that the typical new project can be brought online in "55 months," undermines the Order's reliance on retirements planned more than 55 months in the future to support finding that a shortage of capacity or electricity exists or will exist. 55 months from the date the Order was issued would be March 2031. The 2025 WECC assessment that the Order cites to shows that planned retirements from 2031 through 2035 comprise more than a third of the 22 GW of planned retirements that the Order cites.

Even if the Department were correct that it takes 55 months to bring new generating resources online (it is not), and even if section 202(c) allowed the Department to consider long-term conditions (it does not), the Department could not support the existence of a shortage more than 55 months in the future—because new generating resources could be brought online to avert such a shortage. Moreover, the sole document that the Department cites for the proposition that the "typical" new generating project takes 55 months to bring online is a nation-wide average that overstates the time needed to bring new resources online in the Rocky Mountain Assessment Area. The Lawrence Berkeley National Lab found that interconnection timelines are "typically longer in FERC-jurisdictional ISOs" and that "ERCOT and the non-ISO regions (Southeast and West) have faster processing times." Ex. 3-02 at 40 (Queued Up: 2025 Edition); *see also id.* at 48. A significant number of the electric utilities in the Rocky Mountain Assessment Area do not have their interconnection process managed by an ISO or RTO, and thus the study's estimate of 55 months to bring new resources online overestimates the timeline for at least a portion of the Rocky Mountain Assessment Area.

The Department has failed to explain its inconsistent statements, and it is arbitrary and capricious for the Department to base its finding of a shortage on retirements that are expected to occur on a timeline longer than the Department has stated is needed to bring replacement generation online. That is particularly the case given the evidence presented in this request that utilities throughout the Rocky Mountain Assessment Area have plans to bring new generating, storage, and demand response resources online well before the end of 2035.

*WECC's 2024 Western Assessment of Resource Adequacy*

WECC's 2024 Western Assessment of Resource Adequacy, which the Department summarized in the Order and cited in the December Order as a basis for finding an emergency condition, also does not provide evidence of a long-term shortfall. The December Order references isolated statements from this document: a forecast of peak demand growth in "WECC's Northwest-Central subregion"; the fact that "most planned retirements are 'baseload generation, such as coal, natural gas, and nuclear'"; and the proposition that "571.3 MW of coal-fired generating capacity across six units at three locations have retired in Colorado." December Order at 2.

The Order is also unreasoned and not based on substantial evidence in failing to consider key facets of the 2024 Western Assessment of Resource Adequacy. The document serves to inform planning and does not identify an existing crisis or call for extraordinary measures outside of the normal planning process. Ex. 2-01 at 11–12 & app'x A at 25–27 (Current Energy Group January Report). Moreover, "[t]he study does not identify retirements as a primary cause of future reliability risks," including retirements of coal-burning generators like Craig. *See id.* at 12. Rather, according to the 2024 Western Assessment of Resource Adequacy, "the timely completion of new

generation is the key medium-term requirement for maintaining resource adequacy." *Id.* And in fact, the 2024 Western Assessment of Resource Adequacy shows the active planning and resource deployment in the region:

> The 2024 Western Assessment of Resource Adequacy demonstrates that the region has been actively planning for plant retirements and load growth through increased planned resource additions, including new capacity (~15 GW of new batteries and ~3 GW of new natural gas by 2027), and by moderating previously-assumed retirements downward from 2022. Generation additions across the WECC subregions appear to be on track with the 2024 assessment's expectations. In 2025, approximately 9.4 GW of new batteries, 6 GW of solar, 1.7 GW of gas, and 2 GW of wind were deployed across the interconnection. Of this 19 GW, more than 4.7 GW has been deployed in Colorado, Nevada, Utah, Idaho, Washington, Oregon, Montana, and Wyoming as of the November report [from the Department's Energy Information Administration], and 2.1 GW in the same states is expected to be completed in December.

*Id.* (footnotes omitted).

In addition, the few specifics from the 2024 Western Assessment of Resource Adequacy discussed in the Order do not support the claimed emergency. Both as an evidentiary and as a logical matter, the Order's references to forecasted demand and forecasted retirements cannot together or by themselves demonstrate the existence of a shortfall in electricity or in electricity generation, including because those two data points are insufficient to assess whether the overall level of expected supply is sufficient to meet expected demand. The Order fails to address, for instance, that planned generator additions exceed planned retirements. *See id.* at 17–18; Ex. 2-02 at 8–9 (Grid Strategies Resource Adequacy Report). Moreover, utilities have already accounted for demand growth in their electric resource plans, and have determined that they will not have a shortfall even after Craig's retirement. *See* Ex. 2-02 at 9 (Grid Strategies Resource Adequacy Report).

*Energy Information Administration Data*

Citing the Department's Energy Information Administration data to describe continuing long-term conditions, the Department focuses its attention on retirements of generators burning coal and other fossil fuels in Colorado and the amount of wind-powered generation in the state. Order at 4. But the mix of generating resources in a state is not, standing alone, evidence of an emergency either within that single state or in the Rocky Mountain assessment area on which the Order focuses. Merely tallying retirements of certain generator types, and calculating the amount of wind, does not indicate whether a particular area has a shortfall of energy or capacity. On

this ground alone, the Order's reliance on the data from the Energy Information Administration is unreasoned and does not constitute substantial evidence.

The Order's reliance on the data from the Energy Information Administration is further problematic due to basic mathematical errors. The Order overstates the amount of planned coal retirements shown in the data for Colorado by more than 900 MW. Ex. 2-01 at 17–18 (Current Energy Group January Report). The error is shown in Figure 13 below. The Public Interest Organizations pointed out this error in their Request for Rehearing of the December Order issued for Craig Unit 1, but the Department failed to correct the error and repeated it in the Order.

*Figure 13: Discrepancies Between Order and EIA Data*

| | Order 202-25-14 | EIA 860 M Data* | Discrepancy |
|---|---|---|---|
| **Historical (2019-2024) Coal Retirements** | 571.3 MW | 571.3 MW | None |
| **Planned Coal Retirements by 2029** | ~3,700 MW[74] | 2,789.6MW | ~910 MW |
| **Planned Natural Gas Retirements by 2029** | 656.8 MW | 675.6 MW | 18.8 MW |

*As of November 2025 (released December 2025)

Source: Ex. 2-01 at 18 (Current Energy Group January Report).

The Order also presents an incomplete picture in its reliance on the Energy Information Administration data. The Order "cites EIA data to identify planned generation retirements but does not acknowledge that the same EIA data also show substantial new generation additions in Colorado." *Id.* at 18. According to that data, the historical and planned additions of new generating resources far exceed the retirements in Colorado, *see id.*, as shown in Figure 14 below. The Order is unreasoned and not based on substantial evidence because a complete picture of both retirements and additions shows that there will be a net increase in generating capacity in Colorado of more than 6,000 MW through 2029.

*Figure 14: Retirements and Deployments in Colorado*

| | Retirements (MW) | Deployments (MW) |
|---|---|---|
| **Historical (2019-2024) Retirements** | 845.9 | 4,827.6 |
| **Planned Retirements by end of 2029** | 3,455 | 5,793.5 |
| **Total (2019-2029)** | **4,300.9** | **10,621.1** |

Source: Ex. 2-01 at 18 (Current Energy Group January Report).

The Department fails to explain how this substantial net increase in generating capacity will not be sufficient to address the claimed future shortfall.

*Executive Orders and a White House Memorandum*

The Order also cites executive orders and a White House memorandum as evidence of "continuing emergency conditions." These sources are conclusory and therefore do not constitute substantial evidence. First, the Order cites the Energy Emergency EO and the Grid EO claiming that there is an energy emergency and that the grid is being stressed by unprecedented demand. Order at 5. In the quoted passages from the Energy Emergency EO, the President offers his perspective on issues relating to the nexus between energy usage and "our Nation's economy, national security, and foreign policy." Ex. 2-36 at 90 Fed. Reg. at 8433–34 (Energy Emergency EO). In the Grid EO, the President adds his view on the nature and drivers of electricity demand in the country. Ex. 2-37 at 90 Fed. Reg. at 15521 (Grid EO). In addition, the Order points to a White House memorandum claiming, with no factual basis, that coal is essential to national defense. Order at 5–6.

None of these executive documents supplies valid evidence of an actual energy emergency under Section 202(c), during the ninety-day term of the Order or any time. An emergency under Section 202(c) must be a specific inadequate power supply situation. *See supra* sec. V.A.1; *e.g.*, 10 C.F.R. § 205.371. Yet the executive orders and the presidential memorandum cited in the Order provide no factual evidence applicable to the WECC Rocky Mountain assessment area. *See* Ex. 2-36 at *passim* (Energy Emergency EO); Ex. 2-37 at *passim* (Grid EO). The executive orders and the presidential memorandum thus do not constitute useful evidence, much less substantial evidence. *See, e.g.*, *Chritton v. Nat'l Transp. Safety Bd.*, 888 F.2d 854, 856 (D.C. Cir. 1989) (defining substantial evidence). And reliance on unsupported, generalized conclusions in these documents is unreasoned. *Sinclair Wyo. Ref. Co. LLC v. EPA*, 114 F.4th 693, 714 (D.C. Cir. 2024).

Even if the declared national energy emergency were legitimate, a presidential declaration of an emergency does not unlock unlimited agency powers. *See Biden v. Nebraska*, 600 U.S. 477, 500–01 (2023) (presidential declaration of national emergency does not change the limitations on agency's emergency authority as written into statute). The Energy Emergency EO was issued pursuant to claimed authority from the National Emergencies Act.[5] Congress explained that the National Emergencies Act "is not intended to enlarge or add to Executive power. Rather, the

---

[5] Under the National Emergencies Act, no emergency powers unlocked by a Presidential declaration of a national emergency "shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631 (emphasis added). The Energy Emergency EO does not adhere to this requirement. Ex. 2-36, 90 Fed. Reg. at 8434 (Energy Emergency EO) (generically directing agencies to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate the . . . generation of domestic energy resources.").

statute is an effort by Congress to establish clear procedures and safeguards for the exercise by the President of emergency powers conferred on him by other statutes." S. Rep. No. 94-1168, 3 (1976) (emphasis added). And Section 202(c)'s authority is not triggered by a Presidential emergency declaration; the statute requires that "the Commission determine[] that an emergency exists." 16 U.S.C. § 824a (emphasis added).[6] Thus, the burden is on the Department (which stands in the shoes of the "Commission") to demonstrate that there is an emergency within the narrow terms of Section 202(c); simply pointing to the Energy Emergency EO or the Grid Reliability EO without providing actual evidence that an emergency exists cannot provide the substantial evidence needed to sustain the Order.

*July 2025 Resource Adequacy Report*

Despite the Department's citation of its own July 2025 Resource Adequacy Report as supporting a "long-term" emergency in the WECC Rocky Mountain assessment area, Order at 6, nothing in that report supports such a conclusion. That is because the Order's discussion of the July 2025 Report is strictly limited to (1) mentioning that the report was issued pursuant to presidential directive and (2) inserting a conclusory quotation regarding "the Nation's power grid" found on page 1 of the report. *Id.*

Moreover, even granting for argument's sake that the July 2025 Report does not contain the myriad inaccurate assumptions and methodological flaws discussed below, the July 2025 Report undercuts the Order's emergency determination. According to the July 2025 Report, the normalized unserved energy in 2030 in the "West Non-CAISO" region[7] is lower than any other region of the country. *See* Ex. 2-01 at 16–17 (Current Energy Group January Report).

The lack of evidence for a long-term electricity shortfall is underscored by the fact that the Department's own analysis premises a resource adequacy shortfall on a type of demand increase (large load buildout) that the July 2025 Report goes on to admit would likely never actually be allowed to destabilize the grid. Ex. 2-35 at 2–3, 15–17 (July Resource Adequacy Report). Specifically, the report notes that its analysis "is not an indication that reliability coordinators would allow this level of load growth to jeopardize the reliability of the system." *Id.* at 14. In other words, even taking the report at face value, it does not identify a shortfall of a type and nature that could

---

[6] The Department has exercised certain powers under Section 202(c) since the DOE Organization Act of 1977. *See* 42 U.S.C. § 7151(b).

[7] The "West Non-CAISO" region is roughly, according to the report's delineations, the Western continental United States excluding the California Independent System Operator and nearby areas. *See* Ex. 2-35 at 6, 35, 37 (July Resource Adequacy Report).

justify the invocation of the Department's Section 202(c) emergency authority. At best, the report highlights that data centers cannot be built at projected rates unless new generation is built, which is far from the type of emergency situation that could provide the basis for a Section 202(c) order.

The July 2025 Report does not credibly project conditions in 2030 because of its many inaccurate assumptions and methodological errors. *S*ee Ex. 2-02 at 9–10 (Grid Strategies Resource Adequacy Report). The Department is on notice of these flaws. *See, e.g.*, Ex. 2-40 at *passim* (PIOs' RFR of July Resource Adequacy Report); Ex. 2-40a at 2 (Department's Response to PIOs' RFR of July Resource Adequacy Report). Yet the Order cites the July 2025 Report without providing a reasoned explanation of how it could credibly rely on the report in light of the identified flaws.

Most glaringly, the Department's July 2025 Report overestimates demand growth and expected facility retirements while underestimating the likelihood of new entry. This biases the entire report in the direction of over-identifying resource adequacy concerns. Ex. 2-41 at 21–25 (Inst. Pol'y Integrity Report); Ex. 2-42 at 2–4 (GridLab Report); Ex. 2-40 at 34–35 (PIOs' RFR of July Resource Adequacy Report) (citing multiple expert reports and initiatives demonstrating the potential for flexibility of large data center loads, including Ex. 2-43 (Duke University Rethinking Load Growth Study)).

The July 2025 Report also "departs from best [modeling] practices by using a deterministic modeling rather than a probabilistic approach," and thereby fails to account for necessary uncertainties. Ex. 2-41 at 19 (Inst. Pol'y Integrity Report). And in many places, the Department simply does not explain its own methodology. The report states that its model is derived from NERC's Interregional Transfer Capability Study, which is focused on the ability of the transmission system to transfer power between regions. Ex. 2-35 at 2 (July Resource Adequacy Report). However, the July 2025 Report inexplicably excludes new transmission projects from its analysis, ignoring that transmission improvements can be the most cost-effective way to improve grid reliability. The July 2025 Report also departs from sound statistical reasoning by, for instance, calling out PJM for failing loss-of-load criteria under one realization of a possible weather year that would include Winter Storm Elliott, without considering that a system's loss-of-load expectation is averaged across all simulated weather years. Ex. 2-41 at 19 (Inst. Pol'y Integrity Report); Ex. 2-35 at 7, 9, 27 (July Resource Adequacy Report). The report also added more "perfect capacity" (in megawatts) within its modeling than actually needed to bring regions to its targeted Normalized Unserved Energy level. Ex. 2-41 at 26 (Inst. Pol'y Integrity Report); Ex. 2-35 at 19, 27, 30, 32, 40 (July Resource Adequacy Report). These analytical failings in and of themselves disqualify the report as a viable source of evidence for an emergency finding.

Finally, on its opening page, the July 2025 Report acknowledges that its analysis is general in nature, looking at the country as a whole, and that the various "entities

responsible for the maintenance and operation of the grid" have information "that could further enhance the robustness of reliability decisions" in the sections of the grid they administer. Ex. 2-35 at i (July Resource Adequacy Report). The report's generalized analysis based on incomplete information is simply insufficient to justify a Section 202(c) emergency finding for the WECC Rocky Mountain assessment area or any other specific region.

*iii. The Order Fails to Consider Relevant Evidence That Demonstrates Ordinary Processes for Resource Adequacy Under the Federal-State Balance of Responsibilities*

The Order fails to consider many other facts and processes that undercut its emergency claim. Utilities engage in regular, periodic electric resource planning to acquire the resources they will need to meet future customer demand. *See, e.g.*, *infra* secs. V.A.2, V.A.5; Ex. 2-01 at 3–8 (Current Energy Group January Report); Ex. 2-02 at 1–2 (Grid Strategies Resources Adequacy Report); Ex. 2-05 at 7–9 (Telos Resource Adequacy Report). The Order does not provide any evidence that utility planning processes, as well as state public utility commissions' proceedings and oversight, are insufficient to address any need for resources in 2031 and beyond.

Electric utilities have experienced periods of increased demand before, and they have successfully dealt with forecasted increases in demand. For example, during the 1970s, many electric utilities expected increased demand, and thus a number of new generating facilities were built in the 1970s and 80s. Ex. 2-108 at 6–7 (UT Austin Article).

The mere fact that a resource assessment indicates the need for new resources several years ahead of time is not evidence of an energy emergency—instead, this is a feature of utility resource planning, which exists in part so that utilities can procure new resources to meet any increase in demand. Electric utilities throughout the Rocky Mountain assessment area have been engaged in ongoing efforts to procure new resources to come online in future years to meet customer demand. For example, in the Near Term Procurement, Xcel proposed to acquire over 4,900 MW of resources that would come online between 2027 and 2030, Ex. 2-93 at 4–5 (Xcel 2025 Near Term Procurement Report), and in Proceeding No. 24A-0442E. Xcel will seek additional utility-scale generating resources with in-service dates through 2031, Ex. 2-94 at 154–73 (Xcel 2024 JTS, Volume 2 Technical Appendix) (showing the new resources that would be added for each of the portfolios that were modeled). In March 2026, the Colorado Commission approved up to 4,100 MW of new resources for Xcel in the Near Term Procurement. Ex. 2-169 at 1 (Colorado PUC Press Release, Feb. 18, 2026); Ex. 2-170 at 9–15 (Colorado PUC Feb. 2026 Decision). Also in March, the Colorado Commission issued an order marking the end of Phase I of Xcel's Just Transition Solicitation. *See* Ex. 2-171 at 1, 4, 8 (Colorado PUC March 31, 2026 Decision) (resolving the only remaining request for reconsideration of the Commission's Phase

I decision in the Just Transition Solicitation). As a result, Xcel will issue Requests for Proposals in summer 2026 for additional resources that can come online by the end of 2031. Xcel's recent and pending resource procurement proceedings focused extensively on load growth, and the procurements are designed to meet any need for new resources in light of load growth through 2031.

In fact, each of the Craig Co-Owners already has a plan in place for procuring any incremental resources needed on a longer-term basis. PacifiCorp, which is one of the largest utilities in the West, has pending procurements in Oregon and Utah for new resources that would come online between now and 2030. Ex. 2-109 at 1 (2025 PacifiCorp Oregon RFP Update) (noting that as of October 2025, PacifiCorp has issued its request for proposals for new resources to serve Oregon customers); Ex. 2-110 at 1 (2025 PacifiCorp Utah RFP) (stating that PacifiCorp is soliciting requests for generation resources "to meet 600,000 MWhs of average annual forecasted demand" for customers in Utah).

Tri-State, the operator of Craig, has found that even after Craig retires, Tri-State does not have a need for any new generating resources through 2035. Ex. 2-172 at 2-3 (Tri-State 2026 Annual Resource Adequacy Report) (showing that Tri-State has a capacity surplus for every year through 2035); Ex. 2-89 at 8 (Tri-State 2025 Annual Progress Report) (showing that Tri-State does not have a need for additional capacity until 2035). Platte River's Board has adopted the preferred portfolio in its 2024 IRP, which entails acquiring new generating and storage resources through 2030. Ex. 2-92 at 153, 176–81 (Platte River 2024 IRP).

The Order also fails to reconcile its findings with the Department's own findings elsewhere. For instance, according to the Department, "NERC's FERC-approved comprehensive enforcement mechanism ensures that bulk-power system owners, operators, and users have a strong incentive both to maintain system resources and to prevent reliability problems that could result from movement of electric supplies through export." Ex. 2-120 at 6 (Department Export Authorization EA-365-C (Oct. 21, 2025)).

Engaging in reasoned decision-making based on a planning document necessitates following important basic principles. The fact that a study shows that, under certain conditions, a utility or region might, in a future year, fall below a specific resource adequacy goal that is based on a 1-in-10 LOLE standard does not by itself predict or guarantee that a loss of load event will actually occur. Instead, it indicates future conditions in which system planners might expect more than one shortfall per decade if both those future conditions materialize and if no actions are taken by the utilities and regional entities to address a potential, future shortfall. *See* Ex. 2-01 at 2–6 (Current Energy Group January Report). Importantly, a small deviation below the resource adequacy goal will be associated with a small increase in this likelihood (and vice versa). This fact is relevant in the context of system planning because the tradeoff between grid reliability and energy costs is a core part of system planning: no system

is ever 100% reliable, and ratepayers do not want to spend too much of their income on energy bills. *See id.* at 5; Ex. 2-159 at 4 (Email Correspondence with E3) ("Any electric system will have some level of resource adequacy risk."). Indeed, for this reason, both MISO and PJM have explicit conditions in their tariffs that allow for each grid operator to fall below the 1-in-10 LOLE threshold as part of their response to potential higher capacity prices. Thus, treating a potential short- or medium-term dip in the size of the planning reserve margin as an emergency belies both industry practice that explicitly allows for such dips and basic system planning principles.

In sum, even if there were a need for additional generating resources in some future year, the Order fails to consider that utilities have pending and scheduled procurements of new resources. There is no evidence that these pending and scheduled procurements will be insufficient to address any long-term resource needs. And in addition to the many relevant processes and sources the Order fails to consider, the Order is unreasoned in its reliance on the few sources it does cite. As such, the Order's claimed "continuing emergency conditions" are not based on reasoned decision-making and is not based on substantial evidence.

3. *The Described Concerns Are Insufficiently Specific and Certain to Meet the Statutory Definition of an Emergency.*

The Order is unreasoned, not based on substantial evidence, and otherwise contrary to law and regulation because the Order fails to provide any specific determination of the energy emergency that purportedly exists. Instead, the Order relies on vague and generalized assertions. For example, the Department rationalizes the Order based on the "prolific growth of data centers for the development of AI" and the resulting "new and unexpected source of load growth." Order at 5. But this statement fails to support the claimed near-term emergency. The Order does not provide any specific determinations as to the amount of claimed load growth and shortfall, the time period over which the claimed load growth and shortfall exists, and whether the claimed shortfall is for energy, capacity, or both.

First, the Order does not provide a specific, quantitative determination of the shortage of energy or capacity that allegedly exists. And the Department failed to identify the scale of the so-called "new and unexpected source of load growth" during its claimed emergency. The Order does not say, for instance, whether the load growth will result in a shortage of 1 MW, 100 MW, or 1000 MW. The Department does not even provide a range for the load growth or alleged shortage. Further, as described *infra* secs. V.A.4–.5, the sources cited and ignored by the Department do not support this contention.

Second, the Order does not specify over what time period the claimed emergency exists. The Order lasts for 90 days, but most or all of the Order's discussion of evidence for the claimed shortfall pertains to time periods much further in the future. The Order is unclear, for example, whether the Department has ordered Craig to

remain available solely because the Department believes that an emergency may arise at some future date.

Third, the Order is not clear as to whether the purported shortfall is for energy, capacity, or both. In the electric utility industry, there is a fundamental distinction between energy and capacity. Energy refers to the electricity produced over a given period of time, such as kilowatt-hours or megawatt-hours. Meanwhile, capacity refers to the maximum output a facility can provide, under specific conditions, and at an instant in time. The distinction between energy and capacity runs throughout the electricity industry, informing how contracts are structured (e.g., different payments for energy versus capacity) and how markets are organized (e.g., there are separate energy and capacity markets). The Order is not clear on whether the Department believes that there is a shortfall in energy, capacity, or both.

In relying on generalized assertions and failing to identify the information above, the Order is unreasoned. *Ariz. Pub. Serv. Co. v. United States*, 742 F.2d 644, 649 n.2 (D.C.Cir.1984) ("[M]ere conjecture and abstract theorizing offered in a vacuum are inadequate to satisfy us that the agency has engaged in reasoned decisionmaking."). The Order is also inconsistent with the Department's applicable regulations, which provide that "[a]ctions under this authority are envisioned as meeting a specific inadequate power supply situation." 10 C.F.R. § 205.371.

4. *The Sources Cited in the Order Do Not Support the Existence of a Near-Term Emergency.*

The Order's claimed near-term emergency is unreasoned and not supported by substantial evidence for many of the reasons discussed *supra* sec. V.A.2.ii. These reasons include the failure to grasp or even discuss the functions and conclusions of the sources cited in the Order; the focus on retirements without considering generator additions; the focus on projected demand growth without considering projected growth in supply; the mathematical mistakes and methodological errors committed by the Department; and the reliance on executive orders containing no facts. *See id.*

In a single sentence, the Order claims that Colorado Public Utilities Commissioners "have expressed concerns about the ability of certain utilities to meet projected summer 2026 loads." Order at 4–5. The Order references Commissioner discussions of only a single utility in Colorado, Xcel, not multiple utilities, as the Order suggests.

Moreover, the Department has once again mischaracterized the contents of a document as providing evidence that an actual emergency exists. The Commissioners did not state that Xcel has a near-term or long-term shortfall of electricity or generating supplies, or that Xcel's plans will in fact be insufficient to address any shortfall (even if such a shortfall were to exist). Furthermore, the Commissioners' statements and deliberations underscore that the Colorado Commission is diligently

monitoring Xcel's resource adequacy situation and that the existing regulatory process in Colorado is sufficient to ensure resource adequacy for Xcel (and other utilities in Colorado).

There are additional aspects of the sources cited by the Order that undermine the claimed near-term emergency. For example, the Order cites both the 2025 Long-Term Reliability Assessment and the WECC's 2025 Western Assessment of Resource Adequacy. Both of those studies deem the Rocky Mountain region to be at "normal" risk in 2026. Ex. 2-178 at 7, 159–62 (NERC 2025 Long-Term Reliability Assessment); Ex. 2-183 at PDF 3 (2025 Western Assessment of Resource Adequacy). As noted above in Figure 11, *supra* sec. V.A.2.ii, the probabilistic modeling in the 2025 Long-Term Reliability Assessment did not include 2026, but for the years it analyzed, 2027 and 2029, the study found 0 MWh of expected unserved energy, 0 ppm of normalized unserved energy, and 0 hours of lost load risk. Ex. 2-178 at 161 (NERC 2025 Long-Term Reliability Assessment). Moreover, the 2025 Long-Term Reliability Assessment projected that in 2026, the Rocky Mountain region would have enough generating resources to meet demand. *Id.* at 159. Indeed, it projects that the Rocky Mountain region's reserve margin will be nearly three times the reference margin level in 2026. *Id.* It also projects that the Rocky Mountain region will have sufficient resources to meet the reference margin level through 2030, as shown in Figure 15 below.

*Figure 15: 2025 Long-Term Reliability Assessment Planning Reserve Margins*




Source: Ex. 2-178 at 159 (NERC 2025 Long-Term Reliability Assessment).

Similarly, the 2024 Long-Term Reliability Assessment does not provide evidence of an emergency in 2026 in the Rocky Mountain region. It projects no unserved energy or loss-of-load hours in the "WECC-NW" region (which formerly included the Rocky Mountain region), and projects that the on-peak reserve margin in that region exceeds the target reserve margin. Ex. 2-07 at 129 (NERC 2024 Long-Term Reliability Assessment). This is shown in Figure 16 below.

*Figure 16: 2024 Long-Term Reliability Assessment Findings of "Negligible" Expected Unserved Energy and Loss of Load Hours Risk*

| Base Case Summary of Results | | | |
|---|---|---|---|
| | 2026* | 2026 | 2028 |
| EUE (MWh) | 1,722 | 0 | 1 |
| EUE (PPM) | 4 | 0 | 0 |
| LOLH (hours per year) | 0.04 | 0 | 0 |
| Operable On-Peak Margin | 37.6% | 36.1% | 27.8% |

* Provides the 2022 ProbA Results for Comparison

Source: Ex. 2-07 at 129 (NERC 2024 Long-Term Reliability Assessment).

As for capacity, the 2024 Long-Term Reliability Assessment estimates that the region that formerly encompassed the Rocky Mountain region would have enough capacity to meet target reserve margins in 2026 (and in subsequent years). *Id.* at 127. This is shown in Figure 17 below:

*Figure 17: 2024 Long-Term Reliability Assessment Depiction of Reserve Margins and Reference Margin Level*




Source: Ex. 2-07 at 127 (NERC 2024 Long-Term Reliability Assessment).

Thus, the 2024 Long-Term Reliability Assessment does not support the Order's determination of a near-term emergency. Instead, the assessment reaches the contrary conclusion: there is sufficient energy and capacity in the studied "WECC-NW" region in 2026 (and in the following years). *See id.* at 127–29; Ex. 2-01 at 13–14 (Current Energy Group January Report); Ex. 2-02 at 7–8 (Grid Strategies Resource Adequacy Report).

The 2024 Western Assessment of Resource Adequacy also includes additional information undermining the Order's claimed near-term emergency. Most glaringly, the study finds *no demand at risk hours in 2026 and almost none in 2027* in the three subregions that subsume (and extend beyond) the claimed emergency footprint. *See* Ex. 2-01 at 10–11 (Current Energy Group January Report). This is shown in Figure 18 below.

*Figure 18: Summary of Demand-at-Risk Hours Identified in 2024 Western Assessment of Resource Adequacy*

| Subregion | 2026 Demand-at-Risk Hours in Most Extreme Scenario | 2027 Demand-at-Risk Hours in Most Extreme Scenario |
|---|---|---|
| NW Central | 0 | 0 |
| NW Northeast | 0 | 0 |
| NW Northwest | 0 | ~7 |

Source: Ex. 2-01 at 11 (Current Energy Group January Report).

The Order also fails to come to grips with the 2024 Western Assessment of Resource Adequacy's anticipation of 10 GW of new generation in 2026, of which more than 4 GW is firm capacity, and the support for this anticipation in recent data from the Energy Information Administration. *Id.* at 11; *see also* Ex. 2-29 at 27–29 (FERC Staff Winter Reliability Assessment) (explaining that in the WECC region, 14.1 GW of nameplate capacity additions are completed or expected from March 2025 through February 2026, including roughly 7 GW of additions expected between October 2025 and February 2026). In addition, utilities have accounted for peak demand, including the possibility of increases in peak demand, and concluded in their electric resource planning that they will not have an energy or capacity shortfall in the absence of Craig being available. *See* Ex. 2-02 at 2–5, 8–9 (Grid Strategies Resource Adequacy Report).

Regardless of the exact modeling software and reliability metrics used, standard approaches to assessing the probability of energy shortfalls consist of modeling utilities' available generating and storage resources in light of expected customer demand. *See, e.g.*, Ex. 2-01 at 3–8 (Current Energy Group January Report). This typically includes a "de-rate" of resources based on the likelihood that a generator will be unavailable or produce less than its maximum potential output (*i.e.*, less than its "nameplate capacity") during a peak demand period, a computation whose result is known as "accredited capacity." *Id.* at 5. The Department does not attempt, on its own or based on the cited sources, to assess for Colorado or any other region the probability of shortfalls or the available resources in light of expected demand. Instead, the Department simply tallies retirements of certain types of resources, which logically and analytically cannot answer the question of whether the resources that actually exist today are adequate to serve electricity needs in 2026.

While the Department has failed to conduct any methodologically sound analysis of whether an energy shortfall exists in Colorado, Colorado's electric utilities have done such analyses. As further discussed in secs. V.A.2.ii and V.A.5, Tri-State's analyses conducted in 2025 concluded that it would have no unserved energy and no loss of load hours in 2026, even without the availability of Craig, and Platte River reached a similar conclusion in 2024.

In addition, the Department's July 2025 report does not address whether an energy emergency exists prior to 2030, much less in the first three months of 2026. Thus, the report does not support the claimed near-term emergency either.

The Order's reliance on NERC's 2026 Summer Reliability Assessment also does not establish any short-term emergency. As with the 2025 Long-Term Reliability Assessment and the 2025 Western Assessment of Resource Adequacy, NERC's 2026 Summer Reliability Assessment found "normal" risk, the lowest risk designation under the NERC assessment regime, for the Rocky Mountain region. The Order's selective quote that wildfires and extreme heat conditions "pose the greatest reliability risk scenario" in the region does not change NERC's conclusion that the region does not face any heightened risk. Order at 4–5. In the rest of the document, NERC is clear that "[e]xpected resources meet operating reserve requirements for assessed scenarios" and even "[a]bove-normal summer peak load combined with low resource conditions" only "*could* result in the need to employ operating mitigations (e.g., load-modifying resources) and EEAs [(energy emergency alerts)]." Ex. 3-07 at 16 (2026 Summer Reliability Assessment) (emphasis added). The mere *possibility* of employing mitigation measures in above-normal conditions does not constitute an emergency.

Finally, the Order states in footnote 6 that "[i]t likely would be difficult for the coal-fired unit to resume operations once retired." Order at 1, n. 6. In support of this sweeping assertion, the Order makes a series of generalized statements that do not reflect consideration of Craig Unit 1 and the Craig Station specifically. For example, the Order speculates about what would happen "if the co-owners were to begin disassembling the unit or other related facilities," but presents no evidence that the co-owners of Craig Unit 1 had plans to begin decommissioning or disassembling the unit shortly after December 31, 2025. The Order also fails to consider that Craig Units 2 and 3 continue to operate, Order at 1, and share common facilities with Craig Unit 1, thus making it impossible for the co-owners to decommission and disassemble common facilities that remain in use by Craig Units 2 and 3.

The Order cites only a single document in support of footnote 6, but that document directly contradicts the substance of the footnote by finding that "95%" of retired coal plants are "unremediated and unrepurposed" and "may remain structurally intact" and "have no announced plans to decommission the site." Ex. 3-03 at 5 (Business Models for Coal Plant Decommissioning).

Moreover, the Order fails to reflect the Department's consideration of evidence that undermines the assertion that a coal-fired unit cannot resume operations after it retires. For example, the Department recently announced that it has awarded funding to restart the Warrior Run coal plant in Maryland "that ceased operations in 2024." Ex. 3-04 at 2 (June 2026 Coal Recommissioning and Modernization Announcement).

The Department's decision to award federal funding to restart a retired coal unit is at odds with its statement here that it would be difficult to resume operations after Craig Unit 1 retired.

5. *Many Sources Not Cited in the Order Undercut the Claimed Near-Term and Long-Term Emergency.*

The Department also fails to consider many sources undercutting the claimed near-term and long-term emergency. These include planning by the Craig Co-Owners and their state regulators and boards. The Order is, consequently, unreasoned and not based on substantial evidence.

In 2016, the Craig Co-Owners announced that Craig would close by December 31, 2025.[8] 83 Fed. Reg. 31332 (July 5, 2018) (approving Colorado's Clean Air Act State Implementation Plan revision establishing Craig's closure date); Ex. 2-65 at 183 at § F.VI.D.1 (CDPHE Regulation No. 3) (Colorado Regulation No. 3 provision regarding Craig's closure, which EPA approved). As discussed below, in the decade since they made that announcement, the Craig Co-Owners have built and contracted for new generation, storage, and transmission resources to replace Craig Unit 1. Three of the Craig Co-Owners (PacifiCorp, Tri-State, and Xcel) are regulated by state public utility commissions, while the remaining two (Platte River and Salt River Project) are governed by their respective boards. But regardless of the governance structure and regulatory status of the utility, each co-owner's regulator or board has approved resource plans that include retiring Craig by December 31, 2025.

In addition, utilities have multiple ways to acquire additional supply-side generating resources quickly. Reserve sharing arrangements are in place that allow utilities to call on resources on a short-term basis. Utilities participating in the two energy imbalance markets operating in the West can use those markets to purchase any resources needed on an intra-hour basis. *See* Ex. 2-131 at 7–8 (FERC Western Energy Markets Explainer). As of April 1, 2026, many utilities in the Rocky Mountain assessment area are now participants in SPP West, and thus have expanded access to resources in the SPP footprint. Utilities also have a suite of demand-response programs, including from interruptible service contracts with large commercial customers that allow the utility to interrupt service to large customers under specific conditions, and comparable programs with individual residential customers allowing

[8] The Craig Co-Owners reached a settlement agreement, which was incorporated into Colorado's regional haze SIP and approved by EPA, in which they agreed to either close Craig Unit 1 by December 32, 2025 or cease burning coal at Craig Unit 1 by August 31, 2021 (with an option to convert the unit to burn natural gas by August 31, 2023). Of these two compliance pathways, the Co-Owners elected to close Craig Unit by December 31, 2025.

the utility to, for example, reduce demand from air-conditioning during summer peak hours. *See generally* Ex. 2-94 at 101, 135, 182–83 (Xcel 2024 JTS, Volume 2 Technical Appendix) (explaining how Xcel relies on demand response programs, including interruptible loads).

Tri-State

For Tri-State, the Colorado Commission has approved two electric resource plans that include retiring Craig by December 31, 2025. The Colorado Commission provided its final approval of Tri-State's 2020 resource plan in 2023, Ex. 2-85 at 34 (Colorado Commission Decision C23-0437), and the plan assumed that Craig would retire by the end of 2025, Ex. 2-86 at 20, 31, 43, 53, 64 (Tri-State 150-Day Implementation Report) (showing that in all portfolios, Craig ceases to generate electricity after 2025). Tri-State concluded in its 2020 resource plan that it could reliably operate its system after 2025 without Craig. *See id.*

Tri-State reached the same conclusion—that it does not need Craig for reliability purposes—in its 2023 resource plan. Each portfolio that Tri-State modeled in its 2023 resource plan was required to meet strict reliability criteria, including during extreme weather events, and every portfolio assumed that Craig retires at the end of 2025. Ex. 2-87 at 21–22, 31–32, 42–43, 54–55, 64–65, 75–76 (Tri-State 2023 ERP 120-Day Implementation Report) (showing that in all portfolios, Craig retires at the end of 2025). After assuming that Craig would not provide any energy or capacity after 2025, Tri-State found that each portfolio would be reliable because each portfolio met Tri-State's reliability and resource adequacy requirements. *Id.* at 95 ("Each of the portfolios met Level 1 and 2 Reliability Metrics.").

Tri-State does not have either a near-term or intermediate-term need for additional capacity or energy sources after 2025. Specifically, Tri-State concluded in 2025 that it does not have a need for additional capacity until 2035, even assuming that Craig retires on December 31, 2025: "Tri-State stated within Phase I of the 2023 ERP that it did not forecast a capacity shortfall until 2029. With the updated load forecast, shown above, utilized in Phase II and Phase II preferred portfolio resources, a capacity shortfall is not forecasted to occur until 2035." Ex. 2-89 at 8 (Tri-State 2025 Annual Progress Report). The loads and resources table in Tri-State's 2025 Annual Progress Report shows that Tri-State will have surplus capacity from 2026 through 2034, even without Craig. *Id.* at 10. Note that the surplus is calculated relative to the total amount of resources needed to both meet peak demand and have planning and operating reserves. *See id.* Thus, the surplus shows Tri-State has sufficient capacity to meet its peak demand, plus additional capacity in the form of planning and operating reserves, and then has even more capacity beyond what is needed to meet peak demand and reserves. Furthermore, the loads and resources table in which Tri-State estimates a capacity surplus through 2034, *id.*, assumes that Tri-State makes no market purchases and instead is based solely on Tri-State's owned and contracted

resources, *see id.* In addition, Tri-State conducted reliability analyses in 2025 to stress-test its system under extreme winter and summer weather (including by making multiple worst-case scenario assumptions related to reduced availability of resources during extreme weather events, length of extreme weather events, reduced availability of imports, etc.) and concluded that it has sufficient capacity for 2026 and beyond even under extreme winter and summer weather events. *See* Ex. 2-86 at 6–8, 14–15, 28, 40, 51 (Tri-State 150-Day Implementation Report); Ex. 2-168 at 1–4 (Tri-State Extreme Weather Event Modeling Assumptions) (listing all of the modeling assumptions that are a part of Tri-State's analysis of its system under extreme weather events).

Tri-State's 2026 Resource Adequacy Report reaches similar conclusions as its 2025 Report. In its 2026 Report, Tri-State concludes that it has a capacity surplus in each year of the analysis period, which extends through 2035. Ex. 2-172 at 2-3 (Tri-State 2026 Annual Resource Adequacy Report) (showing that Tri-State has a capacity surplus for each year from 2026 through 2035).

The Colorado Commission approved Tri-State's 2020 and 2023 electric resource plans, which both included retiring Craig by December 31, 2025. Ex. 2-90 at 41 (Colorado Commission Decision No. C25-0612). In its August 2025 decision approving Tri-State's current resource plan, the Colorado Commission expressly found that Tri-State does not need Craig after 2025 to maintain a reliable electric system:

> Craig is not required for reliability or resource adequacy purposes based on the record in this ERP. Every portfolio that Tri-State modeled assumes that Craig retires at the end of 2025 and does not provide any energy or capacity after 2025. At the same time, Tri-State convincingly concludes that every portfolio meets all reliability metrics and is reliable.

*Id.* at 40.

Since 2016, Tri-State has acquired and/or built new generating, storage, transmission, and demand-response resources, and Tri-State's member cooperatives have also added their own resources. (Tri-State allows member cooperatives to self-supply some of their electricity and procure the remainder from Tri-State.) Ex. 2-89 at 12, fig. 4 (Tri-State 2025 ERP Annual Progress Report) (showing that, since 2016, Tri-State has added more than 600 MW of utility-scale and small-scale hydropower, wind, and solar); *id.* at 10–11 (stating that, as of December 2025, Tri-State had signed contracts for 500 MW of new storage resources and 200 MW of new wind resources, and is continuing contract discussions for additional resources).

Platte River

Platte River prepared a resource plan in 2020 that modeled several portfolios, each of which assumed that Craig would retire by December 31, 2025. Ex. 2-91 at 20, 26, 67, 87–90 (Platte River 2020 IRP). Platte River's Board then voted to approve a portfolio that included retiring Craig by December 31, 2025.

Platte River's current resource plan was developed in 2024. Like the 2020 plan, the 2024 plan included retiring Craig by December 31, 2025. Ex. 2-92 at 30, 106, 179 (Platte River 2024 IRP). Platte River's Board then voted to approve a portfolio from the 2024 resource plan that included retiring Craig by December 31, 2025. *Id.*, Appendix C at PDF 211–215.

Both the 2020 and 2024 plans contained action plans to procure additional generating and storage resources to meet electricity demand in Platte River's service territory. *Id.* at 176–79.

Platte River's 2020 and 2024 resource plans followed similar methodologies. *Compare* Ex. 2-92 at *passim* (Platte River 2024 IRP), *with* Ex. 2-91 at *passim* (Platte River 2020 IRP). Platte River's 2024 plan, for instance, contained forecasts of Platte River's expected load, including in 2026 and beyond, based on expected load growth in Platte River's service territory. Ex. 2-92 at 57–96 (Platte River 2024 IRP). Historically, Platte River has experienced its peak electricity demand in the summer, and it forecasts demand in summer to remain significantly higher than in winter through 2050. *Id.* at 61.

The 2024 plan analyzed reliability and resource adequacy using several metrics and by stress testing the portfolios under extreme weather scenarios. *Id.* at 120–31. In all of its modeling, Platte River concluded that it could maintain a reliable system after Craig closes at the end of 2025. *Id.* at 145–55. Platte River's electric resource plans indicate that Platte River does not have a near-term need for additional capacity or energy in the near-term or in the intermediate term.

Since 2016, Platte River has contracted for and/or built new generating, storage, transmission, and demand-response resources. Platte River added 30.5 MW of new solar in 2016, 225 MW of new wind resources in 2020, 22 MW of new solar in 2020, 1 MW of new storage in 2020, and 150 MW of new solar in 2025; and it plans on adding 150 MW of new solar and 25 MW of 4-hour storage in 2026. Ex. 2-92 at 106–08 (Platte River 2024 IRP). The 2024 IRP also calls for additional acquisitions from 2024 onward, including procuring up to 200 MW of additional thermal generation, additional storage capacity, and additional virtual power plants. *Id.* at 176–79.

Public Service Company of Colorado (Xcel)

In the years since 2016, Xcel has contracted for and/or built new generating, storage, transmission, and demand-response resources. In the 2016 electric resource

plan, the Colorado Commission approved Xcel acquiring the following new resources: 1,100 MW of wind; up to 700 MW of solar; up to 275 MW of storage; and 383 MW of gas. Ex. 2-101 at PDF 1 (Xcel Information Sheet on Colorado Energy Plan).

Xcel filed its most recent regular electric resource plan in 2021 and has pending resource procurements underway currently. In all portfolios that it presented to the Colorado Commission for selection, Xcel's 2021 resource plan assumed that Craig would retire by the end of 2025; and in that proceeding, the Colorado Commission approved two portfolios that assumed that Craig would retire by the end of 2025. Ex. 2-164 at 125 (Colorado Commission Decision No. C24-0052); Ex. 2-165 at 70 (Colorado Commission Decision No. C25-0024).

In the 2021 electric resource plan, the Commission's Phase II decision approved the "Alternative Portfolio," consisting of 5,854 MW of new generating and storage resources (which included 669 MW of new gas). Ex. 2-102 at 92, 101 (Colorado Commission Decision No. C24-0052). The Company is on track to procure the new resources approved in its 2021 resource plan. Ex. 2-103 at 14–17 (2025 Xcel ERP Annual Progress Report). As noted above, Xcel also has two resource acquisitions pending in the Near Term Procurement and the Just Transition Solicitation.

Currently, Xcel has two resource procurement dockets pending for its electric system. In the Near Term Procurement Report, Xcel proposed to acquire approximately 4,900 MW of new resources that would come online between 2027 through 2030. Ex. 2-93 at 4 (Xcel 2025 Near Term Procurement Report). In August 2025, Xcel issued a request for proposals for new generating and storage resources. In March 2026, the Colorado Commission approved Xcel acquiring up to 4,100 MW of new resources, including new wind, solar, battery storage, and gas resources. Ex. 2-169 at 1 (Colorado PUC Press Release, Feb. 18, 2026); Ex. 2-170 at 9–15 (Colorado PUC Feb. 2026 Decision).

The load forecast for the Near Term Procurement Report assumes the retirement of Craig at the end of 2025. Xcel states in the report that it has executed short-term contracts for resources for 2026 to ensure that Xcel can meet peak load in 2026. *Id.* at 29. In combination with its owned and contracted resources, these short-term purchases will ensure that Xcel has sufficient resources to reliably serve load in 2026.

Xcel is also undertaking another procurement called the "Just Transition Solicitation" in which Xcel is separately seeking supply-side resources with in-service dates between now and the end of 2031. In March 2026, the Colorado Commission issued an order marking the end of Phase I of Xcel's Just Transition Solicitation, Ex. 2-171 (Colorado PUC March 31, 2026 Decision); as a result, Xcel will soon issue Requests for Proposals for additional resources that can come online by the end of 2031.

In all of the modeling undertaken for the Just Transition Solicitation, Xcel assumed that Craig would retire by the end of 2025. Ex. 2-94 at 85 (Xcel 2024 JTS, Volume 2 Technical Appendix). In that proceeding, Xcel included multiple load forecasts, each of which accounted for expected load growth, including from large commercial customers such as data centers. Currently, Xcel's peak electricity demand occurs in summer. *Id.* at 52, 58. Xcel forecasts that its system will remain summer peaking through at least 2030. *See id.* Xcel found that all of the generic portfolios modeled in Phase I would be reliable, *see id.* at 121 (noting that "system reliability is factored into the development of portfolios in an iterative process that involves inputting various reliability requirements upfront into the EnCompass modeling process" to ensure that the portfolios are reliable), and all of these portfolios included retiring Craig by the end of 2025.

On August 12, 2025, the largest coal unit on Xcel's system, Comanche Unit 3, went out of service as a result of a forced outage. In November 2025, Xcel petitioned the Colorado Commission for a one-year variance from the requirement to retire Comanche Unit 2 by the end of 2025. The Colorado Commission granted the variance solely because of the outage at Comanche Unit 3 (Comanche Unit 3's approved retirement date is January 1, 2031). Ex. 2-95 at 25–26 (Colorado Commission Decision No. C25-0892). The Colorado Commission did not indicate there is a need to extend the life of any unit other than Comanche 2. *See id.* And the Petition did not request a variance from any retirement deadline other than a one-year extension for Comanche 2. *See* Ex. 2-96 (Comanche Unit 2 Variance Petition).

For the years after 2026, Xcel has a series of resource procurements through which it will meet any resource needs after 2026. Specifically, the Colorado Commission has scheduled the following procurements: the base solicitation in the Just Transition Solicitation in 2026; the supplemental solicitation in the Just Transition Solicitation in 2027; and Phase I of the electric resource plan in 2028. Ex. 2-97 at 50 (Colorado Commission Decision No. C25-0747).Thus, even if Xcel were to have any resource needs after 2026, the Colorado Commission has approved a schedule of procurements to fill any resource needs after 2026. Moreover, the Company regularly acquires short-term resources between scheduled procurements through short-term capacity purchases, as noted in the December 5, 2025 Near Term Procurement Report, and the Commission also approved an Incremental Need Pool process by which the Company can procure resources in-between scheduled procurements. *Id.* at 39–40, 44–45.

<u>PacifiCorp</u>

PacifiCorp prepares IRPs roughly every two years. For the 2023 IRP Update, PacifiCorp assumed that Craig retires at the end of 2025 in all portfolios. Ex. 2-98 at 13, 88, 115 (PacifiCorp 2023 IRP Update). PacifiCorp prepared load forecasts covering the years 2026 and beyond that reflected anticipated load growth across its service territory. *Id.* at 39–51. PacifiCorp conducted extensive modeling of reliability and

resource adequacy. In the 2023 IRP, PacifiCorp adopted a preferred portfolio that included retiring Craig at the end of 2025. PacifiCorp found that this portfolio would be consistent with maintaining the reliability of its system.

While PacifiCorp made certain methodological changes in its 2025 IRP and used different values for certain inputs, PacifiCorp's 2025 IRP was similar to its 2023 IRP in several important respects. The 2025 IRP contained forecasts of demand—which include forecasts of expected load growth—throughout PacifiCorp's service territory for the years 2026 and beyond. Ex. 2-99 at 114–40 (PacifiCorp 2025 IRP). On the supply side, PacifiCorp assumed that Craig would close at the end of 2025 and thus not provide any capacity or energy to PacifiCorp's system after 2025. *Id.* at 13, 51, 287, 294. PacifiCorp evaluated reliability and resource adequacy using a variety of metrics, which included considering the impact of extreme weather events. *Id.* at 99–113, 192.

In its 2025 IRP, PacifiCorp reaffirmed its intent to close Craig by the end of 2025 and adopted a preferred portfolio that includes closing Craig by the end of 2025. PacifiCorp adopted its preferred portfolio in part because PacifiCorp found that the portfolio would ensure system reliability, finding that it had enough capacity to meet summer and winter peak demand in 2026 and 2027 without adding new resources. *Id.* at 136–39, *See also* Ex. 2-98 at 49–50 (PacifiCorp 2023 IRP Update). PacifiCorp's system currently has lower electricity demand in the winter than in summer, and experiences peak demand in the summer months; PacifiCorp forecasts that its system will remain summer peaking through 2045. Ex. 2-99 at 74, 106, 114, 132–35 (PacifiCorp 2025 IRP).

PacifiCorp's 2023 and 2025 IRPs each included an action plan that included building and procuring new generation and storage resources and transmission lines. *Id.* at 289–90. Since 2016, PacifiCorp has contracted for and/or built new generating, storage, transmission, and demand-response resources. In its 2015 IRP Update, PacifiCorp reported that for the year 2016, it would have a total of 10,131 MW of resources (both supply- and demand-side resources) across its entire system. Ex. 2-104 at 31 (PacifiCorp 2015 IRP Update). As of its most recent IRP, PacifiCorp reports that for the year 2026, it will have 11,859 MW of existing resources (owned by PacifiCorp or contracted to PacifiCorp) available to meet load in the summer, plus 3,103 MW of available market purchases. Ex. 2-105 at 132 (PacifiCorp 2025 IRP).

None of the state commissions that regulate PacifiCorp objected to PacifiCorp's decision to close Craig by the end of 2025. The most recent PacifiCorp IRP for which state commissions have issued final decisions after proceedings to review the resource plan is PacifiCorp's 2023 IRP. State commissions took various actions on PacifiCorp's 2023 IRP, but no commission expressed concern about retiring Craig by the end of 2025. *See* Ex. 2-128 at 5, 7 (Order No. 24-073_OR PUC on Pac 2023 IRP) (Oregon PUC issues a final order in PacifiCorp's 2023 IRP docket acknowledging PacifiCorp's plan to retire Craig Unit 1 by the end of 2025); Ex. 2-129 (Utah PSC on Pac 2023 IRP)

(Utah PSC issues a final order in PacifiCorp's 2023 IRP, but does not mention any concerns with PacifiCorp's proposal to retire Craig Unit 1 by the end of 2025); Ex. 2-130 at 3 (Idaho PUC on Pac 2023 IRP) (Idaho PUC issues a final order finding that PacifiCorp's 2023 IRP, which proposed to retire Craig Unit 1 by the end of 2025, satisfies Idaho's IRP requirements and the PUC acknowledges the IRP).

Thus, PacifiCorp does not need additional capacity and energy in the near term and has established processes in place for filling any longer-term resource need.

Colorado Generally

Within Colorado, the Energy Information Administration reports that the State's electric utilities added more than 3,000 MW of net summer capacity between 2019 and the end of 2024. *Compare* Ex. 2-106 at PDF 78 (Table 4.7.A) (EIA Annual 2024), *with* Ex. 2-107 at PDF 75 (Table 4.7.A) (EIA Annual 2019). This is shown in Figure 19 below.

*Figure 19: Energy Information Administration Data on Colorado's Increases in Net Summer Capacity, 2019–2024*

| Net Summer Capacity, 2019 (MW) | Net Summer Capacity, 2024 (MW) | Differential, 2019–2024 (MW) |
|---|---|---|
| 16,592 | 19,817 | 3,224 |

Sources: Ex. 2-106 at PDF 78 (Table 4.7.A) (EIA Annual 2024); Ex. 2-107 at PDF 75 (Table 4.7.A) (EIA Annual 2019). MW values rounded to the nearest integer.

The values in Figure 19 do not account for the new resources that came online in 2025 or are planned to come online in 2026 and in future years. As explained in the attached Grid Strategies Report, there are at least 5,800 MW of resource additions planned for future years, through 2029, in Colorado. *See* Ex. 2-02 at 8–9 (Grid Strategies Resource Adequacy Report).

*B. The Order Fails to Best Meet the Claimed Emergency and Serve the Public Interest.*

The Order requires SPP and the Craig Co-Owners to ensure Craig is available to operate and requires SPP to "take every step to employ economic dispatch of [Craig]" to best meet the claimed emergency and serve the public interest. Order at 7. But the Order provides no rational basis for those requirements. There are at least three types of problems with the Order. First, the Order is unreasoned in requiring SPP to employ economic dispatch to meet the claimed emergency. The requirement is unreasoned because it provides for Craig to generate electric energy for reasons untethered to the claimed emergency. Second, the Order does not address Craig's shortcomings. These shortcomings include Craig's unreliability and technical capabilities. The Order does not explain how, considering the plant's unreliability and technical capabilities, Craig could meet the claimed emergency. Third, the Order does not discuss any alternatives to Craig for meeting the claimed emergency and ignores

readily available and obvious alternatives that better address the claimed emergency. As a result, the Order is unreasoned and not based on substantial evidence.

1. *Legal Framework: Section 202(c)(1) Authorizes the Department to Require Only Generation that Best Meets the Emergency and Serves the Public Interest.*

Section 202(c)(1) authorizes the Department to impose only those requirements that (i) "best" (ii) "meet the emergency and" (iii) "serve the public interest." 16 U.S.C. § 824a(c)(1).

The term "best" demands a comparative judgment that there are no better alternatives. The word "best" is inherently a comparative term and means "that which is 'most advantageous.'" *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (*quoting* Webster's New International Dictionary 258 (2d ed.1953)); *cf. Sierra Club v. Env't. Prot. Agency*, 353 F.3d 976, 980, 983–84 (D.C. Cir. 2004) (explaining that statutory "best available control technology" requirement demands sources in a category clean up emissions to the level that peers have shown can be achieved). Consequently, the Department must, at minimum, consider alternatives and evaluate whether and to what extent a given alternative addresses the emergency and serves the public interest, including deficiencies associated with the alternative.[9]

The Department's obligation to exercise reasoned decision-making further requires consideration of alternatives. The Department need not consider every conceivable alternative, but it must consider alternatives within the ambit of the regulatory context as well as alternatives that are significant and viable or obvious. *See Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020); *Motor Vehicle Manufs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013). Intervenors and the public may also introduce information that requires the Department to evaluate alternatives and reconsider its decision to impose or maintain a requirement. *See, e.g.*, *Chamber of Com. of the U.S. v. Secs. & Exch. Comm'n*, 412 F.3d 133, 144 (D.C. Cir. 2005) (evaluating agency failure to consider alternative raised by dissenting Commissioners and introduced by commenters); *cf.* 10 C.F.R. § 205.370 (stating ability to cancel, modify, or otherwise change an order).

The Department's regulations and practice identify relevant alternatives for its consideration. The regulations specify information the Department shall consider in deciding to issue an order under Section 202(c), and require an applicant for a 202(c) order to provide the information. 10 C.F.R. § 205.373. The specified information

---

[9] To be sure, the nature and extent to which the Department must consider alternatives depends on the emergency. An emergency that truly requires the Department to act within hours, for instance, permits a more abbreviated consideration than an emergency for which the Department has days to decide.

includes "conservation or load reduction actions," "efforts . . . to obtain additional power through voluntary means," and "available imports, demand response, and identified behind-the-meter generation resources selected to minimize an increase in emissions." *Id.* § 205.373(f)–(h); Ex. 2-13 at 4 (DOE Order No. 202-22-4).

The Department may then choose only the best alternative. The best alternative is the one that is most advantageous for meeting the stated emergency and serving the public interest.

The statutory command to take only measures that serve the public interest, including with respect to environmental considerations, further constrains the Department's authority. The public interest element demands that the Department advance, or at least consider, the various policies of the Federal Power Act. *Cf. Wabash Valley Power Ass'n*, 268 F.3d at 1115 (interpreting the "consistent with the public interest" standard in Section 203 of the Federal Power Act); *see Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747, 759 (1973); *California v. Fed. Power Comm'n*, 369 U.S. 482, 484–86, 488 (1962). Primary policies of the Federal Power Act include protecting consumers against excessive prices; maintaining competition to the maximum extent possible consistent with the public interest; and encouraging the orderly development of plentiful supplies of electricity at reasonable prices. *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 670 (1976) (orderly development); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374 (1973) (maintaining competition); *Pa. Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414, 418 (1952) (excessive prices). And because Section 202(c) expressly protects environmental considerations, these are part of the public interest element too. See *NAACP*, 425 U.S. at 669 ("[T]he words 'public interest' . . . take meaning from the purposes of the regulatory legislation.").

2. *The Order Fails to Provide a Reasoned Basis for Requiring Economic Dispatch to Meet the Emergency.*

The Order claims an emergency in the WECC Rocky Mountain assessment area. Order at 1. The emergency, according to the Department, is the potential "loss of power to homes and businesses in the areas that may be affected by curtailments or power outages." *Id.* at 6. The Rocky Mountain assessment area includes Colorado, most of Wyoming, and parts of Nebraska and South Dakota. Ex. 2-178 at 159 (NERC 2025 Long-Term Reliability Assessment). The area is shown in Figure 20 below (which is identical to Figure 7 and included here for ease of reference).

*Figure 20: Boundary Areas of WECC Subregions*




Source: Ex. 2-01 at app'x A at 1 (Current Energy Group January Report).

To meet that claimed emergency, the Order requires SPP to employ economic dispatch of Craig. Order at 7. SPP's economic dispatch is based on conditions across the entire SPP RTO footprint, as the SPP market determines a single optimized solution to effectuate one integrated market across the RTO footprint. *See Southwest Power Pool, Inc.*, 190 FERC ¶ 61,169, at PP 9, 40–43 (2025); Ex. 2-179 at 10–11 (SPP Deficiency Response). The market thus determines whether and to what extent to dispatch a given generator (such as Craig) to economically meet obligations across the entire SPP RTO. *See Southwest Power Pool, Inc.*, 190 FERC ¶ 61,169, at PP 9, 40–43; Ex. 2-179 at 10–11 (SPP Deficiency Response). The SPP RTO footprint includes a wide swath of the country not part of the Rocky Mountain assessment area, and at the same time does not include parts of the Rocky Mountain assessment area. See Figure 21 below (which is identical to Figure 2 and included here for ease of reference).

*Figure 21: SPP Expanded Footprint*




Source: Ex. 2-180 at PDF 1 (SPP RTO Expansion).

As such, the Order's economic dispatch requirement is unreasoned. The requirement is unreasoned because it provides for Craig to generate electric energy for reasons untethered to the claimed emergency, including economic conditions and conditions in a geographic footprint that is both overinclusive and underinclusive to meet the claimed emergency. (Additionally, as discussed *infra* sec. V.D.3, the Order's economic dispatch requirement is unlawful and unreasoned for additional reasons.)

*3. The Order Fails to Address Craig's Shortcomings.*

The Order fails to address the reasons that Craig is a poor fit to meet the claimed emergency. Craig is unreliable, and that unreliability hinders the plant from addressing the claimed emergency and actually poses risks to the grid. Moreover, Craig's technical capabilities are a mismatch to meet the claimed emergency.

The Order recognizes—without offering any evidence—significant shortcomings and weaknesses of "coal-fired unit[s]." Order at 1 n.6. But the Order then stops short. It fails to engage in reasoned decision-making regarding how, given these shortcomings and weaknesses, the Department views Craig to be the best means to meet the claimed emergency.

At the time of issuing the December Order, Craig had a forced outage due to a mechanical failure. Ex. 2-06 (Tri-State December 2025 Press Release). Bringing Craig back into service took more than four weeks and required significant repairs and physical infrastructure changes to the plant. Ex. 2-166 at 1 (Tri-State January 2026 Press Release); Ex. 2-175 at 9, 16-17 (Tri-State and Platte River January Rehearing Request). The notion that a plant that experiences persistent and prolonged availability challenges best meets the claimed emergency is facially unreasoned, and the Order presents no supporting rationale.

Craig's unavailability is part of an alarming trend. From 2016 to 2020, Craig's forced outage rate was below 6%. Ex. 2-03 at 8 (Powers Decl.). Then, between 2022 and 2023, Craig's forced outage rate jumped from 1.75% to 9.53%. *Id.* A 9.53% forced outage rate translates to 835 hours that Craig could not operate in 2023. That means Craig was unavailable for approximately five weeks of the year, on top of any non-forced outages (such as planned outages taken for servicing the plant). *See id.*

Craig's unavailability and unreliability are likely to worsen in 2026 and beyond. Tri-State—Craig's operator—has slowed capital expenditures and maintenance at Craig. *See supra* sec. IV.B.3. Tri-State "proactively works to reduce and eliminate capital expenses" for retiring plants. Ex. 2-03 at 6 (Powers Decl.) (discussing Ex. 2-51 at 187 (Tri-State 2020 ERP)). Tri-State's filings with the Colorado Commission memorialize this approach for Craig. In 2023, Tri-State witness Insgold testified that its "investments in [the Craig Plant] are being appropriately limited to only actions necessary for ensuring safe operations and regulatory compliance, given the impending retirement of these units." Ex. 2-50 at 10 (Insgold 2023 ERP Direct Testimony). Mr. Insgold's testimony reflects Tri-State's consistent and strategic decision to decrease capital expenditures and maintenance at retiring coal plants like Craig. *Id.* As a result, Tri-State did not undertake projects that it likely believed were necessary for reliable operation past the planned retirement date. Ex. 2-03 at 6–7 (Powers Decl.). Consequently, it is unlikely that Craig can be depended upon to operate reliably beyond December 2025. *Id.* at 5–6, 8 (Powers Decl.). "Craig 1 will be especially unreliable if the plant is required to run for extended periods of time, is required to stop and start numerous times, or attempts to start up at an accelerated rate in response to extreme demand conditions." *Id.* at 5; *see also* Ex. 2-26 at 59 (NERC 2024 Reliability Report) ("[R]educed investment in maintenance and abnormal cycling that are being adopted primarily in response to rapid changes in the resource mix are negatively impacting baseload coal unit performance.").

The Order also fails to address the dangers to grid reliability that it creates. An unreliable coal plant like Craig is likely to cause grid disturbances and the "loss of power to homes and businesses in the areas that may be affected by curtailments or power outages." Order at 6. As Tri-State and Platte River themselves have explained, "[k]eeping Craig Unit 1 online now simply does not meet the terms of an emergency predicated on potential resource adequacy issues eight or more years in the future, particularly given that as Craig Unit 1's operations are further extended past its intended lifespan, it is likely to experience more and longer periods of outage." Ex. 3-06 at 32 (Tri-State and Platte River April Rehearing Request).

> Cold snaps, heat waves, and storms have all exposed coal's fragility during grid stress events. Reliability is not just about being dispatchable, it's about delivering performance under stress. Coal plants struggle to do that consistently. For coal plants to truly meet the constant demands of data centers, they would need to run at high-capacity factors and avoid major outages, all of which fly in the face of

> current performance trends. If a large coal plant trips offline while supporting a cluster of data centers, the sudden loss of supply could lead to cascading failures across the grid. This is because generation must equal load at all times, datacenter or no datacenter. As a result, relying on coal plants to support these high-density digital loads doesn't enhance reliability, it endangers it. And it's not a matter of *if* the coal plant will fail, but *when*.

Ex. 2-44 at PDF 2–3 (RMI Analysis of Coal Plants' Threats to Reliability).

The Department avers that it is concerned with reliability, *see* Order at *passim*, yet puts forward no analysis to address the likelihood that it is actually creating the (otherwise unproven) problem it is supposedly trying to address. This ostrich-like approach to record evidence and public evidence is not reasoned decision-making. *Butte Cnty.*, 613 F.3d at 194; *cf. Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 177 (D.C. Cir. 2022) (rejecting "ostrich-like approach" to agency decision-making).

Additionally, the Order provides no reasoned basis to conclude that Craig can meet the emergency given its technical capabilities. Craig is not designed to turn on quickly in response to times of extreme demand. Coal units like Craig usually require at least 12 hours to reach full load operation from a cold condition. Ex. 2-03 at 8–9 (Powers Decl.); Ex. 2-33 at 26 (IEA Flexibility Report); Ex. 2-44 (RMI Analysis of Coal Plants' Threats to Reliability); *see also supra* sec. IV.B.3. Meanwhile, "utility-scale battery storage can dispatch from a cold start to full power in a matter of seconds." Ex. 2-03 at 9 (Powers Decl.).

The Order suggests that projections of demand growth, including from "data centers driving artificial intelligence," justify the continued operation of Craig. Order at 6. Even assuming *arguendo* the Department has authority under Section 202(c) to address that claimed circumstance (it does not), coal plants' "always-on nature" and "rigidity" are "a poor match for the dynamic and often unpredictable nature of data center demand." Ex. 2-44 at PDF 3 (RMI Analysis of Coal Plants' Threats to Reliability); *see also* Ex. 2-45 at 3 (Energy Innovation Report) (explaining that data center loads "are not 24/7 blocks. Instead, they are choppy, with swings of hundreds of megawatts over short intervals, undermining assumptions of steady baseload behavior and potentially affecting the stability of the grid if safeguards are not put in place"); *see also* Ex. 2-32 at 16 (NARUC Coal Report) (discussing typical coal plants' startup and cycling costs); Ex. 2-33 at 26 (IEA Flexibility Report) (discussing coal plant start-ups). "[L]arge, voltage-sensitive loads like data centers require flexible, responsive grid solutions, not slow-ramping generators that can take 12 or more hours to come online." Ex. 2-44 at PDF 3 (RMI Analysis of Coal Plants' Threats to Reliability) (relying on NERC).

*Figure 22: Minutes Needed for a Power Plant to Reach Max/Min Capacity*




Source: Ex. 2-44 at PDF 3 (RMI Analysis of Coal Plants' Threats to Reliability).

In short, the Order fails to examine the inherent mismatch between the problem it diagnoses and the mandate it imposes. Thus, the Order does not reflect reasoned decision-making.

Additionally, the Order provides no reasoned basis for determining that Craig best meets the claimed emergency that may arise years into the future (which, again, the Department does not have authority to address under section 202(c)). Transmission and myriad other facilities are available alternatives over the multi-year span addressed by the Order. And the Order fails to identify a resource shortfall that is imminent and specific enough to identify any best-placed resource; the Order is unreasoned in failing to address how Craig is capable of meeting the generalized, uncertain claimed emergency. *See, e.g.*, *supra* sec. V.A.3; Ex. 2-02 at 10 (Grid Strategies Resource Adequacy Report). Additionally, the Order, like the Department's Section 202(c) orders to other plants, causes economic damage by, *inter alia*, crowding out otherwise competitive resources, disrupting planning, and creating policy-driven uncertainty. *See* Ex. 2-46 at PDF 2–3 (R Street Institute Commentary: *DOE "Zombies" Are Eating Competitive Power Markets*); Ex. 2-01 at 4 (Current Energy Group January Report) ("The [reviewed] studies do not support a proposition that extraordinary federal interventions into established processes are necessary to address the challenges in the latter part of the decade. Rather, federal intervention

sends mixed and counterproductive signals to the market that undermine existing planning and procurement practices."); Ex. 2-175 at 31 (Tri-State and Platte River January Rehearing Request) (stating that "Craig Unit 1's continued operation interferes with [Tri-State and Platte River's] ability to invest in other generation capacity" and that, due to transmission constraints, "Craig Unit 1's continued operation could interfere with the ability of new alternatives like Axial Basin to provide economic power to the grid"). Additionally, Craig's operations cause significant environmental harm, a factor the Department does not evaluate in reflexively selecting Craig to meet its (unproven) emergency. For all these reasons, too, the Order is without support in the record and unreasoned.

*4. The Order Fails to Address or Reflect Consideration of Alternatives.*

Other alternatives are available that meet the claimed emergency. The Department's failure to consider these alternatives is unreasoned and further shows that the Order is based on insubstantial evidence.

Hydropower, battery storage, demand response, and combustion gas turbines are all better suited to addressing rapidly varying, peak demand conditions. Ex. 2-03 at 9, 15 (Powers Decl.). As previously explained, *supra* secs. V.A.2, V.A.5, Colorado utilities have collectively built thousands of megawatts of new resources that are now online and provide generating capacity. For example, in 2026, Tri-State will have at its disposal a total of 717 MW of gas and oil-fired generation, 516 MW of hydropower, and 134 MW of demand response to address fast-changing demand on its system. Ex. 2-89 at 10 (Tri-State 2025 ERP Annual Progress Report). Further, Tri-State will have surplus capacity from 2026 through 2034, even without Craig. *Id.* But the Order fails to address—or even mention—these other readily available alternatives.

The Order also fails to address imports to the Rocky Mountain assessment area as an alternative to Craig to meet the purported emergency. Section 202(c) specifically identifies "delivery, interchange, or transmission of electric energy" as among the alternatives available to meet a claimed emergency. 16 U.S.C. § 824a(c)(1). And the Department's regulations provide for consideration of available resources, including power transfers. 10 C.F.R. §§ 205.373(f), 205.375. The Department has long recognized that power pools and utility coordination "are a basic element in resolving electric energy shortages." *Emergency Interconnection of Elec. Facilities and the Transfer of Elec. to Alleviate an Emergency Shortage of Elec. Power,* 46 Fed. Reg. 39984, 39984–86 (Aug. 6, 1981). Recent history demonstrates the important role of transmission connectivity along with imports and exports. *See, e.g.*, Ex. 2-30 at 64 (Winter Storm Elliott System Operations Inquiry) ("Despite tightening conditions on the MISO system . . . MISO maintained steadily increasing exports to TVA throughout the day."); Ex. 2-31 at 43, 83–84 (PJM Elliott Report) (describing PJM exports); *see also* Ex. 2-15 at PDF 2 (DOE Order No. 202-02-1) (providing for usage of interregional transmission). According to NERC, starting in summer 2029, "imports

may be necessary if new resources were to be significantly delayed." Ex. 2-07 at 128 (NERC 2024 Long-Term Reliability Assessment).

Here, the Department does not discuss a notable change between the Order and the December Order issued for Craig Unit 1: that SPP West became operational on April 1, 2026. As noted previously, several large utilities in the Rocky Mountain region became participants in SPP West effective April 1, including Tri-State. The Order does not evaluate alternatives to meet the claimed emergency due to this change.

The Department offers no reasonable basis to question the availability of resources from neighboring regions. But even if there were barriers to transmission from those regions, the Department has not (and likely could not) explain why the Order provides a better means of ensuring resource sufficiency than addressing those barriers directly through its power to require "interchange" and "transmission" of electric energy from those neighboring regions. 16 U.S.C. § 824a(c)(1).[10]

In fact, the successful operation of the grid during the December Order's duration prove that other alternatives can meet the (unreasoned, unsubstantial, and unlawful) claimed emergency. Craig broke and went out of service on December 19, 2025, almost two weeks before the December Order issued, and stayed that way until January 20, 2026. *See* Ex. 2-166 at 1 (Tri-State January 2026 Press Release); Ex. 2-06 (Tri-State December 2025 Press Release). Even after it was repaired, Craig was never called upon to operate before the December Order expired. Ex. 2-177 at 2 (March 30, 2026 Colorado Sun Article). There is no evidence of an increase in adverse resource adequacy or reliability events during that time period. Supply and demand were balanced by alternatives to Craig. The Department must consider the proven alternatives to reach a reasoned decision based on substantial evidence.

Lastly, in response to the Public Interest Organizations' rehearing request of the December Order, Ex. 3-01 at 7 (Department Order No. 202-25-14B, "December Rehearing Order"), the Department cited a study showing that the amount of "[a]ctive capacity in [interconnection] queues (~2,290 GW) is nearly twice the installed capacity of U.S. power plant fleet (~1,320 GW); greater than peak load and installed capacity in most regions," Ex. 3-02 at 17 (Queued Up: 2025 Edition), and that "[a]ctive queue capacity is highest in the West (584 GW)," *id.* at 16. Despite being issued after

---

[10] The Department must also incorporate demand-side resources as a condition precedent to, or an alternative to, circumstances calling for generation by a polluting resource like Craig (and in determining whether an emergency exists), a requirement consistent with Departmental practice. *See* 16 U.S.C. § 824a(c)(1)–(2); 10 C.F.R. § 205.375; *e.g.*, Ex. 2-16 at 3 (DOE Order No. 202-20-2); Ex. 2-17 at 4–5 (DOE Order No. 202-22-2); Ex. 2-18 at 2–3 (DOE Order No. 202-281).

the December Rehearing Order, the Order at issue here does not reflect any consideration of the alternative of using authorities that may be available to the Department to speed up the interconnection of these generating resources.

*C. The Order Exceeds Other Limits on the Department's Authority.*

*1. The Department Lacks Jurisdiction to Impose the Availability Requirements.*

In directing the Craig Co-Owners to take "all measures" to ensure that Craig is "available to operate," Order at 7, the Department exceeds its authority under Section 202(c) of the Federal Power Act and impermissibly intrudes on the authority over generating facilities that Section 201(b) of the statute reserves to the states, 16 U.S.C. §§ 824(b)(1), 824a(c)(1). The sweeping language in the Department's Order would encompass physical and all other changes necessary to revive a generating plant undergoing closure pursuant to a state-approved retirement process. The Federal Power Act's language, structure, legislative history, and interpretation by the courts all confirm that the Department's Order is unlawful.

The structure and language of the Federal Power Act reflect Congress's deliberate choices to preserve the states' traditional authority over generating facilities and to circumscribe the Department's emergency authority in light of the states' role. The first sentence of the Federal Power Act declares that federal regulation extends "only to those matters which are not subject to regulation by the States." *Id.* § 824(a). Section 201(b)(1) states that, except as otherwise "specifically" provided, federal jurisdiction does not attach to "facilities used for the generation of electric energy." *Id.* § 824(b)(1). The courts have held that Section 201(b)(1) reserves to the states authority over electric generating facilities, *see, e.g., Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155 (2016), including the authority to order their closure, *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009) (explaining that under Section 201(b), states retain the right "to require the retirement of existing generators" or to take any other action in their "role as regulators of generation facilities"). Congress also recognized the states' exclusive authority over generating facilities in Section 202(b), which provides that FERC's interconnection authority does not include the power to "compel the enlargement of generating facilities for such purposes." 16 U.S.C. § 824a(b).

There is a clear distinction between authority to regulate generation facilities and the Department's authority under Section 202(c) to require generation of electric energy. Electric energy is an electromagnetic wave, and its "generation, delivery, interchange, and transmission" is the creation and propagation of that wave. *See* Brief *Amicus Curiae* of Electrical Engineers, Energy Economists and Physicists in Support of Respondents at 2, *New York v. FERC*, 535 U.S. 1 (2002); *see also* Edison Electric Institute Glossary of Electric Utility Terms (1991 ed.) (defining electric generation as "the act or process of transforming other forms of energy into electric energy"). Section 202(c)(1), like the rest of the Federal Power Act, is written "in the

technical language of the electric art" and federal jurisdiction generally "follow[s] the flow of electric energy, an engineering and scientific, rather than a legalistic or governmental test." *Conn. Light & Power v. Fed. Power Comm'n*, 324 U.S. 515, 529 (1945); *see also Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 454, 467 (1972).

The scope of the Department's emergency power under Section 202(c) is bounded both by the provision's specific language and Congress's clear intention and repeated direction in the Federal Power Act to respect the states' authority over generating facilities. When an actual emergency exists, Section 202(c)(1) authorizes the Department to order only two specific things: (1) "temporary connections of facilities" and (2) "generation, delivery, interchange, or transmission of electric energy." *Id.* § 824a(c)(1). The only reference to "facilities" in the authorizing provision of Section 202(c)(1) appears in the clause relating to temporary connections, not in the clause pertaining to "generation" of electric energy. And that clause only authorizes connections "of" facilities; it does not provide authority to regulate the facilities. The differences in Congress's word choice in these clauses—referencing "facilities" in one authorizing provision but not the other—must be given effect. *See, e.g.*, *Gallardo v. Marstiller*, 596 U.S. 420, 430 (2022); *Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008).

Given Congress's use of the term "generating facilities" elsewhere in the statute, if it had intended to give the Department authority over generating facilities in Section 202(c)(1), it would have done so explicitly. Instead, the provision conspicuously excludes authority to manage the physical characteristics of power plants. Congress purposely limited and particularized the Department's emergency powers, carefully avoiding intrusion on the states' authority over generating facilities recognized in Section 201(b)(1). *See* S. Rep. No. 74-621, at 19 (explaining that the emergency powers in Section 202(c)(1) "which were indefinite in the original bill have been spelled out with particularity"); *compare* S. 1725, Cong. Tit. II § 203(a) (providing in original, unenacted bill that control of the production and transmission of electric energy "except in time of war or other emergency declared to exist by proclamation of the President, shall, as far as practicable, be by voluntary coordination"), *with* 16 U.S.C. § 824a(c)(1) (providing particularized, specific authorities and circumstances in which the authorities may be exercised).

In certain circumstances, the Department may require generation of electric power, and a utility may properly take steps at the facility to produce the power. It is commonplace in the electric sector for the federal regulator properly acting within its authority to cause effects in a state regulator's jurisdictional sphere, and vice versa. *See Elec. Power Supply Ass'n*, 577 U.S. at 281. But the federal regulator may neither directly regulate generation facilities nor impose requirements aimed at the facilities, even if nominally regulating within its sphere. *See id.* at 281–82; see also *Hughes*, 578 U.S. at 164–65. Such encroachment is impermissible, even in a real emergency or in a wrongly claimed one. *See Conn. Light & Power*, 324 U.S. at 530 ("Congress is acutely aware of the existence and vitality of these state governments. It sometimes

is moved to respect state rights and local institutions even when some degree of efficiency of a federal plan is thereby sacrificed."). Thus, the Department may not require generation that necessitates the utility taking steps reserved to state authority, such as building a new generating unit or refurbishing a broken one.

The Federal Power Act does not give the Department sweeping authority to order "all measures" needed to make a generation facility "available to operate." 16 U.S.C. § 824a(c)(1). Nowhere does the statute empower the Department to order "all" steps that may be needed to ensure Craig's availability, which could include repairs or modifications to physical facilities and other measures going far beyond electric power generation. Because the plant is at the end of its useful life, with years of forgone maintenance and capital expenditures, rendering it capable of meeting a short-term supply shortfall could essentially require rebuilding significant parts of the plant. *See* Ex. 2-175 at 13 (Tri-State and Platte River January Rehearing Request) (stating that the Craig Co-Owners have had to make "material physical changes to the plant, including repairing out-of-service equipment"). On its face, the Department's Order is *ultra vires*. The Order also contravenes the Federal Power Act's repeated direction to respect the states' authority over generating facilities, which includes the authority that Colorado exercised in providing and planning for Craig's closure. *See, e.g.,* COLO. REV. STAT. §§ 40-2-125.5 (requiring retail utilities to submit joint electric resource and clean energy plans for Colorado Commission approval), 40-2-137 (allowing investor-owned utilities to submit resource portfolios that retire existing electric generating facilities), 40-2-134 (requiring wholesale electric cooperatives to submit electric resource plans for Colorado Commission approval); *see also* 4 COLO. CODE REGULS. 723–3:3600–723–3:3619; 40 C.F.R. § 51.308 (providing states' requirements and authority under the regional haze program). The Order, therefore, is unlawful and should be withdrawn.[11]

2. *The Department Lacks Jurisdiction to Disallow Treatment of Craig as a Capacity Resource.*

The Order also includes an explicit instruction that "[b]ecause this order is predicated on the shortage of facilities for generation of electric energy and other causes, Craig Unit 1 shall not be considered a capacity resource." Order at 7. This instruction serves only to increase costs to customers, who will be required to procure duplicative capacity as a result. It is also illegal.

---

[11] A utility that takes steps outside of what section 202(c) authorizes—"temporary connections of facilities and such generation, delivery, interchange, or transmission of electric energy," 16 U.S.C. § 824a(c)(1)—cannot point to a Section 202(c) order as the basis for a right to recover those costs. *See id.* (providing for compensation or reimbursement to be paid based on just and reasonable terms for carrying out an authorized order).

Section 202(c) authorizes the Commission to "require by order . . . temporary connections of facilities and . . . generation, delivery, interchange, or transmission of electric energy," and then shields facilities who operate pursuant to a Section 202(c) order from liability for unavoidable violations of federal, state, or local environmental laws or regulations. 16 U.S.C. § 824a(c)(1), (3). Nowhere does the Act suggest that the Department may predetermine or override the reasoned decisions of FERC in its determination of whether just and reasonable wholesale rates require an operating resource to be considered a capacity resource. Indeed, the very nature of 202(c) orders, which are limited to emergencies involving extant resource shortfalls (in which, by definition, there are no alternative capacity resources that might be displaced by the ordered generation) suggests that capacity resource treatment is well outside the Department's 202(c) authority. There is simply no rational connection between the Order's instruction and the Department's limited authority to "order such temporary connections of facilities and such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest." 16 U.S.C. § 824a(c)(1).

The impropriety of this instruction is exacerbated by the Order's failure to tie it to any discernible purpose that would alleviate the purported emergency underlying the Order. The only explanation the Order offers for the instruction—essentially that Craig cannot be a capacity resource because the order does not deem it a capacity resource—is clearly circular. As a result, the true reasoning behind this instruction remains unclear—but one clear effect, particularly now that two of the Craig co-owners have joined SPP, is to prevent SPP from considering the continued existence of Craig as it works to ensure resource adequacy across its footprint. SPP's tariff requires that Load Responsible Entities in its region maintain adequate capacity to meet their Resource Adequacy Requirement, which is calculated by multiplying each entity's peak load projection by an SPP-determined Planning Reserve Margin.[12] The tariff also establishes clear procedures for calculating capacity contribution from all resources. Thus, the Order's elimination of capacity treatment for Craig prevents SPP from following its own tariff in the wake of Craig's continued operation.

The Department does not have authority under Section 202(c) to govern ratemaking matters. The Department of Energy Organization Act transferred only partial authorities of the Federal Power Commission to the Department, and transferred to the Federal Energy Regulatory Commission "the establishment, review, and enforcement of rates and charges for the transmission or sale of electric energy." 42 U.S.C. § 7172(a); *see* 42 U.S.C. subchapter IV, 42 U.S.C. § 7151(b).

---

[12] SPP Open Access Transmission Tariff, Att. AA, https://www.spp.org/spp-documents-filings/?id=18162.

The Order thus represents a significant and improper intrusion into FERC's authority to ensure that RTOs like SPP justly and reasonably ensure resource adequacy in their footprints. In particular, the Order undermines years of FERC's regulatory oversight of SPP's resource adequacy construct, as codified in SPP's FERC-approved tariff. It is within FERC's purview under Section 205 of the Federal Power Act to provide that oversight, 16 U.S.C. § 824d, and it is within SPP's purview to apply its own tariff in the first instance and decide whether Craig should be able to provide capacity to meet Resource Adequacy Requirements within SPP's FERC-approved resource adequacy construct, 18 C.F.R. § 35.1(e) ("No public utility shall . . . impose any classification, practice, rule, [or] regulation . . . which is different from that provided in a rate schedule required to be on file with this Commission unless otherwise specifically provided by order of the Commission for good cause shown.").

The Department's intrusion into the oversight relationship between FERC and the RTOs also runs afoul of the filed-rate doctrine, which holds that "no change shall be made [in] any [approved] . . . rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public" in another filing with FERC. 16 U.S.C. § 824d(d); *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 829 (D.C. Cir. 2021). Interference in SPP's capacity accreditation procedures effectuates a de facto change to its tariff, without the legally required notice. And more generally, "Congress rejected a pervasive regulatory scheme for controlling the interstate distribution of power in favor of voluntary commercial relationships. . . . governed in the first instance by business judgment and not regulatory coercion." *Otter Tail Power*, 410 U.S. at 374. The Department's interference here in the core operational procedures of SPP's resource adequacy construct improperly upends that relationship.

The impact of the instruction on the Craig Co-owners that have not joined SPP is no more proper. Utilities that are not RTO members are still subject to FERC oversight, as are their resource adequacy determinations. Intruding into those utilities' efforts to follow FERC-approved processes to ensure resource adequacy similarly intrudes on FERC's authority. Additionally, to the extent the decree is directed to state and local officials who also regulate those utilities and provide oversight over their resource adequacy constructs, the Order violates the Tenth Amendment by commandeering state and local officials to implement a federal program. *See, e.g.*, *Printz v. United States*, 521 U.S. 898, 933 (1997).

More broadly, the Department's instruction disallowing SPP from including Craig in its resource adequacy planning suggests that it does not trust SPP and the Craig Co-Owners to accurately assess resource adequacy—the instruction would otherwise be unnecessary to maintain grid security, and therefore outside the Department's Section 202(c) authority. But the Order provides no evidence that either SPP or the non-SPP Craig Co-Owners cannot be trusted to ensure resource adequacy, so a

Department determination that they cannot be trusted would be arbitrary and capricious.

If left unchecked, this provision could impose completely avoidable cost increases on Colorado and SPP ratepayers, by forcing them to pay not only for the resources necessary to meet their own resource adequacy goals, but also for an additional resource, Craig, that the Department is forbidding from contributing to those resource adequacy goals. Even were there a valid emergency justifying the Order, this instruction induces wasteful and unnecessary investments and should be rescinded.

In short, including this instruction is yet another way in which the Department has misapplied the statute: its inclusion only further ensures that Craig's principal impact will not be to plug a gap but rather to sabotage the resource planning of the Craig Co-Owners and heighten cost burdens in a manner that does not serve the public interest.

*D. The Order Fails to Provide the Conditions Required Under Section 202(c) to Lessen Conflicts with Environmental Standards and Minimize Environmental Harm.*

Where an order "may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation," Section 202(c) imposes several requirements. 16 U.S.C. § 824a(c). The Department must "ensure" that the order "requires generation, delivery, interchange, or transmission of electric energy only during hours necessary to meet the emergency and serve the public interest." *Id.* The Department must also "ensure," "to the maximum extent practicable," that the order "is consistent with any applicable Federal, State or local environmental law or regulation." *Id.* Additionally, the Department must ensure that the order minimizes any adverse environmental impacts, regardless of the facility's compliance (or non-compliance) with environmental standards. *See id.*

*1. Legal Framework: Section 202(c) Further Limits the Department's Authority and Mandates Affirmative Steps to Maximize Environmental Compliance and Minimize Environmental Harm Where the Order "May Result in a Conflict" with a Federal, State, or Local Environmental Law or Regulation.*

The Federal Power Act obligates the Department to include precautions in a Section 202(c) Order where the order "may result in a conflict" with environmental laws or regulations. This is a forward-looking inquiry with a low threshold.[13]

---

[13] If actual noncompliance with environmental laws and regulations occurs to carry out the order, the statute provides a safe harbor. 16 U.S.C. § 824a(c)(3).

The word "may" in this context denotes a mere possibility, not a certainty. This is especially apparent when matched against the term "shall" used in Section 202(c)(2) and the other provisions added to Section 202(c) at the same time. *See* Fixing America's Surface Transportation Act of 2015, Pub. L. No. 114-94, 129 Stat. 1312 § 61002 (codified at 16 U.S.C. § 824a). Congress' use of the two disparate terms must be given effect. *See, e.g.*, *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) (discussing significance of the words "may" and "shall" in the same statutory provision).

Moreover, the consequences need not be "noncompliance" or "violation" of environmental law, both of which are terms Congress also used in 2015 when adding other provisions to Section 202(c). A potential "conflict" suffices. *Cf. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (explaining that courts find "conflict" in the preemption context where, for instance, a law or order "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). Taken together, anytime a Department order creates circumstances that might obstruct the accomplishment or execution of environmental laws or regulations, Section 202(c)(2) imposes duties on the Department to maximize compliance with the law and minimize adverse environmental effects.

Congress adopted the requirements of Section 202(c)(2) to address environmental issues arising in response to emergencies on the grid. Congress was well aware of environmental issues stemming from 202(c) orders when it imposed the requirements in Section 202(c)(2). *See, e.g.*, Rolsma, 57 Conn. L. Rev. at 807–09 (discussing prior incidents of tension between environmental requirements and responses to emergencies on the grid, and congressional hearings addressing the matter as part of the passage of Section 202(c)(2)). Congress struck a reasonable balance requiring that environmental concerns not be left by the wayside while the Department responds to actual emergencies. Rather than requiring the Department to engage in a probing review of environmental laws and permits at all levels of our federalist system before acting, Congress set a low threshold for imposition of the mandatory Section 202(c)(2) duties to minimize conflicts with state environmental laws and environmental harms flowing from a Section 202(c) order.

2. *The Order May Result in a Conflict with a Federal, State, or Local Environmental Law or Regulation.*

Here, the Department implicitly acknowledges the possible conflict. The Order is limited to a 90-day duration. Order at 8. That temporal limitation exists for a Section 202(c) order that may result in a conflict with environmental requirements. 16 U.S.C. § 824a(c)(4).

The evidence shows that the Order results in an actual conflict with state and federal environmental regulations: the provision in Colorado's federally-approved Clean Air Act State Implementation Plan ("SIP") that requires Craig to close on or

before December 31, 2025. 83 Fed. Reg. 31332 (July 5, 2018) (approving Colorado's SIP revision establishing Craig's closure date); Ex. 2-65 at 183 at § F.VI.D.1 (CDPHE Regulation No. 3) (Colorado Regulation No. 3 provision regarding Craig's closure, which EPA approved). This SIP provision addresses Colorado's legal obligations under the Clean Air Act's regional haze program, which Congress created to combat the negative effects of air pollution on visibility and treasured scenic vistas in federal "Class I" areas (i.e., listed national parks and wilderness areas). *See generally* 42 U.S.C. § 7491. Congress determined that these areas should enjoy the highest level of air quality and set a national goal of eliminating all human-caused visibility impairment. *Id.* §§ 7491(a)(1); 7472(a). Under the Clean Air Act and EPA's Regional Haze Rule, states must periodically revise their SIPs to continue making progress toward Congress's national visibility goal. *Id.* § 7491(b)(2); 40 C.F.R. § 51.308(b), (f), (g). Once EPA approves a state's SIP, it becomes enforceable under federal law. 42 U.S.C. § 7413(a)(1)–(2).

In developing its SIP for the regional haze first implementation period, Colorado determined that air pollution from the Craig Plant contributes to visibility impairment in several Colorado Class I areas, including (among others) Rocky Mountain National Park, Flat Tops Wilderness Area, Eagles Nest Wilderness Area, Mount Zirkel Wilderness Area, and Rawah Wilderness Area. Ex. 2-03 at 11 (Powers Decl.); Ex. 2-71 at 47–48 (BART CALPUFF). These areas are shown in Figure 23 below.

*Figure 23: Map of Colorado Class I Areas Affected by Visibility Impairment*




Source: Google Earth.

Colorado revised its air pollution control regulations and submitted a SIP revision to EPA in 2017, which established two compliance pathways for Craig: (1) closure by December 31, 2025; or (2) conversion to natural gas-firing by August 31, 2023, coupled with more stringent $NO_x$ emission limits. 83 Fed. Reg. 31332. EPA approved the SIP revision, thereby incorporating by reference the compliance requirements for Craig into the Code of Federal Regulations. *Id.* at 31333. The owners of Craig elected to

close the facility by December 31, 2025, and have not converted it to natural gas-firing. The closure deadline is also contained in Craig's air permit. Ex. 2-73 at 23 (Craig Station Operating Permit) (condition 1.10.1 of Craig air permit). Therefore, the Order's mandate for Craig to be available for operation through June 28, 2026 directly conflicts with state and federal environmental regulations.

In addition to flouting Craig's enforceable closure deadline, the Order may result in a conflict with other environmental requirements. Craig's air permit contains emission limits for $NO_x$, PM, and $SO_2$, pollutants that harm human health and contribute to haze formation. Ex. 2-03 at 11 (Powers Decl.); Ex. 2-73 (Craig Station Operating Permit) (sec. II of Craig air permit). The facility operates pollution control equipment to achieve compliance with those limits: ultra-low $NO_x$ burners with overfire air for $NO_x$ control; wet limestone scrubbers for $SO_2$ control; and pulse jet fabric filters (baghouse) for PM control. Ex. 2-03 at 11 (Powers Decl.). The air permit requires the facility to properly maintain and operate pollution control equipment to achieve compliance with emission limits and to minimize air pollution from the facility. *Id.* at 13. Failure to install, maintain, and operate these air pollution controls in a satisfactory manner can increase emissions, creating a risk that the facility will violate its emission limits. *Id.* at 9, 13–14. For example, over time, fly ash erodes and plugs the bags used in pulse jet fabric filters, causing the bags to degrade and potentially to rupture. *Id.* at 14. Regular bag replacement is necessary for satisfactory performance. *Id.* Similarly, wet limestone scrubbers often suffer from scale formation, poor utilization of reagent, and inadequate spray nozzle efficiency. *Id.* And ultra-low $NO_x$ burners can be degraded by erosion at the burner tip and wear in the coal pulverizers, requiring regular maintenance to minimize $NO_x$ in the boiler. *Id.* There is no information in the public record indicating that the pollution control equipment at Craig has been maintained in a manner that would support operational integrity and adequate emissions control performance beyond the facility's planned closure date. *Id.* at 14–15. Therefore, it cannot be assumed that Craig's pollution control equipment is in good working order and will operate reliably to control the facility's air emissions. *Id.* at 15.

3. *The Order Lacks the Conditions Required by Section 202(c).*

   i. *The Order Fails to Require Generation Only During Hours Necessary to Meet the Purported Emergency.*

The Order directly contradicts the Department's obligation to require generation "only during hours necessary to meet the emergency." 16 U.S.C. § 824a(c)(2). The Order instead states: "For the duration of this Order, SPP is directed to take every step to employ *economic dispatch* of Craig Unit 1 to *minimize costs* to ratepayers." Order at 7 (emphasis added). The "emergency" nominally described by the Order is the potential "loss of power to homes and businesses in the areas that may be affected by curtailments or power outages." *Id.* at 6. Even if the Department had substantiated that emergency (which it has not), the Act would allow the Department

to compel generation only when such losses would occur absent Craig's operation. 16 U.S.C. § 824a(c)(2).[14] "Economic dispatch," in sharp contrast, requires "the lowest-cost resources [to] run first," in pursuit of "the lowest-cost energy available." *City of New Orleans v. FERC,* 67 F.3d 947, 948–49 (D.C. Cir. 1995)*; see also Fla. Power & Light Co. v. FERC,* 88 F.3d 1239, 1241 (D.C. Cir. 1996) (noting distinction between economic dispatch and reserve capacity rules).

By instructing SPP to pursue economic dispatch, the Order's terms permit (indeed, direct) operation of Craig even when other—albeit potentially higher cost—resources are available that would prevent any "curtailments or outages"—that is, the claimed emergency. The Order's further instructions—limiting "operation of Craig Unit 1 to the times and within the parameters established in paragraph A," Order at 7—do not provide the necessary limitation either; they simply repeat that initial instruction without any further limitation.[15]

Moreover, a Department allowance for Craig to offer into SPP on a must run basis, *see generally* DOE Order No. 202-25-7B at P 59, also violates the Department's obligations under Section 202(c)(2). Such allowance fails to ensure generation only during hours needed to meet the claimed emergency. Even Secretary Wright has recognized the waste and cost associated with such an approach:

> [W]hen I hear politicians say we just need more electrons on the grid, no we don't. No we don't. It's the middle of the day and the weather is mild. . . . It just means we send subsidy checks to those generators and we tell the other generators turn down because we're mailing subsidy

[14] *See, e.g.*, Ex. 2-14 at 9 (DOE Order No. 202-17-4 Summary of Findings) ("authorizing operation of" units subject to emergency order "only when called upon . . . for reliability purposes," according to "dispatch methodology" approved by the Department); *see also* Ex. 2-21 at 7 (Department Order No. 202-26-01) (authorizing specified entities "to direct [certain] backup generation resources . . . to operate as a last resort before declaring an Energy Emergency Alert (EEA) 3 (i.e., before firm load interruption) or during an EEA 3"); Ex. 2-22 at 7 (Department Order No. 202-26-01A) (authorizing specified entities "to direct [certain] backup generation resources . . . to operate after ERCOT deploys all available market services, except for frequency responsive services, before declaring an Energy Emergency Alert (EEA) 3 (i.e., before firm load interruption) or during an EEA 3"); *cf.* Ex. 2-23 at 3 (Department Order No. 202-26-03) ("In the event that ISO-NE determines that generation from the Specified Resources is necessary to meet the electricity demand that ISO-NE anticipates in its service territory, I direct ISO-NE to dispatch such unit or units and to order their operation only as needed to maintain reliability.").

[15] That direction further fails to conform to the statute's command to compel only the generation that will "best meet the emergency." 16 U.S.C. § 824(c)(1).

checks to these generators. . . . Giving me extra electricity when I don't need it is just an extra cost.

*Secretary Wright Remarks on Affordability and Reliability of Electricity Grid*, YouTube, timestamps at 4:30 and 15:00 (Feb. 6, 2026), https://www.youtube.com/watch?v=pRi38SJkHPQ.

*ii. The Order Fails to Ensure Maximum Practicable Consistency with Environmental Rules and to Minimize Adverse Environmental Impacts.*

The Order further fails to "ensure" that Craig operates "to the maximum extent practicable" consistent with applicable environmental rules. Order at 7; 16 U.S.C. § 824a(c)(2). The Order paraphrases the statutory text—that "operations of Craig Unit 1 must comply with applicable environmental requirements . . . to the maximum extent feasible," but fails to specify *who* bears that responsibility or *what* such operation entails. Order at 7. It imposes no further conditions beyond stating that the Order provides no relief from any obligation to "pay fees, or purchase offsets or allowances for emissions." *Id.* The direction to "comply . . . to the maximum extent feasible" is, as a result, wholly unenforceable; the Order provides no basis for the Department, or anyone else, to determine whether the plant is in fact complying or who might face the consequences of any failure to do so. *Cf.* Ex. 2-13 at 5–7 (DOE Order No. 202-22-4) (requiring, *inter alia,* reporting of "number and actual hours each day" of operation "in excess of permit limits or conditions," and information describing how generators met requirement to comply with environmental requirements to maximum extent feasible). As such, the Order does not meet the Department's statutory obligation to "*ensure*" the maximum feasible consistency with applicable environmental standards—an obligation that requires the Department to offer some discrete direction as to the plant's operations, rather than merely parroting the statutory text. 16 U.S.C. § 824a(c)(2) (emphasis added).

The most definitive way to maximize consistency with state and federal environmental laws and regulations would be to limit Craig's generation to only the hours necessary to address a "loss of power to homes and businesses" that would occur absent Craig's generation. That limitation would reduce air pollution that contributes to, among other things, visibility impairment in Colorado Class I areas, a problem the closure of Craig was intended to address pursuant to the Clean Air Act's regional haze requirements.

In addition, the Order fails to "minimize[] any adverse environmental impacts." 16 U.S.C. § 824a(c)(2). That mandate is textually and substantively distinct from the Department's (also unfulfilled) obligation to ensure maximum practicable compliance with environmental standards. *Id.*

The Order claims to minimize impacts by "limit[ing] operation of Craig Unit 1 to the times and within the parameters established in paragraph A." Order at 7. But Paragraph A states only that the Craig Co-Owners shall "take all measures necessary

to ensure that Craig Unit 1 is available to operate" at the direction of SPP, that SPP must "take every step to employ economic dispatch of Craig Unit 1 to minimize costs to ratepayers," and that the Co-Owners shall "comply with all orders from SPP related to the availability and dispatch of Craig Unit 1." *Id.* at 7.[16] Instructions demanding availability and economic dispatch have no rational relationship to a requirement to minimize environmental harm. And the Order includes no measures that would mitigate impacts when compliance with environmental standards proves impracticable—measures that have been routinely included in past orders. *See, e.g.*, Ex. 2-14 at 9 (DOE Order No. 202-17-4 Summary of Findings) (permitting non-compliant operation only during specified hours, and requiring exhaustion of "all reasonably and practically available resources," including demand response and identified behind-the-meter generation resources selected to minimize an increase in emissions); Ex. 2-13 at 7 (DOE Order No. 202-22-4) (requiring "reasonable measures to inform affected communities" of non-compliant operations).

The Order makes no attempt to minimize adverse environmental impacts. As stated above, the clearest way to minimize adverse environmental impacts would be to limit Craig's generation to only during hours necessary to address a "loss of power to homes and businesses" that would occur absent Craig's generation. Without that limitation, the Order allows Craig to emit air pollution during operations that are not needed to meet the Department's claimed (and unsupported) emergency. Craig is a significant emitter of $NO_x$, PM, $SO_2$, and $CO_2$. Ex. 2-03 at 11–13 (Powers Decl.). That air pollution is likely to harm human health and the environment and to adversely affect air quality in the state's widely visited national parks and wilderness areas. At a minimum, minimizing adverse environmental impacts would require verification of the good working order of Craig's pollution control equipment, given Tri-State's lack of investment in the unit in preparation for its intended closure. *Id.* at 13-15.

Moreover, the statute requires the Department to include sufficiently detailed reporting obligations to ascertain what impacts result from emergency operations; without such reporting, the Department has no ability to "ensure" that adverse impacts are minimized. *See, e.g.*, Ex. 2-24 at 5 (DOE Order No. 202-24-1) (requiring detailed data on emissions of pollutants). The Order here instead only requires "such additional information" as the Department, in the future, may (or may not) "request[] . . . from time to time." Order at 7. That possibility of future, unspecified

---

[16] To the extent the Order allows SPP to independently devise conditions limiting environmental impacts, that mere possibility, first, cannot satisfy the Department's own statutory obligation to "ensure" that its "order" minimizes environmental impacts (and limits hours to those necessary to meet the emergency, and mandates the maximum practicable compliance). 16 U.S.C. § 824a(c)(2). And even if it could, the Order requires Tri-State and the Co-Owners to "ensure that Craig Unit 1 is available to operate," Order at 7, a direction that is inconsistent with the statute's requirements to minimize the plant's adverse environmental impacts.

inquiry cannot satisfy the statute's demand that the Department "ensure" that its Order minimizes environmental impacts. 16 U.S.C. § 824a(c)(2).

#### *iii. There Is No Indication that the Department Has Conducted the Consultation Required by Section 202(c)(4)(B) or Adopted Conditions Resulting from Consultation.*

Finally, there is no indication in the Order or otherwise that the Department has, as Section 202(c)(4)(B) requires, "consult[ed] with the primary Federal agency with expertise in the environmental interest protected" by the laws with which the Order may conflict. 16 U.S.C. § 824a(c)(4)(B); *see* Order at 6–7. The Order serves as a renewal or re-issuance of the March Order; it claims an emergency exists in the Rocky Mountain assessment area and that "[t]he emergency conditions that necessitated the issuance of Order Nos. 202-25-14 and 202-26-21 continue." Order at 1, 3. But the Department has provided no evidence of consultation with any federal agency having expertise in the environmental interest protected by the laws and regulations with which the Order may conflict. *Cf.* Ex. 2-187 at 2 (Department Order No. 202-22-2 Amendment No. 1) (stating that "the Department consulted with EPA . . . and EPA did not request any additional conditions"); Ex. 2-188 at 2 (Department Order No. 202-22-1 Amendment No. 2) (same); Ex. 2-14 at 9–10 (Department Order No. 202-17-4 Summary of Findings) (including EPA consultation in public record). Nor is there any evidence of "[t]he conditions, if any, submitted" by EPA (or any other agency) following consultation, or "an explanation of [the Department's] determination" that such conditions "would prevent the [Order] from adequately addressing the emergency"—material that Section 202(c)(4)(B) requires the Department to make "available to the public." 16 U.S.C. § 824a(c)(4)(B); *see* Ex. 2-189 at 1 (Starfield Email to Hoffman) (made public by Department). If the Department has failed to consult and procure the required conditions, the Order is contrary to law. 16 U.S.C. § 824a(c)(4)(B). If the Department has received and declined conditions, but refused to disclose them or an explanation of why the Department does not believe any such conditions are necessary, that too is contrary to law. *Id.*

## VI. Request for Stay

Public Interest Organizations further move the Department for a stay of the Order until the conclusion of judicial review. 18 C.F.R. § 385.212.[17] The Department has the authority to issue such a stay under the Administrative Procedure Act and should do so where "justice so requires." 5 U.S.C. § 705. In deciding whether to grant a request for stay, agencies consider (1) whether the party requesting the stay will suffer irreparable injury without a stay; (2) whether issuing a stay may substantially harm

[17] Pursuant to Federal Power Act Section 313(c) and Rule 713(e) of the applicable rules, the filing of a request for rehearing does not automatically stay a Department Order. 16 U.S.C. § 825*l*(c); 18 C.F.R. § 385.713(e).

other parties; and (3) whether a stay is in the public interest. *Nken v. Holder*, 556 U.S. 418, 434, 436 (2010); *Ohio v. EPA*, 603 U.S. 279, 291 (2024); *see, e.g.*, *Midcontinent Indep. Sys. Operator, Inc.*, 184 FERC ¶ 61,020, at P 41 (2023); *ISO Eng. Inc.*, 178 FERC ¶ 61,063, at P 13 (2022), *rev'd on other grounds sub nom. In re NTE Conn., LLC*, 26 F.4th 980, 987–88 (D.C. Cir. 2022).

Injuries under this standard must be actual, certain, imminent, and beyond remediation. *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *ANR Pipeline Co.*, 91 FERC ¶ 61,252, at 61,887 (2000); *City of Tacoma*, 89 FERC ¶ 61,273, at 61,795 (1999) (recognizing that, absent a stay, options for "meaningful judicial review would be effectively foreclosed"). Financial injury is only irreparable where no "adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Wis. Gas Co.*, 758 F.2d at 674 (*quoting Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)); *see also In re NTE Conn., LLC*, 26 F.4th 980, 991 (D.C. Cir. 2022). Environmental injury, however, "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

Under those standards, a stay of the Order is appropriate.

*A. Intervenors Will Suffer Irreparable Harm Without a Stay of the Order.*

A stay is necessary to protect Public Interest Organizations, their members, and the public from harm from continued coal-fired power operations at Craig caused by the Department's Order. As noted *supra* sec. IV.B.3, Craig emits health- and environment-harming air pollutants like $NO_x$, PM, $SO_2$, and VOCs. In just three months, Craig could emit over one million pounds of $NO_x$, hundreds of thousands of pounds of $SO_2$, and thousands of pounds of PM. Ex. 2-03 at 12–13 (Powers Decl.). Air pollution from Craig is harmful to human health, and these harms would not occur if the plant shut down. *Id.* These air pollutants also contribute to visibility impairment at several national parks and wilderness areas in Colorado, including Rocky Mountain National Park, Flat Tops Wilderness Area, Eagles Nest Wilderness Area, Mount Zirkel Wilderness Area, and Rawah Wilderness Area. *See supra* sec. V.D.2. The health and environmental harms from this pollution flow directly from the Department's Order and are actual, specific, and imminent, and can be deadly. *See, e.g.*, Ex. 2-121 at 2–3 (Mercury Mortality Risks of Coal); Ex. 2-123 at PDF 5–6 (EPA COBRA Health Effects Estimate); Ex. 2-160 at PDF 2–3 (Clean Air Task Force Toll from Coal).

Additionally, without a stay, the Order creates other injuries, too. It needlessly forces the Craig Co-Owners to divert attention and investment dollars away from

their electric resource and clean energy plans, thereby denying Public Interest Organizations' members the benefits of Colorado and other state energy policies designed to benefit them and the public. *See supra* secs. V.A.2, V.A.5. In addition, in forcing ratepayers to pay for the availability and generation of a coal-burning facility that the State, stakeholders, and operator want to close, the Department's Order jeopardizes the diversification of generating resources that the Department itself has said increases grid reliability and will also inherently and unjustifiably add to ratepayer costs. Ex. 2-122 at PDF 2–3 (*Energy Reliability and Resilience*); Ex. 2-175 at 31 (Tri-State and Platte River January Rehearing Request) (explaining how "the Order fails to consider how mandating Craig Unit 1's continued operation interferes with [Tri-State and Platte River's] ability to invest in other generation capacity" and stating that, due to transmission constraints, "Craig Unit 1's continued operation could interfere with the ability of new alternatives like Axial Basin to provide economic power to the grid"). As ratepayers, Public Interest Organizations and their members will ultimately bear the costs of keeping this unnecessary coal plant online. Ex. 2-175 at 2 (Tri-State and Platte River January Rehearing Request) (describing the costs to Tri-State's members and Platte River's communities); Ex. 3-06 at 14, 16-17, 20, 22 (Tri-State and Platte River April Rehearing Request) (same); Ex. 2-176 at 4–5 (Xcel Motion to Intervene in Petition for Rehearing) (stating that the co-owners have incurred "substantial additional operations, maintenance, and fuel costs," that Xcel's share of those costs was approximately $100,000 as of April 2026, and that Xcel intends to seek cost recovery).

*B. A Stay Would Not Result in Harm to Any Other Interested Parties.*

No other interested parties would be harmed by a stay. The issuance of a stay would not harm end-use electricity consumers because the lack of an actual emergency means that a stay would not disrupt the provision of electricity. *See, e.g.*, *supra* sec. V.A. Furthermore, because the Craig Co-Owners have already planned for the plant's closure and continue to plan for resource adequacy, *see supra* secs. V.A.2, V.A.5, a stay would only have the effect of relieving them of the administrative, compliance, and planning burdens imposed by the Order. On the balancing of equities, there is therefore no meaningful countervailing harm that would follow from a stay.

*C. A Stay Is in the Public Interest Given the Significant Evidence Demonstrating There Is No Factual or Legal Support for the Order and Given the Harm It Produces to the Broader Public.*

There is no public interest served by the Order, and a stay will only benefit the public. First, the Order exceeds the Department's authority; it has provided no reasonable grounds to substantiate any near-term or imminent shortfall in electricity supply that would justify Craig's continued operation. *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their

existence and operations'") (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Second, the Order overrides Colorado's exercise of its "authority to choose [its] preferred mix of energy generation resources." *Citizens Action*, 125 F.4th at 239. By doing so, it unlawfully intrudes into states' reserved authority over in-state "facilities used for the generation of electric energy." 16 U.S.C. § 824(b)(1); *see Pac. Gas & Elec.*, 461 U. S. at 205 ("Need for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States."); *see also Hughes*, 578 U.S. at 154 (cleaned up) ("Under the [Federal Power Act], FERC has exclusive authority to regulate the sale of electric energy at wholesale in interstate commerce. . . . But the law places beyond FERC's power, and leaves to the States alone, the regulation of any other sale—most notably, any retail sale—of electricity."). And third, a stay would protect the broader public—beyond Public Interest Organizations and their members—from the onerous costs and dangerous pollution produced by Craig's unnecessary operation and availability.

## VII. Conclusion

For the reasons set forth above, the undersigned Public Interest Organizations respectfully request that the Department grant intervention in the proceedings over the Order; stay the Order; grant rehearing of the Order; rescind the Order (and any renewals of the Order); and allow Craig to retire.

Filed on July 24, 2026.

Submitted by:

*/s/ Robert Rigonan*
Robert Rigonan
311 S. Wacker Dr., Suite 1400
Chicago, IL 60616
rrigonan@earthjustice.org

Michael Lenoff
Jennifer Yun
1400 L St NW, Lobby 2, Unit 34117
Washington, DC 20005
(202) 660-0519
mlenoff@earthjustice.org
jyun@earthjustice.org

Leslie Coleman
Michael Hiatt
1125 17th Street, Suite 1010
Denver, CO 80202
lcoleman@earthjustice.org
mhiatt@earthjustice.org

*Counsel for Vote Solar,*
*350 Colorado, and Public Citizen*

*/s/ Matt Gerhart*
Matt Gerhart
Sierra Club Environmental Law Program
1536 Wynkoop St., Suite 200
Denver, CO 80202
matt.gerhart@sierraclub.org

Gregory E. Wannier
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org

*Counsel for Sierra Club*

*/s/ Ted Kelly*
Ted Kelly
Tomás Carbonell
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(202) 387-3500
tcarbonell@edf.org
tekelly@edf.org

*Counsel for Environmental Defense Fund*

Attachments:
Glossary of Terms
Index of Exhibits

## Glossary of Terms

| Shortened Term | Long Description |
|---|---|
| Department | Department of Energy or DOE |
| Order | Department of Energy Order No. 202-26-31 |
| December Order | Department of Energy Order No. 202-25-14 |
| March Order | Department of Energy Order No. 202-26-21 |
| Colorado Commission | Colorado Public Utilities Commission |
| Craig | Craig Unit 1 |
| Craig Co-Owners | The five co-owners of Craig Unit 1 |
| Craig Plant | The entire Craig facility |
| EPA | United States Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| NERC | North American Electric Reliability Corporation |
| Platte River | Platte River Power Authority |
| RTO | Regional Transmission Organization |
| SIP | Clean Air Act State Implementation Plan |
| SPP | Southwest Power Pool |
| Tri-State | Tri-State Generation and Transmission Association |
| WECC | Western Electricity Coordinating Council |
| Xcel | Public Service Company of Colorado or Xcel Energy |

INDEX OF EXHIBITS

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-01 | Current Energy Group January Report | Current Energy Group Report, *Resource Adequacy in the Mountain West* (Jan. 2026) | |
| 2-02 | Grid Strategies Resource Adequacy Report | Michael Goggins, Grid Strategies, *Craig Unit 1 is Not Needed for Electric Reliability* (Jan. 2026) | |
| 2-03 | Powers Decl. | Declaration of Bill Powers (Jan. 24, 2026) | Exhibits identified in Mr. Powers' declaration with a "1-" prefix are numbered here with a "2-" prefix. For instance, Exhibit 1-50 identified in Mr. Powers' declaration is numbered here as Exhibit 2-50. |
| 2-04 | Grid Strategies Costs Report | Michael Goggins, Grid Strategies, *The Economic Cost of a DOE Mandate for the Craig Unit 1 Coal-Burning Generator to Continue Operating* (Dec. 2025) | |
| 2-05 | Telos Resource Adequacy Report | Telos Energy, *Resource Adequacy Planning in Colorado* (2025) | |
| 2-06 | Tri-State December 2025 Press Release | Tri-State, *U.S. DOE Orders Tri-State to keep Craig Generating Station Unit Operating for Next 90 days* (Dec. 31, 2025) | https://tristate.coop/us-doe-orders-tri-state-keep-craig-generating-station-unit-operating-next-90-days |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-07 | NERC 2024 Long-Term Reliability Assessment | N. Am. Electric Reliability Corp., *2024 Long-Term Reliability Assessment* (July 11, 2025) | |
| 2-08 | NERC 2025-26 Winter Assessment | North American Electric Reliability Corp., *2025-2026 Winter Reliability Assessment* (Nov. 2025) | https://www.nerc.com/globalassets/our-work/assessments/nerc_wra_2025.pdf |
| 2-09 | 2024 Western Assessment of Resource Adequacy | WECC, *2024 Western Assessment of Resource Adequacy* (last visited April 21, 2026) | https://feature.wecc.org/wara/ |
| 2-10 | Cooke Email to Alle-Murphy | Email from Lot Cooke, DOE to Linda Alle-Murphy Re: Rehearing procedures for DOE Order No. 202-05-3 (Dec. 30, 2005) | https://www.energy.gov/oe/articles/question-and-answer-procedural-questions-application-rehearing-order-no-202-05-02?nrg_redirect=397676 |
| 2-11 | DOE Rehearing Procedures | U.S. Dep't of Energy, *DOE 202(c) Order Rehearing Procedures* (last visited June 17, 2025) | https://www.energy.gov/ceser/doe-202c-order-rehearing-procedures |
| 2-12 | Department 202(c) Webpage | U.S. Dep't of Energy, *DOE's Use of Federal Power Act Emergency Authority* (last visited April 27, 2026) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 2-13 | Department Order No. 202-22-4 | U.S. Dep't of Energy, Order No. 202-22-4 (Dec. 24, 2022) | https://www.energy.gov/sites/default/files/2022-12/PJM%20202%28c%29%20Order.pdf |
| 2-14 | Department Order No. 202-17-4 Summary of Findings | U.S. Dep't of Energy, Summary of Findings DOE Order No. 202-17-4 (Sept. 14, 2017) | https://www.energy.gov/sites/default/files/2017/09/f36/Order%20202-17-4%20Summary%20of%20Findings.pdf |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-15 | Department Order No. 202-02-1 | U.S. Dep't of Energy, Order No. 202-02-1 (Aug. 16, 2002) | https://www.energy.gov/sites/default/files/202%28c%29%20order%20202-02-1%20August%2016%2C%202002%20-%20CSC.pdf |
| 2-16 | Department Order No. 202-20-2 | U.S. Dep't of Energy, Order No. 202-20-2 (Sept. 6. 2020) | https://www.energy.gov/oe/articles/federal-power-act-section-202c-caiso-september-2020?nrg_redirect=454296 |
| 2-17 | Department Order No. 202-22-2 | U.S. Dep't of Energy, Order No. 202-22-2 (Sept. 4, 2022) | https://www.energy.gov/ceser/federal-power-act-section-202c-banc-september-2022 |
| 2-18 | Department Order No. 202-21-1 | U.S. Dep't of Energy, Order No. 202-21-1 (Feb. 14, 2021) | https://www.energy.gov/oe/articles/federal-power-act-section-202c-ercot-february-2021?nrg_redirect=364318 |
| 2-19 | FERC Energy Primer | FERC, *Energy Primer: A Handbook of Energy Market Basics* (Dec. 2023) (excerpt) | https://www.ferc.gov/media/energy-primer-handbook-energy-market-basics |
| 2-20 | Department Order No. 202-08-1 | U.S. Dep't of Energy, Order No. 202-08-1 (Sept. 14, 2008) | https://www.energy.gov/sites/prod/files/202%28c%29%20order%20202-08-1%20September%2014%2C%202008%20-%20CenterPoint%20Energy.pdf |
| 2-21 | Department Order No. 202-26-01 | U.S. Dep't of Energy, Order No. 202-26-01 (Jan. 24, 2026) | https://www.energy.gov/documents/order-no-202-26-01-ercot |
| 2-22 | Department Order No. 202-26-01A | U.S. Dep't of Energy, Order No. 202-26-01A (Jan. 25, 2026) | https://www.energy.gov/documents/amended-order-no-202-26-01a |
| 2-23 | Department Order No. 202-26-03 | U.S. Dep't of Energy, Order No. 202-26-03 (Jan. 25, 2026) | https://www.energy.gov/documents/order-no-202-26-03-iso-ne |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-24 | Department Order No. 202-24-1 | U.S. Dep't of Energy, Order No. 202-24-1 (Oct. 9, 2024) | https://www.energy.gov/sites/default/files/2024-10/Duke%20202%28c%29%20Order_100924%20FINAL_JMG%20signed.pdf |
| 2-25 | Omitted | | |
| 2-26 | NERC 2024 Reliability Report | NERC, *2024 State of Reliability* (June 2024) | |
| 2-27 | NERC 2025 Summer Reliability Assessment | NERC, *2025 Summer Reliability Assessment* (May 2025) | https://www.nerc.com/globalassets/programs/rapa/ra/nerc_sra_2025.pdf |
| 2-28a | 2019–24 NERC Summer Reliability Assessments | NERC, *Summer Reliability Assessments for 2019-2025* (compiled) | 2019 Reliability Assessment: https://www.nerc.com/globalassets/programs/rapa/ra/nerc_sra_2019.pdf<br>2020 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2020.pdf<br>2021 Reliability Assessment: https://nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC%20SRA%202021.pdf<br>2022 Reliability Assessment: n/a<br>2023 Reliability Assessment: https://www.nerc.com/globalassets/programs/rapa/ra/nerc_sra_2023.pdf<br>2024 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2024.pdf |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-28b | 2019–24 NERC Summer Reliability Assessments | NERC, *Summer Reliability Assessments for 2019-2025* (compiled) | 2019 Reliability Assessment: https://www.nerc.com/globalassets/programs/rapa/ra/nerc_sra_2019.pdf<br>2020 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2020.pdf<br>2021 Reliability Assessment: https://nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC%20SRA%202021.pdf<br>2022 Reliability Assessment: n/a<br>2023 Reliability Assessment: https://www.nerc.com/globalassets/programs/rapa/ra/nerc_sra_2023.pdf<br>2024 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2024.pdf |
| 2-28c | 2019–24 NERC Summer Reliability Assessments | NERC, *Summer Reliability Assessments for 2019-2025* (compiled) | 2019 Reliability Assessment: https://www.nerc.com/globalassets/programs/rapa/ra/nerc_sra_2019.pdf<br>2020 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2020.pdf<br>2021 Reliability Assessment: https://nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC%20SRA%202021.pdf<br>2022 Reliability Assessment: n/a<br>2023 Reliability Assessment: https://www.nerc.com/globalassets/programs/rapa/ra/nerc_sra_2023.pdf<br>2024 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/ |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| | | | Reliability%20Assessments%20DL/NERC_SRA_2024.pdf |
| 2-29 | Omitted | | |
| 2-30 | Winter Storm Elliott System Operations Inquiry | FERC, NERC, and Regional Entity Staff Report, *Inquiry into Bulk-Power System Operations During December 2022 Winter Storm Elliott* (Oct. 2023) | https://www.ferc.gov/media/winter-storm-elliott-report-inquiry-bulk-power-system-operations-during-december-2022# |
| 2-31 | PJM Elliott Report | PJM, *Winter Storm Elliott: Event Analysis and Recommendation Report* (July 17, 2023) | https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/20230717-winter-storm-elliott-event-analysis-and-recommendation-report.pdf?ref=blog.gridstatus.io |
| 2-32 | NARUC Coal Report | Phillip Graeter & Seth Schwartz, *Recent Changes to U.S. Coal Plant Operations and Current Compensation Practices*, Nat'l Assoc. of Regulatory Util. Commissioners (Jan. 2020) (excerpt) | https://www.osti.gov/servlets/purl/1869928 |
| 2-33 | IEA Flexibility Report | Colin Henderson, *Increasing the Flexibility of Coal-Fired Power Plants*, International Energy Agency Clean Coal Centre (Sept. 2014) (excerpt) | https://usea.org/sites/default/files/092014_Increasing%20the%20flexibility%20of%20coal-fired%20power%20plants_ccc242.pdf |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-34 | Secretary Wright's West Virginia Remarks | Charles Young, *Energy Secretary Chris Wright: Future of U.S. Coal is 'long and bright'*, West Virginia News (July 5, 2025) | https://www.wvnews.com/news/wvnews/energy-secretary-chris-wright-future-of-u-s-coal-is-long-and-bright/article_948eb88e-2509-42a3-b985-07c47f1ee151.html |
| 2-35 | July Resource Adequacy Report | U.S. Dep't of Energy, *Resource Adequacy Report: Evaluating the Reliability and Security of the United States Grid* (July 2025) | https://www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%20Report%20%28FINAL%20JULY%207%29.pdf |
| 2-36 | Energy Emergency EO | Exec. Order No. 14,156, 90 Fed. Reg. 8433, Declaring a National Energy Emergency (Jan. 29, 2025) | https://www.federalregister.gov/documents/2025/01/29/2025-02003/declaring-a-national-energy-emergency |
| 2-37 | Grid EO | Exec. Order No. 14,262, 90 Fed. Reg. 15521, Strengthening the Reliability and Security of the U.S. Electric Grid (Apr. 14, 2025) | https://www.federalregister.gov/documents/2025/04/14/2025-06381/strengthening-the-reliability-and-security-of-the-united-states-electric-grid |
| 2-38 | NY Times Coal Article | Brad Plumer & Mira Rojanasakul, *Trump Signs Orders Aimed at Reviving a Struggling Coal Industry*, NY Times (Sept. 3, 2025) | https://www.nytimes.com/2025/04/08/climate/trump-order-coal-mining.html |
| 2-39 | DOE July 7 Press Release | U.S. Dep't of Energy, *Department of Energy Releases Report on Evaluating U.S. Grid Reliability and Security* (July 7, 2025) | https://www.energy.gov/articles/department-energy-releases-report-evaluating-us-grid-reliability-and-security |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-40 | PIOs' RFR of July Resource Adequacy Report | *Motion to Intervene and Request for Rehearing of Nat. Res. Def. Council, the Ecology Ctr., Envtl. Def. Fund, Envtl. Law and Pol'y Ctr., Pub. Citizen, Sierra Club, and Vote Solar*, U.S. Dep't of Energy Resource Adequacy Report (Aug. 8, 2025) | https://sustainableferc.org/wp-content/uploads/2025/08/2025-08-06_NRDC-et-al-Request-for-Rehearing-DOE-Resource-Adequacy-Report.pdf |
| 2-40a | Department's Response to PIOs' RFR of July Resource Adequacy Report | Letter from Tina Francone, Acting Director, Grid Deployment Office, Dep't of Energy, to Caroline Reiser et al., Nat. Res. Def. Council, RE: August 8, 2025 Submission (Sept. 5, 2025) | |
| 2-41 | Inst. Pol'y Integrity Report | Jennifer Danis, Christopher Graf & Matthew Lifson, *Enough Energy: A Review of DOE's Resource Adequacy Methodology*, Inst. Pol'y Integrity (July 2025) | https://policyintegrity.org/files/publications/IPI_EnoughEnergy_FinalReport.pdf |
| 2-42 | GridLab Report | Ric Oconnell, *GridLab Analysis: Department of Energy Resource Adequacy Report*, GridLab (July 11, 2025) | https://gridlab.org/gridlab-analysis-department-of-energy-resource-adequacy-report/ |
| 2-43 | Duke University Rethinking Load Growth Study | Tyler H. Norris et al., *Rethinking Load Growth: Assessing the Potential for Integration of Large* | https://nicholasinstitute.duke.edu/sites/default/files/publications/rethinking-load-growth.pdf |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| | | *Flexible Loads in US Power Systems*, Duke University Nicholas Institute for Energy, Environment & Sustainability (2025) | |
| 2-44 | RMI Analysis of Coal Plants' Threats to Reliability | Gabriella Tosado, Ashtin Massie & Joe Daniel, RMI, *Reality Check: We Have What's Needed to Reliably Power the Data Center Boom, and It's Not Coal Plants* (Aug. 12, 2025) | https://rmi.org/reality-check-we-have-whats-needed-to-reliably-power-the-data-center-boom-and-its-not-coal-plants/ |
| 2-45 | Energy Innovation Report | Eric G. Gimon, *Dodging the Firm Fixation for Data Centers and the Grid*, Energy Innovation (Nov. 2025) | https://energyinnovation.org/wp-content/uploads/Dodging-the-Firm-Fixation-for-Data-Centers-and-the-Grid.pdf |
| 2-46 | R Street Institute Commentary: DOE "Zombies" Are Eating Competitive Power Markets | Michael Giberson, *Low-Energy Fridays: DOE "Zombies" Are Eating Competitive Power Markets*, R Street (Nov. 13, 2025) | https://www.rstreet.org/commentary/low-energy-fridays-doe-zombies-are-eating-competitive-power-markets/ |
| 2-47 | Palgrave Handbook | Manfred Hafner & Giacomo Luciana, *Palgrave Handbook of International Economics*, Palgrave Macmillan (2022) (excerpt) | https://link.springer.com/book/10.1007/978-3-030-86884-0 |
| 2-48 | IEA Report | International Energy Agency, *The role of CCUS in low-carbon power systems* (July 17, 2020) (excerpt) | https://www.iea.org/reports/the-role-of-ccus-in-low-carbon-power-systems |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-49 | Tri-State Revised 2020 ERP Assessment of Existing Resources | Tri-State, *ERP Assessment of Existing Resources* (Aug. 3, 2020) | |
| 2-50 | Insgold 2023 ERP Direct Testimony | Barry Insgold, *Direct Test., Rev. 1* (Dec. 1, 2023) | |
| 2-51 | Tri-State 2020 ERP | Tri-State, *2020 ERP* (Dec. 1, 2020) | |
| 2-52 | 2023 Colorado Water Plan | Colo. Water Conservation Bd., *Colorado Water Plan* (2023) | |
| 2-53 | Colorado Sun Article | Brittany Peterson and Jennifer McDermott, *In Colorado town built on coal, some families are moving on, even as Trump tries to boost industry* (Dec. 8, 2025) | https://coloradosun.com/2025/12/08/colorado-coal-transition-jobs/ |
| 2-54 | PacifiCorp FERC Form 1 | PacifiCorp, *FERC Form 1* (April 14, 2025) | |
| 2-55 | Platte River Power Authority Coal Energy | Platte River Power Authority, *Coal Energy* | https://prpa.org/generation/coal/ |
| 2-56 | Xcel FERC Form 1 | Public Service Company of Colorado, *FERC Form 1* (April 4, 2025) | |
| 2-57 | 2018 SIP Element Adopted | Docket No. EPA-R08-OAR-2018-0015, Environmental Protection Agency, *SIP Element Adopted* (April 26, 2018) | |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-58 | Lisa Tiffin 2020 ERP Direct Testimony | Colorado PUC Proceeding No. 20A-0528E, *Lisa Tiffin Direct Testimony* (December 1, 2020) | |
| 2-59 | Intertek Reliability Study | Intertek, *Update of Reliability and Cost Impacts of Flexible Generation on Fossil-fueled Generators* (May 12, 2020) | https://web.archive.org/web/20240620151239/https://www.wecc.org/Reliability/1r10726%20WECC%20Update%20of%20Reliability%20and%20Cost%20Impacts%20of%20Flexible%20Generation%20on%20Fossil.pdf |
| 2-60 | SRP Power Generation Sources | Salt River Project, *SRP Power Generation Sources*, (last visited Jan. 27, 2026) | https://www.srpnet.com/grid-water-management/grid-management/power-generation-stations |
| 2-61 | 2023 ERP Phase II Modeling Assumptions | Colorado PUC Proceeding No. 23A-0585E, Phase II Implementation Report, Attachment B, *Modeling Assumptions* (April 11, 2025) | |
| 2-62 | NERC Electrochemical Storage Study | NERC, *Energy Storage: Overview of Electrochemical Storage* (February 2021) | |
| 2-63 | GE LM6000 Information | General Electric, *Get to know the LM6000* (last visited Jan. 27, 2026) | https://www.gevernova.com/gas-power/products/gas-turbines/lm6000 |
| 2-64 | Tri-State SPP West Press Release | Tri-State, *Benefits of SPP RTO West participation highlighted in filing with Colorado PUC* (June 17, 2025) | https://tristate.coop/benefits-spp-rto-west-participation-highlighted-filing-colorado-puc |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-65 | CDPHE Regulation No. 3 | Colorado Department of Public Health and Environment, Colorado APCD, *Regulation No. 3, Part F, Sec. VI.D* (adopted December 15, 2016) | |
| 2-66 | Omitted | | |
| 2-67 | EPA $NO_2$ Information | U.S. EPA, *Basic Information about $NO_2$* (last visited Jan. 27, 2026) | https://www.epa.gov/no2-pollution/basic-information-about-no2 |
| 2-68 | EPA Sulfur Dioxide Information | U.S. EPA, *Sulfur Dioxide Basics* (last visited Jan. 27, 2026) | https://www.epa.gov/so2-pollution/sulfur-dioxide-basics |
| 2-69 | EPA PM Information | U.S. EPA, *Health and Environmental Effects of Particulate Matter (PM)* (last visited Jan. 27, 2026) | https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm |
| 2-70 | 2018 BART | Docket No. EPA-R08-OAR-2018-0015, Colorado APCD, *Best Available Retrofit Technology (BART) Analysis – Tri-State Craig Station Units 1 and 2* (April 26, 2018) | |
| 2-71 | BART CALPUFF | Colorado Department of Public Health and Environment, *BART CALPUFF Class I Federal Area Individual Source Attribution Visibility Impairment Modeling Analysis for Tri-State Generation &* | |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| | | *Transmission Association Craig Station Units 1 and 2 (Revised)* (Mar. 3, 2006) | |
| 2-72 | EPA Carbon Dioxide Information | U.S. EPA, *Carbon Dioxide Emissions* (last visited Jan. 27, 2026). | https://www.epa.gov/ghgemissions/carbon-dioxide-emissions |
| 2-73 | Craig Station Operating Permit | Colorado Department of Public Health and Environment, *Craig Station Operating Permit* (July 1, 2021) | |
| 2-74 | March 2025 Field Inspection Report | Colorado APCD, *Field Inspection Report – Craig Generating Station* (March 25, 2025) | |
| 2-75 | Tri-State 2023 ERP Phase I Report | Colorado PUC Proceeding No. 23A-0585E, Hearing Exhibit 101, Attachment LKT-1, *Tri-State 2023 Electric Resource Plan Phase I* (April 22, 2024) | |
| 2-76 | Power Engineering Fabric Filters Article | Power Engineering, *Real World Performance Results of Fabric Filters on Utility Coal-Fired Boilers* (August 1, 2012) | https://www.power-eng.com/environmental-emissions/real-world-performance-results/ |
| 2-77 | Power Engineering Wet-Limestone Scrubbing Article | Power Engineering, *Wet-Limestone Scrubbing Fundamentals* (August 1, 2006) | https://www.power-eng.com/operations-maintenance/wet-limestone-scrubbing-fundamentals/ |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-78 | Power Magazine Pulverizers Article | Power Magazine, *To optimize performance, begin at the pulverizers* (February 2007) | https://www.powermag.com/to-optimize-performance-begin-at-the-pulverizers/ |
| 2-79 | Riley Power Low NOx Burner Performance Article | Riley Power, *Advanced Erosion Protection Technology Provides Sustained Low NOx Burner Performance* (April 2024) | |
| 2-80 | Neundorfer Fabric *Filter Design* | Neundorfer, *Lesson 5 - Fabric Filter Design Review* (April 2016) | |
| 2-81 | Norman Kapala 2021 Consumers IRP Direct Testimony | Michigan PSC Case No. U-21090, *Revised Direct Testimony* of Norman J. Kapala (October 2021) | |
| 2-82 | 2011 BART | Docket No. EPA-R08-OAR-2011-0770, Colorado Department of Public Health and Environment, Air Pollution Control Division, *Best Available Retrofit Technology (BART) Analysis – Tri-State Craig Station Units 1&2* (March 26, 2012) | |
| 2-83 | 2025 EIA Form 923 | U.S. Department of Energy, *EIA Form 923, Page 4 Generator Data* (2025) | |
| 2-84 | 2024 EIA Form 923 | U.S. Department of Energy, *EIA Form 923, Page 4 Generator Data* (2024) | |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-85 | Colorado Commission Decision No. C23-0437 | Colorado PUC Proceeding No. 20A-0528E, *Decision No. C23-0437* (June 30, 2023) | |
| 2-86 | Tri-State 150-Day Implementation Report | Colorado PUC Proceeding No. 20A-0528E, *Tri-State's 150-Day Implementation Report* (2023) | |
| 2-87 | Tri-State 2023 ERP 120 Day Implementation Report | Colorado PUC Proceeding No. 23A-0585E, *Tri-State's 120-Day Implementation Report* (2025) | |
| 2-88 | Tri-State 2023 ERP Modeling Assumptions | Colorado PUC Proceeding No. 23A-0585E, Tri-State's Hearing Exhibit 101 LKT-1 - Attachment B - Public - *Modeling Assumptions* (2023) | |
| 2-89 | Tri-State 2025 ERP Annual Progress Report | Colorado PUC Proceeding No. 23A-0585E, *Tri-State's 2025 Annual Progress Report* (Dec. 1, 2025) | |
| 2-90 | Colorado Commission Decision No. C25-0612 | Colorado PUC Proceeding No. 23A-0585E, *Decision No. C25-0612* (August 26, 2025) | |
| 2-91 | Platte River 2020 IRP | Platte River Power Authority, *2020 Integrated Resource Plan* (2020) | |

| No. | Exhibit Name | Document Name | URL and Notes |
| --- | --- | --- | --- |
| 2-92 | Platte River 2024 IRP | Platte River Power Authority, *2024 Integrated Resource Plan* (2024) | |
| 2-93 | Xcel 2025 Near Term Procurement Report | Public Service Company of Colorado, *Near Term Procurement Report* (2025) | |
| 2-94 | Xcel 2024 JTS, Volume 2 Technical Appendix | Colorado PUC Proceeding No. 24A-0442E, Hearing Exhibit 101, Attachment JWI-2, *Volume 2 - Technical Appendix, Rev. 2* (Oct. 15, 2024) | |
| 2-95 | Colorado Commission Decision No. C25-0892 | Colorado PUC Proceeding No. 25V-0480E, *Decision No. C25-0892* (Dec. 10, 2025) | |
| 2-96 | Comanche Unit 2 Variance Petition | Colorado PUC Proceeding No. 25V-0480E, *Joint Petition* (2025) | |
| 2-97 | Colorado Commission Decision No. C25-0747 | Colorado PUC Proceeding No. 24A-0442E, Decision No. C25-0747 (November 6, 2025) | |
| 2-98 | PacifiCorp 2023 IRP Update | PacifiCorp, *2023 Integrated Resource Plan Update* (2024) | |
| 2-99 | PacifiCorp 2025 IRP | PacifiCorp, *2025 Integrated Resource Plan, Volume I* (Mar. 31, 2025) | |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-100a | Salt River Project 2023 IRP | Salt River Project, *Integrated System Plan* (2023) | |
| 2-100b | Salt River Project 2023 IRP | Salt River Project, *Integrated System Plan* (2023) | |
| 2-101 | Xcel Information Sheet on Colorado Energy Plan | Xcel, *Information Sheet on Colorado Energy Plan* (2019) | |
| 2-102 | Colorado Commission Decision No. C24-0052 | Colorado PUC Proceeding No.21A-0141E, *Decision No. C24-0052* (Jan. 23, 2024) | |
| 2-103 | 2025 Xcel ERP Annual Progress Report | Xcel, Colorado PUC Proceeding No. 21A-0141E, *2021 Electric Resource Plan & Clean Energy Plan Annual Progress Report* (Mar. 31, 2025) | |
| 2-104 | PacifiCorp 2015 IRP Update | PacifiCorp, *Integrated Resource Plan Update* (2015) | |
| 2-105 | PacifiCorp 2025 IRP | PacifiCorp, *Integrated Resource Plan* (2025) | |
| 2-106 | EIA Annual 2024 | EIA, *2024 EIA Annual* (2025) | |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-107 | EIA Annual 2019 | EIA, *2019 EIA Annual* (2021) | |
| 2-108 | UT Austin Article | University of Texas at Austin Energy Institute, *The History and Evolution of the US Electricity Industry* (2016) | https://energy.utexas.edu/sites/default/files/UTAustin_FCe_History_2016.pdf |
| 2-109 | PacifiCorp 2025 Oregon RFP | Oregon PUC Docket UM 2383, *PacifiCorp, PacifiCorp's Informational Filing* (2025) | |
| 2-110 | PacifiCorp 2024 URC RFP | PacifiCorp, *2024 Utah Renewable Communities Request for Proposals, "2024 URC RFP"* (2025) | |
| 2-111 | Western Energy Imbalance Market Webpage | CAISO, *Western Energy Markets, Western Energy Imbalance Market*, (last visited Jan. 27, 2026) | https://www.westernenergymarkets.com/western-energy-imbalance-market-weim |
| 2-112 | WEIS Southwest Power Pool | SPP, *Western Energy Imbalance Service Market*, (last visited Jan. 27, 2026) | https://spp.org/western-services/weis/ |
| 2-113 | Craig Station, AMD data 2020 through 2025 | EPA, Enforcement and Compliance History Online, *Air Pollutant Report*, (last visited April 21, 2026) | https://echo.epa.gov/air-pollutant-report?fid=110041086393 |
| 2-114 | Tri-State Members | Tri-State Gen. & Transm. Ass'n, Inc., *What It Means To Be a Member* (last visited Jan. 19, 2026) | https://tristate.coop/members |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-115 | Department Explainer on Balancing Authorities | Dep't of Energy, *How It Works: The Role of a Balancing Authority* (2022) | https://www.energy.gov/sites/default/files/2023-08/Balancing%20Authority%20Backgrounder_2022-Formatted_041723_508.pdf |
| 2-116 | EIA Explainer on Balancing Authorities | Sara Hoff, U.S. Energy Info. Admin., U.S. Dep't of Energy, *U.S. Electric System Is Made up of Interconnections and Balancing Authorities* (July 20, 2016) | https://www.eia.gov/todayinenergy/detail.php?id=27152 |
| 2-117 | NERC Emergency Operations | N. Am. Elec. Reliab. Corp., *EOP-011-4 Emergency Operations* (last visited Jan. 19, 2026) | https://www.nerc.com/globalassets/standards/reliability-standards/eop/eop-011-4.pdf |
| 2-118 | Department Press Release on Centralia Order | U.S. Dep't of Energy, *Energy Secretary Ensures Washington Coal Plant Remains Open to Ensure Affordable, Reliable and Secure Power Heading into Winter* (Dec. 17, 2025) | https://www.energy.gov/articles/energy-secretary-ensures-washington-coal-plant-remains-open-ensure-affordable-reliable-and |
| 2-119 | 2001 National Energy Policy | Nat'l Energy Pol'y Dev. Grp., *Reliable, Affordable, and Environmentally Sound Energy for America's Future* (May 16, 2001) | https://www.nrc.gov/docs/ml0428/ml042800056.pdf |
| 2-120 | Department Export Authorization EA-365-C (Oct. 21, 2025) | Research Power Corp., *Order No. EA-365-C* (Oct. 21, 2025) | https://www.energy.gov/gdo/ea-365-c-research-power-corporation |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-121 | Mercury Mortality Risks of Coal | *Particulate Pollution from Coal Associated with Double the Risk of Mortality than PM2.5 from Other Sources*, Harvard T.H. Chan Sch. of Pub. Health (Nov. 23, 2023) | https://hsph.harvard.edu/news/particulate-pollution-from-coal-associated-with-double-the-risk-of-mortality-than-pm2-5-from-other-sources/ |
| 2-122 | Energy Reliability and Resilience | U.S. Dep't of Energy, *Energy Reliability and Resilience* (webpage as of Oct. 21, 2025) | https://web.archive.org/web/20251021071021/https:/www.energy.gov/eere/energy-reliability-and-resilience |
| 2-123 | EPA COBRA Health Effects Estimate | Envtl. Prot. Agency, *COBRA Web Edition* (last visited Jan. 22, 2025) | Go to https://cobra.epa.gov/. In Step 1.A, select Colorado and "Moffat" county. In Step 1.B, select "Fuel Combustion: Industrial." In Step 1.C, input reduce SO2 by 335.43 tons and reduce NOx by 2,211.57 tons (based on Craig-specific data for annual emissions from 2024, available at https://campd.epa.gov/data/custom-data-download). In Step 1.C, also input reduce PM2.5 by 13 tons (based on Craig-specific 2020 National Emissions Inventory ("NEI") data for annual PM2.5 Filterable emissions, scaled by the ratio of Craig's 2024 SO2 and NOx emissions to their 2020 NEI SO2 and NOx emissions. NEI 2020 data is available at https://www.epa.gov/air-emissions-inventories/2020-national-emissions-inventory-nei-data). Use a 2% discount rate and run scenario. |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-124 | 2025 PacifiCorp Fact Sheet | PacifiCorp, "Just the Facts" (2025) | https://www.pacificorp.com/content/dam/pcorp/documents/en/pacificorp/about/PacifiCorp_Fact_Sheet.pdf |
| 2-125 | Service Area and Territory (Electric Power and Water) SRP | SRP, "Service Territory" (2025) | https://www.srpnet.com/about/service-area-territory |
| 2-126 | Xcel, List of Towns Receiving Electric Service in Colorado | Xcel, *Colorado Communities Served by Xcel Energy* (2024) | https://xcelnew.my.salesforce.com/sfc/p/#1U0000011ttV/a/8b000002Y8vy/cDTZ25fPv.NuR_sx_peANfpfaxL47xQXr7fhoTJZoOw |
| 2-127 | Who we serve - Platte River Power Authority | Platte River Power Authority, *Who We Serve* (last visited Jan. 26, 2026) | https://prpa.org/about-prpa/who-we-serve/ |
| 2-128 | Order No. 24-073_OR PUC on Pac 2023 IRP | Oregon PUC Docket LC 82, Order No. 24-073 (Mar. 19, 2024) | |
| 2-129 | Utah PSC on Pac 2023 IRP | Utah PUC Docket No. 23-035-10, Order (April 17, 2024) | |
| 2-130 | Idaho PUC on Pac 2023 IRP | Idaho PUC Docket PAC-E-23-10, Order No. 35977 (Oct. 31, 2023) | |
| 2-131 | FERC Western Energy Markets Explainer | Office of Public Participation, FERC, *Western Energy Markets Explainer* (last visited Jan. 2, 2026) | https://ferc.gov/OPP/western-markets-explainer |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-132 through 2-144 | Omitted | | |
| 2-145 | Western Pool Reserve Sharing Program | Western Power Pool, *Northwest Power Pool Reserve Sharing Program Documentation* (effective Oct. 1, 2025) | https://www.westernpowerpool.org/private-media/documents/NWPP_RSG_Program_Doc_-_RSGC_Approved_effective_10.1.2025.pdf |
| 2-146 | Western Frequency Response Sharing Group | Western Power Pool, Western *Frequency Response Sharing Group* (last visited Jan. 2, 2026) | https://www.westernpowerpool.org/about/programs/western-frequency-response-sharing-group |
| 2-147 | WRAP Tariff | Western Power Pool, *Western Resource Adequacy Program Tariff* (effective Mar. 16, 2025) | https://www.westernpowerpool.org/private-media/documents/WRAP_Tariff_Effective_3.16.25.pdf |
| 2-148 | WRAP Notice | Rebecca Sexton, *WPP Notice to WRAP Resource Adequacy Participants Committee*, Western Power Pool (last modified Oct. 31, 2025) | https://www.westernpowerpool.org/news/wpp-notice-to-wrap-resource-adequacy-participants |
| 2-149 | "About WECC" Webpage | Western Elec. Coordinating Council, *About WECC* (last visited Jan. 2, 2026) | https://www.wecc.org/about/about-wecc |
| 2-150 | NERC Rules of Procedure | N. Am. Elec. Reliab. Corp., *Rules of Procedure* (effective Nov. 28, 2023) | https://www.nerc.com/globalassets/who-we-are/rules-of-procedure/nerc-rop-effective-20231128_with-appendicies.pdf |
| 2-151 | WECC Contingency Reserve Whitepaper | Western Elec. Coordinating Council, *WECC-0142 BAL-002-WECC-3 Contingency* | https://www.nerc.com/globalassets/standards/approved-standards/bal/bal-002-wecc-3-cont.-rev.---req.-to-retire---white-paper---final_09162025.pdf |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| | | *Reserve Request to Retire* (Jan. 21, 2025) | |
| 2-152 | WECC Risk Factor Criteria | Western Elec. Coordinating Council, *WECC Risk Factor Criteria for Inherent Risk Assessment* (effective March 22, 2021) | https://www.wecc.org/sites/default/files/documents/program/2024/WECC%20Risk%20Factor%20Criteria%20for%20IRA.pdf |
| 2-153 | WECC Reliability Assessment Webpage | Western Elec. Coordinating Council, *Reliability Assessments* (last visited Jan. 2, 2026) | https://www.wecc.org/program-areas/reliability-planning-performance-analysis/reliability-assessments |
| 2-154 through 2-158 | Omitted | | |
| 2-159 | Email Correspondence with E3 | Email Thread Between Arne Olson, Energy and Envtl. Economics, Inc., and Brad Cebulko, Current Energy Group, Re: E3 NW RA study and Centralia (Dec. 31, 2025 to Jan. 9, 2026) | |
| 2-159a | E3's Attachment to Email Correspondence with E3 | E3's Attachment (in PDF form) to Email Thread in Ex. 1-159 | |
| 2-159b | E3's Attachment to Email Correspondence with E3 (as | E3's Attachment (as transmitted in Excel form) to Email Thread in Ex. 1-159 | |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| | transmitted in Excel form) | | |
| 2-160 | Clean Air Task Force Toll from Coal | Clean Air Task Force, *Toll from Coal* (last visited Jan. 23, 2025) | https://www.tollfromcoal.org/#/map/(title:6021//detail:6021//map:6021/CO) |
| 2-161 | SPP West Press Release | *Southwest Power Pool First RTO to Operate in Both Interconnections with Tariff Approval* (Mar. 20, 2025) | https://www.spp.org/news-list/spp-first-rto-to-operate-in-both-interconnections-with-tariff-approval/ |
| 2-162 | EIA Generating Unit Annual Capital and Life Extension Costs Analysis | EIA, Generating Unit *Annual Capital and Life Extension Costs Analysis* (2019) | https://www.eia.gov/analysis/studies/powerplants/generationcost/pdf/full_report.pdf |
| 2-163 | Trump Advisor Says Electricity Customers Pay for 202(c) Orders | Laura Sanicola, Barrons, *Who's Paying to Keep Coal Plant Alive? All Electricity Customers, Trump Advisor Says* (Jan. 14, 2026) | https://www.msn.com/en-us/money/markets/who-s-paying-to-keep-coal-plant-alive-all-electricity-customers-trump-advisor-says/ar-AA1UdRHI |
| 2-164 | Colorado Commission Decision No. C24-0052 | Colorado PUC Proceeding No. 21A-0141E, *Decision No. C24-0052* (2024) | |
| 2-165 | Colorado Commission Decision No. C25-0024 | Colorado PUC Proceeding No. 21A-0141E, *Decision No. C25-0024* (2025) | |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-166 | Tri-State January 2026 Press Release | Tri-State, *Tri-State Makes Craig Generating Station Unit 1 Available to Operate in Compliance with DOE Emergency Order* (Jan. 23, 2026) | https://tristate.coop/tri-state-makes-craig-generating-station-unit-1-available-operate-compliance-doe-emergency-order |
| 2-167 | SPP Markets+ Website | SPP, *Markets+* (last visited Jan. 27, 2026) | https://www.spp.org/marketsplus |
| 2-168 | Tri-State Extreme Weather Event Modeling Assumptions | Colorado PUC Proceeding No. 23A-0585E, 2023 ERP Phase II Implementation Report, Attach. B-5, *Extreme Weather Event Modeling Assumptions* | |
| 2-169 | Colorado PUC Press Release, Feb. 18, 2026 | Colorado PUC, "Colorado Public Utilities Commission Approves New Energy Resources for Xcel Energy" (Feb. 18, 2026) | https://puc.colorado.gov/press-release/colorado-public-utilities-commission-approves-new-energy-resources-for-xcel-energy |
| 2-170 | Colorado PUC Feb. 2026 Decision | Colorado PUC Proceeding No. 21A-0141E, Decision No. C26-0117 (Feb. 23, 2026) | |
| 2-171 | Colorado PUC March 31, 2026 Decision | Colorado PUC Proceeding No. 24A-0442E, Decision No. C26-0200 (Mar. 31, 2026) | |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-172 | Tri-State 2026 Annual Resource Adequacy Report | Colorado PUC Proceeding No. 26M-0028E, TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.'S NOTICE OF 2026 RESOURCE ADEQUACY ANNUAL REPORT (Mar. 17, 2026) | |
| 2-173 | 2024 NREL Lessons from Renewable Integration Studies | National Renewable Energy Laboratory, Maintaining Grid Reliability – Lessons from Renewable Integration Studies (Apr. 2024) | https://docs.nlr.gov/docs/fy24osti/89166.pdf |
| 2-174 | 2021 NREL North American Renewable Integration Study | National Renewable Energy Laboratory, The North American Renewable Integration Study: A U.S. Perspective (June 2021) | https://docs.nrel.gov/docs/fy21osti/79224.pdf |
| 2-175 | Tri-State and Platte River Request for Rehearing | Request for Clarification and for Rehearing of Tri-State Generation and Transmission Authority and Platte River Power Authority, *In re Craig Order No. 202-25-14* | https://tristate.coop/sites/default/files/PDF/Order%20No.%20202-24-14%20-%20Petition%20for%20Rehearing%20of%20Tri-State%20Generation%20and%20Platte%20River%20-%20FINAL%20COMBINED.pdf |
| 2-176 | Xcel Motion to Intervene in Petition for Rehearing | Motion for Leave to Intervene of Public Service Company of Colorado, Case Nos. 26-1059, 26-1060 (D.C. Cir.) | |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-177 | March 30, 2026 Colorado Sun Article | Michael Booth, *Life of coal burning Craig Unit 1 extended again by Trump administration* (Mar. 30, 2026) | https://coloradosun.com/2026/03/30/craig-coal-power-trump-administration-extension/ |
| 2-178 | NERC 2025 Long-Term Reliability Assessment | N. Am. Elec. Reliab. Corp., *2025 Long-Term Reliability Assessment* (Jan. 2026) | https://www.nerc.com/globalassets/our-work/assessments/nerc_ltra_2025.pdf |
| 2-179 | SPP Deficiency Response | SPP, Deficiency Response, FERC Docket No. ER24-2184-001 (Nov. 4, 2024), Accession No. 20241104-5148 | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20241104-5148&optimized=false&sid=dde6f58b-8031-46cf-8518-471a0e9356a3 |
| 2-180 | SPP RTO Expansion | SPP, *RTO Expansion* (last visited Apr. 17, 2026) | https://www.spp.org/western-services/rto-expansion/ |
| 2-181 | Department Press Release on March Centralia Order | U.S. Dep't of Energy, *Trump Administration Keeps Coal Plant Open to Ensure Affordable, Reliable and Secure Power in the Northwest* (Mar. 16, 2026) | https://www.energy.gov/articles/trump-administration-keeps-coal-plant-open-ensure-affordable-reliable-and-secure-power |
| 2-182 | Grid Strategies Analysis of NERC LTRA | Adria E. Brooke, Michael Goggin & John D. Wilson, *Review of NERC's 2025 Long-Term Reliability Assessment*, Grid Strategies (Mar. 5, 2026) | https://gridstrategiesllc.com/wp-content/uploads/FINAL-2025-LTRA-Review.pdf |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 2-183 | 2025 Western Assessment of Resource Adequacy | WECC, *2025 Western Assessment of Resource Adequacy* (last visited Apr. 20, 2026). | https://feature.wecc.org/2025wara/index.html |
| 2-184 | 2025 WARA Supplemental Information | WECC, *2025 Western Assessment Supplemental Information* (last visited Apr. 20, 2026) | https://feature.wecc.org/warasupplemental/index.html |
| 2-185 | Current Energy Group April Report | Current Energy Group Report, *Resource Adequacy in the Mountain West: Addendum* (Apr. 2026) | |
| 2-186 | Public Interest Organizations' January 2026 Rehearing Request | Sierra Club et al., *Motion to Intervene, Motion for Clarification and Request for Rehearing and Stay* (Jan. 28, 2026) | https://www.energy.gov/documents/motion-intervene-motion-clarification-and-request-rehearing-and-stay-sierra-club |
| 2-187 | Department Order No. 202-22-2 Amendment No. 1 | | https://www.energy.gov/sites/default/files/2022-09/Amendment%20No.%201%20to%20Order%20202-22-2%20sb%20A_S3%20Hogan.pdf |
| 2-188 | Department Order No. 202-22-1 Amendment No. 2 | | https://www.energy.gov/sites/default/files/2022-09/Amendment%202%20to%20Order%20202-22-1_FINAL_9.8.2022%20sb%20A_S3%20Hogan.pdf |
| 2-189 | Starfield email to Hoffman | Email from Lawrence Starfield, EPA to Patricia Hoffman, DOE Re: DOE section202(c) order (Sept. 11, 2017) | https://www.energy.gov/sites/default/files/2017/09/f36/2017-9-11%20EPA%20consultation%20renewal.pdf |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| 3-01 | Department Order No. 202-25-14B | | https://www.energy.gov/documents/order-addressing-arguments-raised-rehearing-202-25-14b |
| 3-02 | Queued Up: 2025 Edition | Rand, Joseph et al, Lawrence Berkeley National Laboratory, "Queued Up: 2025 Edition" (Dec. 2025) | https://eta-publications.lbl.gov/sites/default/files/2025-12/queued_up_2025_edition_12.15.2025.pdf |
| 3-03 | Business Models for Coal Plant Decommissioning | Lessick, Jennifer et al, Pacific Northwest National Laboratory, "Business Models for Coal Plant Decommissioning" (Aug. 2021) | https://www.pnnl.gov/main/publications/external/technical_reports/PNNL-31348.pdf |
| 3-04 | June 2026 Coal Recommissioning and Modernization Announcement | DOE, "Project Selections for Broad Agency Announcement DE-FOA-0003605, Restoring Reliability: Coal Recommissioning and Modernization (Topic 1)" (June 4, 2026) | https://www.energy.gov/hgeo/project-selections-broad-agency-announcement-de-foa-0003605-restoring-reliability-coal-0 |
| 3-05 | Public Interest Organizations' April 2026 Rehearing Request | Sierra Club et al., *Motion to Intervene, Motion for Clarification and Request for Rehearing and Stay* (Apr. 28, 2026) | https://www.energy.gov/documents/motion-intervene-motion-clarification-and-request-rehearing-and-stay-public-interest-11 |
| 3-06 | Tri-State and Platte River April | Request for Rehearing of Tri-State Generation and Transmission Association and Platte | https://www.energy.gov/documents/request-rehearing-tri-state-generation-and-transmission-association-and-platte-river |

| No. | Exhibit Name | Document Name | URL and Notes |
|---|---|---|---|
| | Rehearing Request | River Power Authority, *In re Craig Order No. 202-26-21* | |
| 3-07 | NERC 2026 Summer Reliability Assessment | North American Electric Reliability Corp., *2026 Summer Reliability Assessment* (May 2025) | https://www.nerc.com/globalassets/our-work/assessments/nerc_sra_2026.pdf |

# Exhibit C

**UNITED STATES OF AMERICA**
**Department of Energy**
Washington, DC 20585

Tri-State Generation and Transmission Association,
Platte River Power Authority, Salt River Project,
PacifiCorp, Xcel Energy Inc. and
Southwest Power Pool
Regarding Craig Station

Order No. 202-26-31A

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND PROVIDING FOR FURTHER CONSIDERATION
(August 24, 2026)

Rehearing has been timely requested of the Department of Energy's order issued on June 26, 2026, in the above-captioned matter.[1] Thirty (30) days having passed from the date on which rehearing requests were filed, the requests for rehearing are deemed denied by operation of law.[2]

As provided in 16 U.S.C. § 825*l*(a) and 16 U.S.C. § 824a(c), the requests for rehearing of the above-cited order may be addressed in a future order.[3]

Chris Wright
Secretary of Energy

[1] *Tri-State Generation & Transmission Ass'n*, DOE Order No. 202-26-31 (June 26, 2026) (regarding Craig Station).
[2] 16 U.S.C. § 825*l*(a).
[3] *Id.* (DOE may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper); 16 U.S.C. § 824a(c) (DOE may issue a supplemental order).